Andrew A. Harnisch, Esq. (SBN 024957)
Eric Moats, Esq. (SBN 037303)
**MAY POTENZA BARAN & GILLESPIE P.C.**
1850 N. Central Ave., Suite 1600
Phoenix, AZ  85004-4633
Telephone: (602) 252-1900
Facsimile:  (602) 252-1114
Email: aharnisch@maypotenza.com
          emoats@maypotenza.com

*Attorneys for UniCredit Bank Austria AG.*

## UNITED STATES DISTRICT COURT

## DISTRICT OF ARIZONA

| | |
|---|---|
| UniCredit Bank Austria AG, an Austrian company, <br>                   Plaintiff, <br>       v. <br> Inmobiliaria y Arrendadora Cuadro S.A. de C.V., a Mexican company; Zummit Plastics Inc., a Nevada corporation; Miguel Angel Peredo Luna, an individual; Maria de Los Angeles Luna Gale, an individual; Amalia Cecilia Luna Contreras, an individual; John Doe Contreras, an individual; ABC Corporations, 1-10; Black and White Partnerships, 1-10; XYZ Limited Liability Companies, 1-10; John Does, 1-10; Jane Does, 1-10, <br><br>    Defendants. | Case No. <br><br> **COMPLAINT** |

Plaintiff, UniCredit Bank Austria AG, an Austrian Company ("BA" or "Plaintiff"), files this Complaint against Inmobiliaria y Arrendadora Cuadro S.A. de C.V., a Mexican company ("IyAC"); Zummit Plastics Inc., a Nevada corporation ("Zummit"); Miguel Angel Peredo Luna and Maria de Los Angeles Luna Gale, husband and wife; and Amalia Cecilia Luna Contreras and John Doe Contreras, husband and wife; and ABC Corporations, 1-10; Black and

White Partnerships, 1-10; XYZ Limited Liability Companies, 1-10; John Does, 1-10; Jane Does, 1-10 (collectively, "Defendants"), and alleges as follows:

## PARTIES

**I.    Plaintiff**

1.    Plaintiff UniCredit Bank Austria AG is an Austrian company.

**II.    Individual Defendants**

2.    Miguel Angel Peredo Luna ("Mr. Peredo Luna" or "Miguel Peredo Luna"), upon information and belief, is the person in *de facto* control of IyAC and Zummit (collectively, the "Defendant Business Entities"); identifies himself as the Vice President of Operations of Zummit; and is a married man residing in Maricopa County, Arizona.

3.    Maria de Los Angeles Luna Gale is Miguel Peredo Luna's wife.

4.    The actions and omissions complained of herein were done by Mr. Peredo Luna on behalf of his marital community with Maria de Los Angeles Luna Gale and therefore their marital community is liable for the claims asserted against Mr. Peredo Luna herein.

5.    Amalia Cecilia Luna Contreras ("Ms. Luna Contreras"), upon information and belief, is the General Manager and controlling shareholder of IyAC; the President and Director of Zummit; and the mother of Mr. Peredo Luna, residing in Maricopa County, Arizona.

6.    Upon information and belief, John Doe Contreras is married to Ms. Luna Contreras.

7.    The actions and omissions complained of herein were done by Ms. Luna Contreras on behalf of her marital community with John Doe Contreras and therefore their marital community is liable for the claims asserted against Ms. Luna Contreras herein.

8.     Defendants John and Jane Does 1-10 represent unknown individuals who may be liable for the acts alleged herein.  The true names of these defendants are unknown to Plaintiff.  Plaintiff may request leave to amend this Complaint if and when the true names of these defendants are ascertained.

### III.    Defendant Business Entities

9.     IyAC is a Mexican company with assets and operations in Arizona.

10.    IyAC was established on March 8, 2006.

11.    The original shareholders of IyAC were Defendant Ms. Luna Contreras (52%), and Defendant Maria de Los Angeles Luna Gale (48%).

12.    Public commercial registry records in Mexico indicate that Defendant Ms. Luna Contreras currently is the general manager and 99% shareholder of IyAC.

13.    Public commercial registry records in Mexico indicate that other individuals authorized to act on behalf of IyAC under powers of attorney include Jose Antonio Montes Vera ("Mr. Montes"), Mr. Adrian Peredo Luna (Mr. Peredo's brother), and Ms. Gabriela Peredo Luna (Mr. Peredo's sister).

14.    The listed corporate address for IyAC is Avenida el Marques 39, Col. Parque Industrial Bernardo Quintana, El Marques 76246 Querétaro, Qro., Mexico,

15.    Zummit Plastics Inc. is a Nevada corporation with assets and operations in Arizona.

16.    Defendant Ms. Luna Contreras is President and Director of Zummit.

17.    Defendant Mr. Peredo Luna represents himself to be a Vice President of Operations of Zummit.

3

18.    Zummit's annual filings with the State of Arizona Corporation Commission for 2017, 2018 and 2019 identify its shareholder as "Fruma Plastics."

19.    Zummit occupies and operates a large plastic wrap manufacturing facility at 240 N. 48th Ave., Phoenix, AZ.

20.    Defendants ABC Corporations, 1-10, Black and White Partnerships, 1-10, and XYZ Limited Liability Companies, 1-10, represent unknown parties who may be liable for the acts alleged herein or hold assets transferred to them by Defendant Entities without due consideration. The true names of these defendants are unknown to Plaintiff. Plaintiff may request leave to amend this Complaint if and when the true names of these defendants are ascertained.

## **JURISDICTION AND VENUE**

21.    This Court has jurisdiction pursuant to 28 U.S.C. §§ 1332.

22.    Additionally, this Court has jurisdiction to recognize the arbitration award in favor of Plaintiff and against IyAC pursuant to 9 U.S.C. § 201, as Chapter 2 of the Federal Arbitration Act (9 U.S.C. §§ 1-16, 201–208, 301-307) ("FAA") implements the New York Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") and provides for federal court jurisdiction for the enforcement of international awards.

23.    An arbitral award issued in a Signatory State of the Convention is generally enforceable in the U.S., so long as the arbitration is of a commercial nature and either (i) at least one party is not a citizen of the U.S. or (ii) all parties are U.S. citizens but there is some reasonably relation with one or more foreign states.

4

24.    As neither party to the arbitration award is a U.S. citizen, jurisdiction is proper under the FAA and New York Convention.

25.    Venue is proper in this District pursuant to 28 U.S.C. §§ 1391 and 9 U.S.C. § 204.

## INTRODUCTION

26.    Defendant IyAC, a plastic film manufacturing company then located in Queretaro, Mexico, entered into contracts to purchase plastic-making equipment from SML Maschinenbaugesellschaft mbH ("SML"), an Austrian company.

27.    In 2018, IyAC obtained a €3,351,600 loan from Plaintiff to finance the purchase of certain SML equipment.

28.    Defendants represented to Plaintiff that Zummit was IyAC's 100%-owned subsidiary.

29.    The SML equipment was delivered to Zummit at its facility in Arizona.

30.    IyAC defaulted on the loan in April 2019 by failing to pay timely its first loan installment and thereafter failing to pay any more money due under the loan.

31.    In December of 2019, IyAC filed an international arbitration claim against Plaintiff in the approximate amount of €41.858M.

32.    IyAC's claim against Plaintiff was based on Plaintiff's alleged failure to provide IyAC an additional loan.

33.    In the arbitration proceeding, Plaintiff counterclaimed for the outstanding loan balance of €3,037,823.24 plus interest and costs.

34.    During the arbitration proceeding, IyAC's attorney advised the arbitrator that IyAC and Zummit had entered into a Memorandum of Understanding under which Zummit would acquire IyAC.

35.    The arbitrator issued an award dated March 21, 2021, dismissing IyAC's arbitration claim against Plaintiff and issuing to Plaintiff an award against IyAC in the approximate amount of €3.9M (for the loan balance and costs) plus interest.

36.    When Plaintiff's Mexican counsel thereafter sought to enforce Plaintiff's credit rights and attempted to effect service of process on IyAC at its facility in Mexico, it learned that IyAC had vacated the facility, leaving no equipment or other assets and no forwarding address.

37.    Subsequent investigation revealed that IyAC's financed acquisition of plastic-making equipment and its subsequent disappearance fit the pattern of prior transactions perpetrated by Mr. Peredo Luna and other related parties over many years.

38.    Specifically, on prior occasions, entities controlled by Mr. Peredo Luna (A) financed the purchase of plastic manufacturing equipment, (B) directed that the equipment be sent to, or transferred the equipment to, other entities which Mr. Peredo Luna also controlled, (C) defaulted after paying little or no portion of the financed purchase price, and (D) then went out of business, leaving no forwarding address and no assets which might serve as a source of recovery to creditors.

39.    Plaintiff did not know that IyAC and the other Defendants (as more specifically alleged below) had conspired to defraud it until its investigation following its Mexican counsel's finding IyAC's former facility vacant.

## GENERAL ALLEGATIONS

### I.    IyAC Purchases SML Equipment, Joint Venture with Zummit, and Purchase Agreement with Empaques

#### A.    Equipment Purchase

40.    On June 14, 2016, June 16, 2016, and June 10, 2017, IyAC entered into purchase agreements with SML for the delivery of specific types of plastic extrusion equipment (the "SML Equipment").

41.    IyAC's purchase of the SML Equipment was intended to be financed by two credit facilities ("Facility A" and "Facility B") to be provided by Plaintiff and delivered separately – one set of equipment (the "Facility A SML Equipment) to be financed by Facility A and the second set of equipment (the "Facility B SML Equipment") to be financed by Facility B.

42.    IyAC instructed SML to deliver the SML Equipment to Zummit (IyAC's supposedly 100%-owned subsidiary) at its facility in Phoenix, Arizona.

43.    The Facility A SML Equipment was delivered in 2018 to Zummit in Phoenix, Arizona.

**II.    IyAC and Plaintiff Enter into Loan Agreement**

44.    To finance the purchase of the SML Equipment, IyAC negotiated a credit facility with Plaintiff.

45.    Mr. Peredo Luna presented himself to Plaintiff as an authorized agent for IyAC.

46.    According to the Public Commercial Registry in Mexico, during the period during which IyAC and Plaintiff negotiated the loan facility, Mr. Peredo Luna was the General Manager of IyAC and held a general power of attorney.

47.    However, according to the Public Commercial Registry in Mexico, Mr. Peredo Luna's position as General Manager and authority to act on behalf of IyAC had been revoked by IyAC at a meeting held in November of 2014, the minutes of which were notarized in November of 2015 but not recorded with the Mexican public commercial registry until September 26, 2017 (years

after the revocation and only two weeks prior to IyAC's execution of the BA loan documents).

48.    Mr. Peredo Luna and other personnel providing information to Plaintiff on behalf of IyAC, and at Mr. Peredo Luna's direction, did so *via* email with domain names of various entities which, on information and belief, were then or had been previously controlled by Mr. Peredo Luna.

49.    To induce Plaintiff to extend the credit facility, Defendants made a series of representations to Plaintiff.

50.    Defendants represented that IyAC was the 100% owner of Zummit.

    a.    IyAC provided a series of entity organization charts showing, among other things, IyAC to have a 100% ownership interest in Zummit.

    b.    Ms. Luna Contreras signed a number of these entity organization charts.

51.   For instance, in July 2017, Mr. Peredo Luna provided Plaintiff with the following entity organization chart, signed and dated by Ms. Luna Contreras, regarding IyAC's organizational structure,



52.   The chart lists Inmobiliaria y Arrendadora **Grupo**, Mexico, an entity that, upon information and belief, does not, nor ever has, existed.

53.   Plaintiff asked Mr. Peredo Luna about the discrepancy between use of the names "Inmobiliaria y Arrendadora **Cuadro**" (*i.e.*, IyAC) and "Inmobiliaria y Arrendadora **Grupo**" (emphasis supplied).

54.   Mr. Peredo Luna stated that Inmobiliaria y Arrendadora Grupo is "like our dba (Comercial [*sic*] name)."

55.   Based on Mr. Peredo Luna's statement that Inmobiliaria y Arrendadora Grupo was a dba for IyAC, the organization chart represented that Zummit is 100% owned by IyAC.

56.   On information and belief, the representations by Defendants Mr. Peredo Luna, Ms. Luna Contreras, and IyAC concerning IyAC's purported 100% ownership of Zummit were false and made with the intent that Plaintiff rely upon them, which it did.

57.   Zummit's annual filings with the State of Arizona for 2017, 2018 and 2019 states that "Fruma Plastics" was Zummit's shareholder.

58.   Defendants IyAC and Mr. Peredo Luna provided financial information about IyAC.

59.   Audited financial statements IyAC provided to Plaintiff are for "Inmobiliaria y Arrendadora **Grupo"** but per Mr. Peredo Luna's assertion, and as confirmed by the auditor who prepared the statements, this was understood to be a dba for, and refer to, IyAC.

60.   On information and belief, IyAC's financial information provided by Mr. Peredo Luna and IyAC were false and made with the intent that Plaintiff rely upon them, which it did.

61.   In October of 2017, IyAC's finance officer, Mr. Montes was granted a special power of attorney to sign the credit documents with Plaintiff.

62.   IyAC, by Mr. Montes, signed an *Export Credit Facility Agreement*, dated October 10, 2017 (the "Credit Agreement") and a promissory note dated November 6, 2017 (the "Promissory Note").

63.   Plaintiff countersigned the Credit Agreement on January 10, 2018, and by letter dated February 23, 2018 from Plaintiff to IyAC, Plaintiff declared the facility to be open.

64.   Plaintiff's loan to IyAC was insured by the Austrian credit insurance agency, OeKB.

65.    The Credit Agreement contemplated Plaintiff making available to IyAC two loan facilities: Facility A in the amount of €3,351,600 and Facility B in the amount of €3,145,500.

66.    Both facilities were intended to finance the acquisition of SML Equipment to be delivered to and used by Zummit.

### III.    IyAC Enters Contracts in Contemplation of Acquiring the SML Equipment

67.    In anticipation of obtaining the SML Equipment, IyAC purportedly entered into two agreements.

#### A. Joint Venture Agreement

68.    On September 15, 2017 (nine days after Zummit's incorporation and prior to execution of the Credit Agreement), IyAC and Zummit purportedly entered into a Joint Venture Agreement (the "JVA") with one-another.

69.    The person signing for IyAC was Mr. Montes, and the person signing for Zummit was Mr. Peredo Luna.

70.    Under the JVA, IyAC agreed to contribute the SML Equipment valued at approximately €7.2M to the venture, and Zummit agreed to obtain a real estate facility in Arizona for the SML Equipment.

71.    The parties agreed that venture profits from the Arizona joint venture would be split 70% to Zummit and 30% to IyAC.

72.    The JVA did not define how "profit" was to be determined.

73.    The JVA provided that in the event of a breach, the breaching party would pay the other a $5 million penalty.

74.    The JVA did not define what would constitute a breach, nor provide any opportunity to cure.

11

75.    The JVA further provided for IyAC to collaterally assign to Zummit 1,000,000 shares in Zummit to secure its (IyAC's) contingent liability to Zummit in the event IyAC breached the JVA.

76.    There was no reciprocal collateral pledge by Zummit to IyAC.

77.    Zummit's Articles of Incorporation authorized the issuance of 1,000,000 shares, and accordingly, the collateral pledge was for 100% of Zummit.

78.    Accordingly, if Zummit executed upon the IyAC's collateral pledge of its 1,000,000 shares in Zummit, Zummit would own 100% of itself.

79.    On November 12, 2019, Zummit issued a default letter to IyAC notifying it that it considered IyAC to be in breach of the JVA because IyAC "failed to provide evidence of the adquisition [*sic*]" of the SML Equipment it was required to provide under the JVA.

80.    Zummit's default letter also advised IyAC that Zummit would "keep possession and ownership of the shares title certificate pledged since the joint venture contract was signed ..." (*i.e.*, the 1,000,000 shares of Zummit pledged to Zummit by IyAC).

81.    Zummit's default letter also demanded that IyAC pay Zummit the penalty amount of $5 million.

82.    Plaintiff was unaware of the JVA until IyAC's arbitration claim in December of 2019.

### B. Private Purchase Agreement

83.    On January 15, 2018, IyAC purportedly entered into a Private Purchase Agreement (the "PPA") with Empaques Poliplasticos S.A. de C.V. ("Empaques").

84.    Under the PPA, IyAC agreed to sell and Empaques agreed to buy 30 million pounds of plastic wrap per year at a price of $1 per pound for five years, beginning in 2021.

85.    The PPA provided that on a monthly basis, IyAC could adjust the price per pound.

86.    The PPA provided that in the event of a breach, the breaching party would be required to pay a penalty to the non-breaching party in the amount of $30 million.

87.    The PPA did not define what would constitute a breach, nor provide any opportunity to cure.

88.    The PPA, although entered into between two Mexican entities and providing for any dispute under the agreement to be governed by Mexican law and adjudicated in a Mexican venue, was written in English.

89.    As a result of Plaintiff's refusal to disburse Facility B, IyAC claimed it could not fulfill its obligations to Empaques under the PPA.

90.    On October 25, 2019, Empaques issued a default letter to IyAC stating that IyAC had breached the PPA and demanded payment of a $30 million penalty.

91.    Plaintiff was unaware of the PPA until IyAC's arbitration claim in December of 2019.

**IV.    Defendant Defaults on Facility A**

92.    Plaintiff disbursed €3,351,600 in loans to IyAC to finance IyAC's purchase of the Facility A SML Equipment.

93.    This equipment was delivered to Zummit.

94.    IyAC failed to timely make the first installment due under the Credit Agreement.

95.    In connection with a request for Facility B, in April 2019, IyAC provided 2017 and 2018 financial statements to Plaintiff as required under the Credit Agreement.

96.    IyAC's 2018 financial statements provided by IyAC to Plaintiff omitted any reference to IyAC's debt to Plaintiff of approximately €3,351,600.

97.    IyAC and its auditor could not provide a credible explanation for this omission.

98.    IyAC also attempted to change what SML Equipment it could purchase under Facility B.

99.    On July 2, 2019, Plaintiff advised IyAC that the availability of Facility B had lapsed and would not be renewed.

## V.    IyAC Initiates Foreign Arbitration

100.    Clause 32.1 of the Credit Agreement contains the following:

> (a) Any dispute, controversy or claim arising out of or in connection with any Finance Document including any question which may arise in connection with the creation, existence, validity, effect, termination, interpretation, performance of or breach of, or the legal relationships established by, any of the Finance Documents (including claims for set-off or counterclaim) or any noncontractual obligation arising out of or in connection with any Finance Document (a "Dispute") shall be referred to, and finally settled by, arbitration under the Rules of Arbitration and Conciliation of the International Arbitral Centre of the Austrian Federal Economic Chamber Austria in Vienna (Vienna Rules), as

14

in force at the date at which the proceedings are referred to arbitration (the "Rules").

(b) There shall be one arbitrator appointed in accordance with the Rules; the seat of the arbitration shall be Vienna, Austria; the language of the arbitration shall be English.

(c) Any decision of the arbitral tribunal shall be final and binding and the Parties hereby irrevocably waive any rights to any form of appeal, review or recourse to any state or other judicial authority in so far as such waiver may validly be made.

(d) In any arbitral proceeding, the certificate of the Lender as to any amount due to such Lender shall be prima facie evidence of such amount.

101.    On December 18, 2019, IyAC filed a statement of claim with the Arbitral Tribunal of the Vienna International Arbitral Centre (the "VIAC") of the Austrian Federal Economic Chamber, initiating case number ARB-5614, and stating that Plaintiff breached the Credit Agreement and demanding that Plaintiff pay €41,858,900.00 in damages from Plaintiff.

102.    IyAC claimed that Plaintiff's alleged breach of the Credit Agreement precipitated IyAC's default under the JVA and PPA, and sought, among other relief, damages to cover the penalty amounts ostensibly owed by IyAC to Zummit and to Empaques in respect of such defaults.

103.   On September 28, 2020, IyAC's attorney emailed the arbitrator seeking leave to file an unscheduled submission and amend IyAC's claim "on account of [being] notified only recently that [IyAC] and Zummit have entered into a Memorandum of Understanding under which Zummit will acquire [IyAC]."

### Plaintiff Prevails in Foreign Arbitration

104.   On January 31, 2020, Plaintiff responded to IyAC's statement of claim and asserted a counterclaim in the amount of €3,037,823.24 plus interest for amounts due and owing under the Credit Agreement.

105.   In February 2020, the parties jointly nominated Dr. Werner Jahnel as the arbitrator (the "Arbitrator").

106.   An arbitration hearing was held on September 30–October 2, 2020, before the Arbitrator.

107.   On March 8, 2021, the Arbitrator issued a final award (the "Final Award") in Plaintiff's favor, which provides in relevant part:

> –   IyAC's claims are dismissed in their entirety.
>
> –   IyAC is liable to pay the amount of **€3,075,192.72** to BA within 14 days after service of the award.
>
> –   IyAC is liable to pay BA default interest in the aggregate of (1) 2.4% *per annum* and (2) the one month EURIBOR as applicable if EURIBOR is not below zero, of the amount of €66,303.14 from 1 July 2020 until the date of payment of the capital, as well as default interest of the aggregate

of (1) 2.94% and (2) the six months EURIBOR as applicable if EURIBOR is not below zero, out of the amount of € 3,008,889.59 from 1 July 2020 until the date of payment of the capital.

–     IyAC is liable to pay BA an amount of € 890,161.08 for fees, expenses and costs related to the arbitration.

–     All other claims and requests are rejected.

A true and correct copy of the Final Award is attached hereto as **Exhibit A**.

## VI.   IyAC Avoids Payment of Final Award by Disappearing; Plaintiff Learns of Miguel Peredo Luna's Pattern of Fraud

108.   Following the issuance of the Final Award, Plaintiff attempted to enforce its rights against IyAC, and to this end, Plaintiff's Mexican counsel sought to effect service on IyAC.

109.   Plaintiff's Mexican counsel reported that IyAC's facilities had been vacated and listed for rent.

110.   Plaintiff subsequently investigated Mr. Peredo Luna, and entities associated with him and discovered facts that (i) indicated Defendants had defrauded Plaintiff, and (ii) a pattern of fraud perpetrated by entities controlled by Mr. Peredo Luna similar to the fraud perpetrated on Plaintiff.

111.   On information and belief, Mr. Peredo Luna has a long history of defrauding creditors using a similar "shell game" *modus operandi* to that which he used to defraud BA.

112.   He arranges for entities of which he has *de facto* control (A) to purchase on credit plastic-making equipment and material, (B) to default after completing the purchase or maxing out credit lines, (C) to cause the purchased assets to be sent or transferred to another entity he also controls,

and (D) to then go out of existence, leaving no assets out of which the creditors can recover.

**Hi-Films S.A. de C.V**.

113.   Miguel Peredo Luna-controlled Hi-Films S.A. de C.V. ("Hi-Films"), a Mexican company, borrowed in the aggregate approximately $6.9M in three separate credit facilities – two from Sterling Bank and one from WorldBusiness Capital, Inc. - in 2004 and 2005 to finance the purchase of plastic manufacturing equipment and material for plastic production.

114.   On information and belief, Hi-Films provided false financial information to procure the loans, was not actively conducting business at the time, and was not located where it purported to be.

115.   The purchased goods were delivered to another Peredo-controlled entity that was not an obligor under the respective Hi-Films loans.

116.   After Hi-Films maxed out a line of credit, it defaulted on the respective loans, leaving an unpaid principal balance of approximately $6.6M.

117.   The lenders' credit insurer, the Export Import Bank of the United States ("EXIM"), paid the insurance claims of Sterling Bank and WorldBusiness Capital and was assigned their respective loans to Hi-Films.

118.   When EXIM sought to collect on these loans, Hi-Films disappeared and EXIM was unable to find any assets or collect any money.

**PG Films, LLC**

119.   On information and belief, Mr. Peredo Luna borrowed approximately $10M from La Jolla Bank ("LJB") in 2006 guaranteed and collateralized by, and to provide financing for, a plastic wrap manufacturing company he controlled in San Diego - PG Films, LLC ("PG Films").

120.   The loan was restructured in 2009, but again went into default.

121.   LJB was merged into OneWest Bank ("OneWest").

122.   OneWest sued Mr. Peredo Luna and its guarantors (including PG Films) in September, 2010.

123.   OneWest discovered that equipment was being removed from the PG Films facility, and obtained an injunction prohibiting further removal and an order appointing a receiver of the PG Films' property.

124.   By the time the receiver took control on October 1, 2010, the facility was empty.

125.   In 2010, PG Films went out of business, and Mr. Peredo Luna filed for chapter 7 personal bankruptcy in San Diego County.

126.   In 2011, OneWest filed a "*Complaint to Determine Non-Dischargeability and Objecting to Discharge*" against Mr. Peredo Luna.

127.   OneWest alleged that Mr. Peredo had improperly transferred from PG Films equipment that he had valued at $3.5M on his chapter 7 bankruptcy schedules and that he never accounted for.

128.   On information, the equipment purchased by Mr. Peredo Luna for PG Films and financed by LJB/OneWest Bank was eventually transferred to an enterprise over which Mr. Peredo Luna had control.

**Grupo Cuadro S.A. de C.V.**

129.   Miguel Peredo Luna-controlled Grupo Cuadro S.A. de C.V. ("Grupo Cuadro") borrowed approximately $2.9M in 2008 from HSBC plc to finance the purchase of plastic making equipment.

130.   The loan was insured by the German export credit agency, Euler Hermes AG.

131.   The equipment was sent to PG Films in San Diego.

132.   Grupo Cuadro defaulted by failing to make its first payment and both it and PG Films went out of business.

133.   On information and belief, HSBC plc obtained a judgement against Grupo Cuadro in the United Kingdom but never collected any money.

134.   On information and belief, the plastic-making equipment purchased by Grupo Cuadro with HSBC plc financing was eventually transferred to Zummit in Phoenix, Arizona.

135.   On information and belief, HSBC plc obtained zero recovery.

### REQUESTS FOR RELIEF

### COUNT I

### Recognition of Foreign Arbitration Award

### (Against IyAC and Zummit)

136.   Plaintiff incorporates by reference and realleges each of the foregoing allegations as is fully set forth herein.

137.   At all times mentioned herein, the Country of Austria was, and is, a party to the New York Convention.

138.   VIAC is an Austrian arbitral tribunal.

139.   At all times mentioned herein, the Country of the United States of America was, and is, a party to the New York Convention.

140.   On March 8, 2021, the Arbitrator issued the Final Award.

141.   To date, IyAC has not paid or satisfied the Final Award.

142.   On information and belief, IyAC was acquired by and merged into Zummit, so that Zummit, as successor to IyAC and its assets, also has successor liability for IyAC's debt.

143.   Accordingly, Plaintiff requests the court to issue judgment on the Final Award against both IyAC and Zummit.

### COUNT II

### Fraud

### (Against All Defendants)

144. Plaintiff incorporates by reference and realleges each of the foregoing allegations as is fully set forth herein.

145. Defendants IyAC, Zummit, Mr. Peredo Luna, and Ms. Luna Contreras made oral and written misrepresentations to Plaintiff and omitted material facts which induced Plaintiff to enter into the Credit Agreement and issue Facility A.

**Ownership of Zummit**

146. The Defendants knowingly misrepresented to Plaintiff that IyAC was the 100% owner of Zummit when, in fact, IyAC was not the 100% owner of Zummit and it is unclear what ownership interest if any IyAC had in Zummit.

147. IyAC and Zummit transmitted a number of organization charts to IyAC showing that "Inmobiliaria y Arrendadora Grupo" (which Mr. Peredo Luna represented was IyAC's dba name) was the 100% owner of Zummit.

148. With one exception (a chart transmitted to Plaintiff by Mr. Peredo Luna in 2016), the entity organization charts showing IyAC as the 100% owner of Zummit were dated and signed by Ms. Luna Contreras.

149. These misrepresentations were made with the intent that Plaintiff rely upon them in its underwriting process, which it did reasonably and to its detriment by executing and then advancing funds under the Credit Agreement to finance the purchase of the SML Equipment for export to Zummit (and not to IyAC).

**False Financial Statements**

150. On information and belief, IyAC and Mr. Peredo Luna knowingly provided false IyAC financial statements to Plaintiff.

151.   These statements were delivered with the intent that Plaintiff rely upon them, which it did to its detriment by executing and then advancing funds under the Credit Agreement that have not been repaid.

152.   As noted below, the financial statements, among other things, concealed alleged contingent liabilities of $5 million and $30 million that could be due to Zummit and Empaques as penalties under the JVA and PPA, respectively.

**Concealment of JVA and PPA**

153.   Defendants concealed the JVA and PPA because they would have revealed facts that would have deterred Plaintiff from entering the Credit Agreement lending money to IyAC,

154.   Had Plaintiff known the terms of the JVA and PPA, Plaintiff would have been deterred from entering into the Credit Agreement and making the loan because of the following:

**Joint Venture Agreement**

a.   The JVA evidenced that the interests of Zummit and IyAC were in opposition to one-another, rather than congruent, as would be the case if IyAC were really the 100% owner of Zummit. With a parent entity and 100%-owned subsidiary.

b.   It therefore would evidence that IyAC did not hold a 100% ownership interest in Zummit.

c.   Under the JVA, IyAC had a contingent liability of $5 million (the penalty which IyAC would owe Zummit if it defaulted under the JVA) which could impair IyAC's ability to repay Plaintiff.

d.   This $5 million contingent liability was nowhere reflected in the IyAC financials presented to Plaintiff or otherwise disclosed to Plaintiff.

e.    IyAC's collateral pledge under the JVA of 1,000,000 shares of stock in Zummit to secure its (IyAC's) contingent liability showed that IyAC could lose ownership and control of Zummit, and thus have no means of using Zummit's cash flow relating to the SML Equipment and otherwise to repay Plaintiff.

f.    Mr. Montes signed the JVA on behalf of IyAC notwithstanding that IyAC had not issued to him a power of attorney authorizing him to do so (in contrast, it did issue him a special power of attorney three weeks later to sign the credit documents with Plaintiff).

g.    On information and belief, the reason IyAC did not issue a power of attorney authorizing Mr. Montes to sign the JVA on IyAC's behalf is that the recordation of such power of attorney in the Public Commercial Registry might have revealed to Plaintiff the existence of the JVA.

**Private Purchase Agreement**

h.    Under the PPA, IyAC was required to supply 30 million pounds of product per year to a single undisclosed customer, and thus represented concentration-of-business vulnerabililty which Plaintiff would have needed to examine in its underwriting.

i.    Under the PPA, IyAC was subject to a $30 million penalty in the event it defaulted.

j.    Such a liability could impair its ability to repay Plaintiff.

k.    This $30 million contingent liability was nowhere reflected in the IyAC financials or otherwise disclosed to Plaintiff.

l.      This terms of the PPA, had they not been concealed from Plaintiff, would have deterred Plaintiff from entering into the Credit Agreement and providing IyAC a loan thereunder.

**IyAC's Bad Faith Arbitration Claim**

155.   On information and belief, Zummit's default letter demanding a $5 million penalty from IyAC by reason of IyAC's supposed default under the JVA, and Empaques default letter demanding a $30 million penalty by reason of IyAC's supposed default under the PPA, were made at Mr. Peredo Luna's direction.

156.   On information and belief, the Zummit and Empaques default letters were sent solely for the purpose of providing IyAC a basis to assert its arbitration claim against Plaintiff and delay and hinder Plaintiff in the enforcement of its credit rights, and not for the purpose of obtaining the demanded penalties from IyAC.

157.   On information and belief, both the JVA and PPA were documents created for the purpose of defrauding Plaintiff by giving support to meretricious claims.

158.   IyAC's bad faith assertion of its arbitration claims against Plaintiff in fact distracted Plaintiff and delayed its enforcement of its credit rights, giving it the necessary time to vacate its facility in Queretaro.

159.   All of the foregoing misrepresentations and omissions were intentional.

160.   Defendants knew that their misrepresentations were false.

161.   Defendants' misrepresentations and omissions were done to entice Plaintiff to loan funds to IyAC.

162.   At the time of the misrepresentations and omissions, De3fendant indented not to repay loan funds received from Plaintiff.

163.    Plaintiff relied on all the foregoing misrepresentations to its detriment.

164.    Plaintiff has suffered damages as a  direct result of the actions complained of herein.

### COUNT III

### Successor Liability

### (Against Zummit)

165.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as is fully set forth herein.

166.    Zummit is a mere continuation of, and successor in interest to, IyAC.

167.    Upon information and belief, Zummit and IyAC entered into a memorandum of understanding for Zummit to acquire IyAC.

168.    IyAC and Zummit are both *de facto* controlled by Mr. Peredo Luna.

169.    IyAC and Zummit operate out the same location in Phoenix, AZ.

170.    Zummit benefits from the skills, knowledge, workforce, market contacts, assets, and customer relationships of IyAC's ownership and management.

171.    Upon information and belief, IyAC transferred substantially all of its assets, business, and going concern value to Zummit for less than adequate consideration.

172.    The acquisition of IyAC by Zummit amounts to a consolidation or merger.

### COUNT IV

### Piercing the Corporate Veil – Alter Ego

### (Against All Defendants)

25

173.   Plaintiff incorporates by reference and realleges each of the foregoing allegations as is fully set forth herein.

174.   Upon information and belief, IyAC is a mere instrumentality of Mr. Peredo Luna, Ms. Luna Contreras, and Zummit.

175.   Upon information and belief, IyAC was, at all relevant times, insufficiently capitalized for purposes of corporate undertaking.

176.   Upon information and belief, IyAC did not observe essential corporate formalities.

177.   Upon information and belief, IyAC's funds and assets, to the extent it had any, were used solely for the benefit of the *de facto* and *de jure* owners of IyAC, including Mr. Peredo Luna, Ms. Luna Contreras, and Zummit.

178.   Upon information and belief, Mr. Peredo Luna controlled IyAC and acted as its sole representative in negotiating the credit agreement with Plaintiff notwithstanding that his status as IyAC General Manager and his power of attorney had been revoked years before.

179.   Upon information and belief, IyAC remains effectively controlled by Mr. Peredo Luna, and not IyAC's registered officers and directors.

180.   Upon information and belief, IyAC did not maintain corporate records on a regular basis or in the ordinary course of business.

181.   Upon information and belief, IyAC's existence was a mere *façade* for individual dealings of the *de facto* and *de jure* owners of IyAC, including Mr. Peredo Luna, Ms. Luna Contreras, and Zummit.

182.   Recognizing the corporate separateness of IyAC would sanction a fraud against Plaintiff.

183.   For the reasons above, Defendants Mr. Peredo Luna, Ms. Luna Contreras, and Zummit must be liable for the actions and debts of IyAC,

1
2

including but not limited to the amounts owning under the Arbitration Award.

3
4
5

## COUNT V

### Unjust Enrichment

### (Against Zummit)

6
7

184.  Plaintiff incorporates by reference and realleges each of the foregoing allegations as is fully set forth herein.

8
9
10
11

185.  Defendants were unjustifiably enriched as a result of Defendants' misrepresentations, actions and omissions because such misrepresentations, actions and omissions caused Plaintiff to enter into the Credit Agreement and allowed IyAC to purchase the SML Equipment for delivery to Zummit.

12
13
14

186.  Specifically, Zummit has retained the value of the Facility A SML Equipment purchased with Plaintiff's loaned funds and been able to use this SML equipment "for free."

15
16
17
18

187.  Plaintiff was unjustifiably impoverished as a result of Defendants' misrepresentations, actions and omissions because Plaintiff loaned IyAC €3,351,600 through the Credit Agreement, an amount Plaintiff would not have loaned had it known of the misrepresentations and omissions.

19
20
21

188.  Zummit's enrichment is directly connected to Plaintiff's impoverishment as Plaintiff's impoverishment resulted from loaning IyAC €3,351,600 and not having the full balance paid.

22
23

189.  There is no justification for Plaintiff's impoverishment and Defendants' resulting enrichment.

24
25
26

190.  In the event that other remedies sought herein against Zummit are denied, there is no adequate remedy at law to fully redress the damage caused to Plaintiff.

27
28

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

## COUNT VI

### Arizona Uniform Fraudulent Transfer Act

### A.R.S. §§ 44-1001, Et Seq.

### (Against Zummit, Miguel Peredo Luna, and Amalia Cecilia Luna Contreras)

191.    Plaintiff incorporates by reference and realleges each of the foregoing allegations as is fully set forth herein.

192.    Plaintiff is entitled to recover from Zummit the fraudulent transfers made from IyAC to Zummit.

193.    Plaintiff is a creditor of IyAC.

194.    At all times relevant herein, Defendants were aware that Plaintiff is a creditor of IyAC.

195.    Upon information and belief, IyAC transferred assets, including but not limited to the SML equipment, to Zummit.

196.    Upon information and belief, IyAC directly or indirectly transferred other assets to Mr. Peredo Luna and Ms. Luna Contreras, including but not limited to cash and revenue from business operations.

197.    Due to their respective relationships with IyAC, Zummit is an insider for purposes of the Arizona Uniform Fraudulent Transfer Act.

198.    These transfers were made with the actual intent to hinder, delay, or defraud the creditors of IyAC, including Plaintiff.

199.    IyAC did not receive reasonably equivalent value in exchange for any of these transfers.

200.    IyAC was insolvent at the time of such transfers or became insolvent as a result of such transfers.

201.    These transfers of funds were fraudulent transfers as defined by A.R.S. §§ 44-1004 and 44-1005.

202.   Plaintiff has been damaged by these fraudulent transfers and seeks, pursuant to A.R.S. § 44-1007, avoidance of such transfers, attachment and execution on the property transferred or their proceeds, monetary judgments against all intermediate and ultimate transferees for the value of such transfers, and any other available remedies, including but not limited to appointment of a receiver over the property transferred.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff respectfully requests that this Court enter Judgment in favor of Plaintiff and against Defendants:

A.  Confirming the Final Award against IyAC, pursuant to 9 U.S.C. § 207, and entering judgment in favor of Plaintiff in conformity with the Final Award, plus statutory interest;

B.  Finding that Zummit is a successor-in-interest to IyAC, and liable for all IyAC's debts due and owing to Plaintiff;

C.  Awarding compensatory damages against all Defendants;

D.  Awarding Plaintiff pre and post judgment interest at the maximum legal amount for any and all monetary awards;

E.  Awarding Plaintiff punitive damages in an amount to be determined at trial;

F.  Piercing the corporate veil of IyAc and finding that the remaining Defendants are the *alter egos* of IyAC, and liable for IyAC's debts;

G.  Finding that all Defendants are jointly and severally liable for all damages caused to Plaintiff;

H.  Avoiding fraudulent transfers by IyAC, Zummit or affiliates thereof;

I.  Attachment and garnishment of transferred property and their proceeds;

J. Awarding Plaintiff's costs and attorneys' fees associated with bringing this action pursuant to A.R.S. §§ 12-341 and 341.01, the contract and agreements at issue, and other applicable law; and

K. Awarding any such other and further relief the Court deems just and proper.

RESPECTFULLY SUBMITTED this 21st day of September, 2023.

**MAY POTENZA BARAN & GILLESPIE P.C.**

By: */s/ Andrew A. Harnisch*

Andrew Harnisch
Eric Moats
*Attorneys for Defendants*

# EXHIBIT A

**VIAC – VIENNA INTERNATIONAL ARBITRAL CENTRE OF THE AUSTRIAN FEDERAL ECONOMIC CHAMBER**

**CASE ARB-5614**

**INMOBILIARIA Y ARRENDADORA CUADRO S.A. DE C.V. (MEXICO)**

Claimant/Counter-Respondent

vs.

**UNICREDIT BANK AUSTRIA AG (AUSTRIA)**

Respondent/Counter-Claimant

---

**FINAL AWARD**

**8 March 2021**

---

**Before:**
Dr Werner Jahnel (Sole Arbitrator)

**Table of Contents**

1   THE PARTIES AND THE ARBITRAL TRIBUNAL ...............5

  1.1   The Claimant/Counter-Respondent...............................5

  1.2   The Respondent/Counter-Claimant...............................5

  1.3   The Arbitral Tribunal....................................................6

2   THE      ARBITRATION      AGREEMENT      AND      THE
    APPLICABLE PROCEDURAL RULES...................................6

  2.1   The Arbitration Agreement...........................................6

    2.1.1   The seat of the arbitration.........................................7

    2.1.2   The language of the arbitration.................................7

    2.1.3   The governing law of the arbitration .........................7

    2.1.4   The applicable procedural rules.................................7

3   THE ARBITRAL PROCEEDINGS ...........................................7

4   THE PARTIES PRAYERS FOR RELIEF ..............................22

  4.1   Relief sought by Claimant............................................22

  4.2   Relief sought by Respondent/Counterclaimant........................23

5   BACKGROUND OF THE DISPUTE ....................................25

6   THE PARTIES' POSITIONS ..................................................27

  6.1   Introduction .................................................................27

  6.2   The Claimant's position ..............................................28

    6.2.1   The Respondent has breached and unlawfully terminated
        the Agreement....................................................................28

    6.2.2   Due to depriving the Claimant of the loan under Facility B
        the Respondent caused the Claimant to suffer damages...........29

    6.2.3   The Claimant has not breached the Facility Agreement
        (Defense to counterclaim) .......................................................31

  6.3   The Respondent's position ....................................................31

    6.3.1   The Respondent has not breached the Agreement...................31

6.3.2    The Claimant's claims for damages are not justified ..............31

6.3.3    The Claimant has breached the Agreement by default in payment of the instalments due for Facility A: The Respondent's Counterclaim......................................................32

7    CONSIDERATIONS OF THE SOLE ARBITRATOR.............33

7.1    Introduction ...............................................................................33

7.2    Breach and unlawful termination of the Export Facility Agreement by the Respondent ................................................33

7.2.1    The Respondent has not unlawfully terminated or breached the Agreement by not disbursing Facility B ............................33

7.2.1.1    The Parties' Positions ..........................................................33

7.2.1.2    Considerations by the Sole Arbitrator ................................38

The Conditions for Disbursement of Facility B under the Agreement...............................................................39

The Agreement must be distinguished from the Loan Agreement related to Facility B ....................................52

Neither Facility B nor any of the Conditions Precedent or any other provision contained in the Agreement related to Facility B were amended by common consent of the Parties....................................................54

The Conditions Precedent required for Disbursement of Facility B were not and would not have been fulfilled by the Claimant within the time period provided under the (eventually amended) Agreement...63

The Claimant could not justifiably rely on the conclusion of the amendment ........................................68

7.2.2    The Respondent has not breached any confidentiality obligations ...............................................................................73

7.2.2.1    The Parties' positions ........................................................73

7.2.2.2    Considerations by the Sole Arbitrator ................................74

7.2.3    The Respondent is not otherwise liable for damages ..............77

7.2.3.1    The Parties' positions ...........................................77

7.2.3.2    Considerations by the Sole Arbitrator ...............................78

7.3    Breach of the terms of the Export Facility Agreement by the Claimant: The Respondent's counterclaim...............................79

7.3.1    Introduction ............................................................79

7.3.2    The Parties positions..................................................79

7.3.3    Considerations by the Sole Arbitrator ....................................81

8    CONCLUSION ...................................................................86

9    COSTS ...........................................................................87

9.1    The Claimant's cost submission and comments on allocation on costs.....................................................................87

9.2    The Respondent's costs submission ..........................................87

9.3    The Parties' positions on the cost submissions ........................88

9.4    The Sole Arbitrator's considerations on costs.........................89

10    AWARD..........................................................................94

# 1    THE PARTIES AND THE ARBITRAL TRIBUNAL

## 1.1    The Claimant/Counter-Respondent

1    The Claimant/Counter-Respondent Inmobiliaria y Arrendadora Cuadro S.A. de C.V. ("**the Claimant**" or "**the Counter-Respondent**" or "**Cuadro**") is a company incorporated and existing under the laws of Mexico, registered at:

Av. del Marqués No. 39
76246 El Marqués Querétaro
Mexico

2    The Claimant is represented in this arbitration by:

OBLIN Rechtsanwälte GmbH
Dr. Klaus Oblin, LLM (USD)
Neva Cirkveni, LLM (USC)
Josefstädter Strasse 11
1080 Vienna
Austria
Tel:        +43 1 505 37 05-13 / +43 1 505 37 05
Emails:     klaus.oblin@oblin.at / neva.cirkveni@oblin.at

## 1.2    The Respondent/Counter-Claimant

3    The Respondent/Counter-Claimant UniCredit Bank Austria AG ("**the Respondent**" or "**the Counter-Claimant**" or "**UniCredit**" and together with the Claimant, "**the Parties**") is a company incorporated and existing under the laws of Austria, registered at:

Rothschildplatz 1
1020 Vienna
Austria

4    The Respondent is represented in this arbitration by:

Lansky, Ganzger + partner Rechtsanwälte GmbH
Dr. Gerald Ganzger
Mag. Valentin Neuser
Biberstrasse 5
1010 Vienna
Austria
Tel:        +43 1 533 33 30 5411
Email:      gerald.ganzger@lansky.at / valentin.neuser@lansky.at

### 1.3    The Arbitral Tribunal

5    The Arbitral Tribunal is constituted as follows:

Dr Werner Jahnel ("**the Sole Arbitrator**")
LALIVE SA
Stampfenbachplatz 4
P.O. Box 212
8042 Zurich
Switzerland
Tel:        +41 58 105 21 00
Email:      wjahnel@lalive.law

## 2    THE    ARBITRATION    AGREEMENT    AND    THE    APPLICABLE PROCEDURAL RULES

### 2.1    The Arbitration Agreement

6    The Claimant relies on an arbitration agreement contained in the "Export Credit Facility Agreement" entered into between the Parties on 10 January 2018 (the "**Agreement**").

7    Clause 32.1 of the Agreement contains the following arbitration agreement ("**Arbitration Agreement**"):

> "*(a) Any dispute, controversy or claim arising out of or in connection with any Finance Document including any question which may arise in connection with the creation, existence, validity, effect, termination, interpretation, performance of or breach of, or the legal relationships established by, any of the Finance Documents (including claims for set-off or counterclaim) or any noncontractual obligation arising out of or in connection with any Finance Document (a "**Dispute**") shall be referred to, and finally settled by, arbitration under the Rules of Arbitration and Conciliation of the International Arbitral Centre of the Austrian Federal Economic Chamber Austria in Vienna (Vienna Rules), as in force at the date at which the proceedings are referred to arbitration (the "**Rules**").*
>
> *(b) There shall be one arbitrator appointed in accordance with the Rules; the seat of the arbitration shall be Vienna, Austria; the language of the arbitration shall be English.*
>
> *(c) Any decision of the arbitral tribunal shall be final and binding and the Parties hereby irrevocably waive any rights to any form of*

*appeal, review or recourse to any state or other judicial authority in so far as such waiver may validly be made.*

(d)  *In any arbitral proceeding, the certificate of the Lender as to any amount due to such Lender shall be prima facie evidence of such amount.*

(e)  *The Lender shall not be prevented from taking proceedings for the purposes of enforcing a court or arbitration order relating to a Dispute in any other courts with jurisdiction."*

### 2.1.1    The seat of the arbitration

8    Pursuant to the Arbitration Agreement the seat of the arbitration shall be in Vienna, Austria.

### 2.1.2    The language of the arbitration

9    Pursuant to the Arbitration Agreement the language of the arbitration shall be English.

### 2.1.3    The governing law of the arbitration

10   Clause 31 of the Agreement states that "*this Agreement, and any non-contractual obligation arising out of or in connection with it, are governed by Austrian law*".

### 2.1.4    The applicable procedural rules

11   The current proceedings are subject to the provisions of the Rules of Arbitration and Mediation of the Vienna International Arbitral Centre ("**Vienna Rules**") and the specific procedural rules of Procedural Order No. 1 dated 21 April 2020 which had been discussed with the Parties.

## 3    THE ARBITRAL PROCEEDINGS

12   The Claimant filed the Statement of Claim dated 18 December 2019 with the Vienna International Arbitral Centre of the Austrian Federal Economic Chamber ("**VIAC**") on 27 December 2019 ("**SoC**") together with exhibits C-1 to C-46.

13   By letter dated 30 December 2019, the VIAC informed the Respondent of the filing of the SoC and granted the Respondent thirty days to submit its Answer to the SoC.

14    On 31 January 2020, the Respondent filed its Answer to the Statement of Claim and Counterclaim ("**Answer**") together with exhibits R-1 to R-36, RWS-1 and RWS-2 and RL-1 to RL-3. The Answer also contained a Request for Security for Costs.

15    By email of 10 February 2020, the Claimant informed the VIAC that the Parties jointly nominate Werner Jahnel as Sole Arbitrator.

16    By email of 11 February 2020, the Respondent confirmed the joint nomination of Werner Jahnel as Sole Arbitrator.

17    By letter dated 20 March 2020, the VIAC informed the Parties that the shares of the advances on costs had been fully paid by the respective Parties. The VIAC also informed the Parties that the Secretary General had confirmed the nomination of Werner Jahnel as Sole Arbitrator and that all relevant documents to the case had been sent to the Sole Arbitrator.

18    By letter dated 30 March 2020, the Sole Arbitrator requested the Claimant to submit evidence that Oblin Rechtsanwälte GmbH had the authority to represent the Claimant in the present arbitration proceedings. The Sole Arbitrator also invited the Parties to submit their availabilities for a Case Management Conference ("**CMC**") in order to establish the procedural rules and timetable and sent a draft agenda of said CMC.

19    On 7 April 2020, the Sole Arbitrator informed the Parties by email that the CMC would take place on 8 April 2020 and submitted the agenda of the CMC as well as a draft Procedural Order No. 1.

20    The Parties and the Sole Arbitrator held the CMC on 8 April 2020 by conference call during which they agreed that the Claimant could file its comments on the Request for Security for Costs by 9 April 2020 and that the Respondent would have the opportunity to file a reply by 30 April 2020, before the Sole Arbitrator was to render his decision by 13 May 2020. This schedule was reflected in the new drafts of Procedural Order No. 1 and the Procedural Timetable sent to the Parties by email by the Sole Arbitrator on the same day inviting them to comment on the draft documents until 15 April 2020.

21    On 9 April 2020, the Claimant filed its submission on security for costs ("**Reply to Security on Costs**") followed by a list of exhibits CL-1 to CL-7).

22    On 14 April 2020, the Claimant submitted a power of attorney for Oblin Rechtsanwälte GmbH and asked to have this document filed as exhibit C-1. The Claimant also stated that in its view a hearing on security on costs was not necessary.

23    By letter of 15 April 2020, the Respondent submitted its comments on the draft Procedural Order No. 1 and Procedural Timetable.

24    By email of 16 April 2020, the Sole Arbitrator asked the Parties to liaise and report to the Arbitral Tribunal by 20 April 2020 on any agreement regarding the suggested amendments to the draft Procedural Order No. 1 and Procedural Timetable.

25    By the Respondent's email of 20 April 2020, the Sole Arbitrator was informed of the partial agreement reached by the Parties on the draft Procedural Order No. 1. The Claimant confirmed this by email of the same date. By separate emails of the same day, the Parties submitted their respective further comments on the non-agreed points of draft Procedural Order No. 1.

26    By letter dated 21 April 2020 sent by email to the Parties, the Sole Arbitrator provided the Parties with his decision on the Procedural Order No. 1 ("**PO1**") and the Procedural Timetable ("**PT**") and sent the final documents to the Parties.

27    On 30 April 2020, the Respondent filed its Reply to Claimant's Reply to Security on Costs ("**Reply on Claimant's Reply to Security on Costs**") together with exhibits R-37 to R-41, RL-4 to RL-8 and RWS-3 to RWS-7.

28    On 5 May 2020, the Claimant applied to submit an unscheduled submission to "*address the issues Respondent raised in its Reply*" and informed that it "*deem[ed] it necessary to hold a hearing on the issue of Security for Costs.*"

29    The Arbitral Tribunal granted the Respondent until 6 May 2020, 5pm, to comment on the Claimant's communication of 5 May 2020.

30    On 6 May 2020, the Respondent submitted its comments on the Claimant's request for an unscheduled submission.

31    By email of 7 May 2020, the Sole Arbitrator rejected the Claimant's application to submit an unscheduled submission and to hold a hearing and announced that the reasoning for this decision would follow together with the decision on the Request for Security for Costs.

32    By email of 13 May 2020, the Sole Arbitrator issued the Procedural Order No. 2 ("**PO2**") rejecting the Respondent's Request for Security on Costs and the Claimant's motion to award any further relief that the Arbitral Tribunal would deem necessary.

33    On 14 May 2020, the Claimant submitted its Reply to the Answer to the Statement of Claim/Answer to Counterclaim ("**Reply**") together with exhibits C-47, CL-8 to CL-14, CWS-1 to CWS-4 and CEWS-1 by email.

34   On 3 June 2020, the Respondent submitted its Document Production Request in the form of a Redfern Schedule by email.

35   By email of 3 June 2020, the Sole Arbitrator invited the Claimant to comment on the Respondent's Document Production Request by 10 June 2020 and granted the Respondent until 12 June 2020 to respond to the Claimant's comments.

36   By email of 10 June 2020, the Claimant submitted its comments to the Respondent's Document Production Request.

37   By email of 12 June 2020, the Respondent submitted its response to the Claimant's comments on the Respondent's Document Production Request.

38   On 16 June 2020, the Sole Arbitrator issued Procedural Order No. 3 ("**PO3**") with his decision on the Respondent's Document Production Request and ordered the Claimant to comply with the requests granted by 22 June 2020 and to comment on Request 23 by the same date.

39   By email of 22 June 2020, the Sole Arbitrator invited the Parties to liaise and confirm by 9 July 2020 whether the Hearing scheduled in August could take place.

40   On 22 June 2020, the Claimant submitted its "*Brief No. 4 Claimant's Submission on Document Production Request*" with "*exhibits C-48 to C-65*". The Claimant also requested an extension to submit the translations of the documents produced until 24 June 2020.

41   By email to the Parties of 24 June 2020, the Sole Arbitrator drew the Claimant's attention to the fact that the documents submitted in reply to the Document Production Request should not have been introduced in the proceedings by the Claimant as the Claimant's exhibits, which was acknowledged by the Claimant by email of the same day. The Sole Arbitrator also granted the Claimant an extension to file the translations of the produced documents until 24 June 2020, as requested.

42   By email of 23 June 2020, the Respondent submitted a Request for Time Extension to file its Answer to Claimant's Reply to Respondent's Answer and Counterclaims until 2 July 2020**.** By email of the same day, the Sole Arbitrator invited the Claimant to comment on the Respondent's Request for Time Extension.

43   On 23 June 2020, the Claimant submitted its comments regarding the Respondent's Request for Time Extension. Based on the Claimant's comments, and in light of the Claimant's agreement to an extension of "*two*

*days*", the Arbitral Tribunal invited the Parties to liaise on the Request. By email of 24 June 2020, the Claimant confirmed that it agreed to a time extension until 29 June 2020, but confirmed however that the Parties could not find a further agreement. The Sole Arbitrator therefore confirmed his understanding that the Respondent upheld its Request and that he would therefore render a decision on the Request. By email of the same day, the Respondent confirmed that it maintained its Request and that the Parties could not find a further agreement but proposed to further substantiate its Request if deemed necessary by the Sole Arbitrator.

44    On 24 June 2020, the Sole Arbitrator issued Procedural Order No. 4 ("**PO4**") and granted Respondent an extension of the time limit to file the Answer to the Claimant's Reply to Respondent's Answer and Counterclaims until 30 June 2020.

45    Pursuant to the PO4 and the PT, the Respondent submitted its Answer to Claimant's Reply to Respondent's Answer and Counterclaim ("**Answer to Reply**") by email of 30 June 2020. The Respondent therein made some procedural requests in sections 1.3.4., 1.3.5. and 1.4.

46    On 1 July 2020, the Respondent's Answer to Reply along with exhibits R-42 to R-82, RL-9 to RL-46 and REWS-1 to REWS-3 were made available by the Respondent on the online dataroom brainloop.

47    By email of 2 July 2020, the Sole Arbitrator confirmed receipt of the Respondent's Answer to Reply and the exhibits. The Sole Arbitrator also confirmed in his email that he would consider the procedural requests made by the Respondent, "*including to which extent the Claimant will be invited to comment on those requests after 9 July 2020.*"

48    By email of 9 July 2020, the Respondent informed the Arbitral Tribunal that it had not been able to liaise with the Claimant regarding the maintaining of the dates of the Hearing in August but submitted its comments thereto.

49    Pursuant to the PO1 and the PT, the Parties submitted their respective witness statements by email on 9 July 2020 (CWS-2 to CWS-9 for Claimant; RWS-8 to RWS-10 for Respondent). Together with its email by which the witness statements were submitted, the Claimant requested relief from the Arbitral Tribunal to file a new document in these proceedings. The Claimant explained that the document was not available to Claimant at a prior date but that it was important to the Claimant in order to prove the Claimant's claims on the merits as well as substantiating its claim for damages.

50    By email of 9 July 2020, the Claimant proposed to move the date of the Hearing to the first week of October (1st and 2nd October 2020).

51    By email of 10 July 2020, the Sole Arbitrator confirmed receipt of the Parties' comments on the dates for the Hearing and informed the Parties of his availabilities. Furthermore, the Sole Arbitrator invited the Respondent to inform if it upheld its procedural requests under items 1.3.4., 1.3.5. and 1.4 of its Answer to Reply by 15 July 2020. At the same time, with regard to the request to file a new document, the Sole Arbitrator invited the Claimant to file a reasoned request with a description of the document (without sending the document), copying the Respondent.

52    By email of 14 July 2020, the Respondent submitted its comments on the possible new dates for the Hearing in September or October 2020.

53    By email of the same day, the Sole Arbitrator invited the Claimant to comment on the Respondent's comments on the possible new dates for the Hearing and of the appearance of the Claimant's witnesses in person at a Hearing in Vienna.

54    By email of 15 July 2020, the Respondent submitted its clarifications and modifications on the procedural requests under sections 1.3.4., 1.3.5. and 1.4. of its Answer to Reply.

55    By email of 15 July 2020, the Claimant submitted its formal request for introduction of a new document into the proceedings ("**Claimant's Request for Introduction of a New Document**").

56    By email of 17 July 2020, the Claimant submitted its comments on the dates for the Hearing.

57    By email of 21 July 2020, the Sole Arbitrator confirmed receipt of the Parties' latest correspondence and gave the Parties the following deadlines to submit their comments:

–    Until 31 July 2020 for the Claimant to file its comments on the Respondent's requests in the Answer to Reply and submission of 15 July 2020;

–    Until 23 July 2020 for the Claimant to answer the Sole Arbitrator's questions regarding its Request for Introduction of a New Document;

–    Until 23 July 2020 for the Respondent to provide its comments regarding the organisation of the Hearing.

58    By email of 22 July 2020, the Claimant provided its answers to the Sole Arbitrator's questions regarding its Request for Introduction of a New Document.

59    By email of 22 July 2020, the Sole Arbitrator invited the Respondent to comment on the Claimant's Request for Introduction of a New Document by 31 July 2020.

60    By email of 23 July 2020, the Respondent submitted its comments regarding the organisation of the Hearing.

61    By email of 29 July 2020, the Sole Arbitrator informed the Parties that the Hearing should take place between 30 September and 3 October 2020 and invited the Parties to liaise in order to make the necessary hearing arrangements. The Sole Arbitrator also invited the Claimant to comment on the Respondent's suggestions regarding the video conferencing in case not all witnesses and experts should be able to attend the Hearing in person.

62    By email of 31 July 2020, the Respondent submitted its comments on the Claimant's Request for Introduction of a New Document.

63    By email of the same day, the Claimant filed its answer to the Respondent's requests filed in the Answer to Reply and in the submission of 15 July 2020.

64    In its email of 2 August 2020, the Claimant requested the Arbitral Tribunal to hold a conference call with the Parties in order to discuss the relevant issues regarding the Hearing. Furthermore, the Claimant alleged that the Respondent was burdening and delaying the arbitral proceedings by submitting an increased number of documents and long briefs.

65    By email of 3 August 2020, the Sole Arbitrator invited the Claimant to submit its comments on the Respondent's suggestions regarding the video conferencing during the Hearing by the end of the day, as previously ordered. The Sole Arbitrator also instructed the Parties on how to proceed regarding the organisation of the Hearing and that the Arbitral Tribunal expected the Parties to collaborate in that respect.

66    By emails of 4 August 2020, the Parties informed the Arbitral Tribunal that they were in the process of obtaining quotes from service providers for the organisation of the Hearing and would keep the Sole Arbitrator informed on the progress of such process. The Parties also confirmed that they were discussing the Respondent's suggestion regarding the video conferencing during the Hearing.

67    On 7 August 2020, the Sole Arbitrator issued Procedural Order No. 5 ("**PO5**"), invited the Parties to provide some additional information (in form of a table) regarding allegedly new factual allegations contained in Claimant's witness statements, granted the Claimant's request to introduce a new document and invited the Claimant to file that document by 11 August 2020.

The Respondent was granted until 7 September 2020 to file a limited additional submission to respondent to the new document.

68    By email of 10 August 2020, the Claimant informed that its expert witness Prof. Kalss would be available to testify on 1 and 2 October 2020.

69    By email of the same day, the Sole Arbitrator invited the Parties to update him on the status of the hearing preparations by the end of the week.

70    By email of 11 August 2020, the Claimant submitted an update on the hearing preparations.

71    By email of the same day, the Claimant submitted the new exhibit C-48 with its translation.

72    By email of 12 August 2020, the Respondent sent its comments on the Claimant's update on the Hearing preparations.

73    By email of 14 August 2020, the Sole Arbitrator invited the Parties to inform him of their availabilities for a conference call in order for the Parties to discuss the organization of the Hearing and to agree on the next deadlines.

74    By email of 17 August 2020, the Respondent, pursuant to PO5, informed that it upheld its request to disregard CWS-8 and CWS-9 and submitted the table on the alleged new factual allegations contained in witness statements.

75    By email of 24 August 2020, the Claimant, pursuant to PO5, submitted the comments regarding the alleged new factual allegations contained in witness statements.

76    On 25 August 2020, the Parties and the Arbitral Tribunal held a conference call and agreed on the next steps of the proceedings and discussed the details of the Hearing. On the same day, the Sole Arbitrator sent an email to the Parties with a summary of the outcome of the conference call.

77    On 27 August 2020, the Sole Arbitrator issued Procedural Order No. 6 ("**PO6**") with his decision on the Respondent's request to disregard parts of certain witness statements submitted by the Claimant (which was rejected) and granted the Respondent a deadline to address some factual allegations.

78    By email of 31 August 2020, the Claimant submitted the statement of independence of its expert witness Prof. Kalss together with legal exhibits used in the preparation of the Expert Witness Statement.

79    By email of 7 September 2020, the Respondent submitted its comments on the Claimant's exhibit C-48 together with exhibits RL-47 and REWS-4.

80    By email of 9 September 2020, the Claimant filed its submission named "*Requests on Matters of the Evidentiary Hearing*".

81    On the same day, the Claimant informed of the Respondent's witnesses for cross-examination at the Hearing.

82    By email of the same day, the Sole Arbitrator gave further instructions regarding the Hearing and commented on the Respondent's submission of 7 September 2020 and informed that REWS-4 was admitted.

83    By email of 10 September 2020, the Respondent filed its additional submission on Claimant's witness statements together with exhibit R-83.

84    By email of the same day, the Claimant stated that the Parties had agreed that the Hearing would last until 2 October 2020 and that 3 October 2020 would be kept provisionally. Furthermore, the Claimant pointed out that in the Respondent's submission of 7 September 2020, the Respondent made new factual allegations against the Claimant's claim and regarding the Claimant's witnesses. The Claimant referred to its right to be heard and to defend itself from all allegations made by the Respondent and informed that it would submit additional exhibits numbered C-49 and C-50 that would disprove the Respondent's allegations. The Claimant also informed the Arbitral Tribunal that the Parties had been unable to agree on simultaneous translators for expert witnesses at the Hearing.

85    By email of the same day, the Sole Arbitrator invited the Respondent to comment on the Claimant's email of 11 September 2020 by 12 September 2020, 12 am. He also pointed out that the Hearing dates had been agreed upon by the Parties and that the remote witness testimonies might take more time as usual and therefore 3 October 2020 had to remain a real option. The Sole Arbitrator also confirmed that the Claimant would have the possibility to ask questions at the Hearing related to exhibit C-48 to its witnesses in direct examination and that the Respondent had to be given the opportunity to ask follow-up questions. He also made clear that no new documents and no new witnesses who had not filed a witness statement would be admitted at the Hearing. The Sole Arbitrator also called on the Parties to find an agreement regarding the translation of the witness testimonies.

86    The Respondent submitted its list of witnesses to the Sole Arbitrator by email of 11 September 2020 and to the Claimant by email of 12 September 2020.

87    By email of 14 September 2020, the Sole Arbitrator submitted a draft agenda for the pre-hearing conference call to the Parties and invited them to comment on it by 16 September 2020, 10am.

88    By email of 14 September 2020, the Respondent asked the Claimant, while copying the Sole Arbitrator, to send its list of witnesses and experts for cross-examination due on 12 September 2020.

89    By email of 15 September 2020, the Sole Arbitrator requested the Claimant to share its list of witnesses to be cross-examined, due on 12 September 2020, with the Respondent without further delay.

90    By email of 15 September 2020, the Respondent informed the Sole Arbitrator on the status of the hearing preparations in regard to hearing facilities, court reporter, interpreters and the notary in Mexico and submitted the CV of the proposed interpreter and the statement of independence of the notary in Mexico. The Respondent also informed that it had nothing to add to the Sole Arbitrator's response to the Claimant's announcement to introduce new documents and witnesses at the Hearing. Furthermore, the Respondent requested to schedule the Hearing so that Respondent would not have to respond immediately to the new statements made during the direct examination.

91    By email of 15 September 2020, the Claimant forwarded its list of witnesses for cross-examination to the Respondent stating that its understanding was that the Sole Arbitrator would forward it to the Respondent.

92    On 16 September 2020, the Parties and the Arbitral Tribunal held the pre-hearing conference call.

93    By email of 17 September 2020, the Sole Arbitrator circulated a draft hearing schedule among the Parties asking for their comments by 21 September 2020. The Sole Arbitrator confirmed the agreement made during the pre-hearing conference call that the Claimant would submit exhibits C-49 to C-51 and one additional witness statement addressing the Respondent's comments on document C-48 by 21 September 2020 and that the Respondent would have the opportunity to cross-examine the additional witness at the Hearing. The Sole Arbitrator reminded the Parties that no new documents or witnesses and experts would be admitted at the Hearing.

94    By email of the same day, the Respondent requested an extension of the deadline to file its comments on the draft hearing schedule to 22 September 2020.

95    By email of the same day, the Sole Arbitrator informed the Parties that the Respondent's request for extension of the deadline until 22 September 2020 was granted and would apply to both Parties.

96    By email of 21 September 2020, the Respondent informed on the agreements between the Parties of the interpreter, the court reporter and the notary in Mexico and the provisional schedule for the Hearing.

97    By email of 22 September 2020, the Claimant submitted its consolidated list of exhibits together with new exhibits C-49 to C-56 and CWS-10.

98    By email of the same day, the Sole Arbitrator invited the Respondent to inform if it would be calling Mr. Gutierrez for cross-examination at the Hearing.

99    By email of the same day, the Claimant informed that it would call Mr. Gutierrez for direct examination.

100   By email of the same day (11:31), the Respondent requested that the Claimant's exhibits and witness statement filed on 22 September 2020 be rejected as belated and, if they were not rejected as belated, the exhibits C-52 to C-56 should be rejected as the Sole Arbitrator had only allowed the Claimant to file exhibits C-49 to C-51 and one additional witness statement. The Respondent also stated that the Claimant had not followed the provision set out in PO1 and that the new exhibits could have been submitted earlier. Furthermore, the Respondent stated that the exhibits C-52 to C-56 did not relate to the Respondent's comments on exhibit C-48. The Respondent added that if direct examination of Mr. Gutierrez was made by the Claimant, the rule that no new allegations shall be made should strictly apply.

101   By email of the Sole Arbitrator on the same day (11:38), he granted the Claimant a deadline until 4pm to comment on the Respondent's email.

102   By email of the same day (17:50), the Sole Arbitrator rejected the Respondent's request to reject the Claimant's exhibits as they were filed only a few minutes after the deadline. He argued that he could not see any prejudice of the late filing for the Respondent. The Sole Arbitrator clarified that the Claimant was not limited in the number of exhibits it filed as long as they were related to exhibit C-48. The Sole Arbitrator further mentioned that he could not see the relation between exhibit C-48 and the submitted exhibits C-52 and C-54 to C-56. He invited the Claimant to explain the link between the filed new exhibits and exhibit C-48 by 23 September 2020, 4pm. The Sole Arbitrator also invited the Claimant to file a translation of exhibit C-56 by the same deadline. Furthermore, he informed that the pleadings made by the Claimant in the opening statement and the questions to Mr. Gutierrez in the direct examination would be limited to the lawsuit contained in exhibit C-48. The Sole Arbitrator furthermore extended the deadline for the Parties' comments to the draft hearing schedule to 24 September 2020, 4pm.

103    By email of 23 September 2020, the Claimant, without seeking prior leave from the Sole Arbitrator, submitted an unsolicited submission containing a request to amend its prayer for relief together with exhibits CL-15 to CL-21 and an English translation of exhibit C-56. By email of the same day, the Sole Arbitrator refused to admit the submission based on the fact that that submission was filed by the Claimant in violation of section 9 of PO1 and informed that exhibits C-52 and C-55 to C-56 would not be admitted to the present proceedings as the Claimant had not filed an explanation of the link between exhibits C-52 and C-55 to C-56 and the lawsuit contained in C-48 within the deadline granted. The Sole Arbitrator also stated that the document in exhibit C-54 had already been filed by the Respondent as exhibit R-45 and invited the Respondent to confirm without delay that the Sole Arbitrator's understanding was correct.

104    By email of the same day, the Respondent confirmed that exhibit C-54 corresponded to exhibit R-45. Thereafter, the Sole Arbitrator allowed the Claimant to refer to this document as exhibit R-45 in its opening statement.

105    By email of 24 September 2020, the Claimant filed an objection.

106    By email of 24 September 2020, the Respondent submitted its comments to the provisional hearing schedule as well as the statement of independence of Mr. Alfonso González Alonso.

107    By email of the same day, the Sole Arbitrator granted the Claimant a deadline until 25 September 2020, 4pm to file any comments to the Respondent's email of the same day. He also confirmed receipt of the Claimant's objection.

108    By email of 25 September 2020, the Claimant submitted its comments on the draft hearing schedule and witness statements at the Hearing and stated that the Claimant's counsel had no time to request leave for a submission and the submission made by Claimant's counsel is pertinent to the damages and Claimant's Prayer for Relief.

109    By letter of 28 September 2020 sent by email to the Parties, the Arbitral Tribunal made clear that it could not and would not admit new submissions filed in violation of section 9 of PO1 and explained the reasons for its decision. Nevertheless, the Arbitral Tribunal granted the Claimant the possibility to *"[..] explain in the opening statement which matter the Claimant wishes to address in an application or future submission for which leave is sought and the reasons why such leave shall be granted at this late stage of the proceedings. No supporting documentation will be accepted in that regard. The Respondent will then have the opportunity either to reply to this request for leave in its opening statement or reserve its reply to a later stage of the proceedings. The*

*Sole Arbitrator will decide on the request for leave and if and/or to which extent the application or submission is granted at a moment he deems appropriate."* The Arbitral Tribunal furthermore informed the Parties that as long as it had *"not decided on the leave sought, if any, the facts contained in the Claimant's Brief No. 7, unless mentioned in the leave request, and documents C-52 and C-55 to C-56, are not part of the present arbitration."* The Sole Arbitrator made further comments to the witness examination at the Hearing and sent a revised hearing schedule attached to his letter. He also instructed the Parties that any presentation for the opening statement had to be handed out to the Arbitral Tribunal and the opposing Party and circulated by email. The Parties were also invited to circulate an updated list of exhibits by 28 September 2020, 5pm.

110   By emails of 28 September 2020, the Respondent submitted its consolidated list of exhibits together with its following comments on the Arbitral Tribunal's letter of the same day.

111   By email of the same day, the Claimant submitted its consolidated list of exhibits with its comments to the Respondent's earlier email of the same day and the following relief sought and comments:

> *"Claimant hereby seeks leave now to file an unscheduled submission in line with Margin Number 37 of PO1. In this regard Claimant seeks leave to submit a brief addressing the new developments that are pertinent to these proceedings. Mainly Claimant wishes to address the fact that Claimant must reduce its Prayer for Relief (as per Claimant's duty), as well as to address the facts that led to the same. Claimant's counsel has been notified only recently that Claimant and Zummit have entered into a Memorandum of Understanding under which Zummit will acquire Claimant. This not only changes the nature of Claimant's claim for damages and as such, the amount of the same, but it also erases some of Respondent's (although unsubstantiated and wrong) assertions regarding the relationship between Claimant and Zummit.* […]

> *In case the Tribunal rejects Claimant's request to seek leave now and rather have Claimant seek it at the occasion of Claimant's opening statement, Claimant would in that case like to propose that the substance of such a new submission be discussed on the last day of the hearing if Claimant's leave is granted. Claimant's main concern and thus Claimant's basis for such a suggestion is the wish to not delay the proceedings. In case this is not allowed, the only other option would be to submit these submissions after the hearing, this however would*

> *not only delay the proceedings, but also would not leave space for*
> *neither Claimant nor Respondent to question witnesses on these fact*
> *or present their arguments at the occasion of the hearing. Particularly*
> *in light of the fact that these developments carry great weight and*
> *impact on both the calculation of damages and the merits of the case."*

112   The Sole Arbitrator replied to the Parties' emails and pointed out that by his email of the same day he wanted to issue clear directions for the Parties in order to prepare the Hearing and that he did not "*exclude or reject any request by the Respondent to file a new submission […] or evidence."* The Sole Arbitrator granted the Respondent until 29 September 2020, 2pm, to file any comments on the Claimant's email.

113   By email of 29 September 2020, the Respondent submitted its comments to the Claimant's email of 28 September 2020 and requested *"that CLAIMANT is allowed to withdraw its alleged damages claim for the penalty under the Zummit Agreement (i.e. the penalty of USD 2,750,000), while CLAIMANT's request to make new factual allegations or even bring forward a new claim shall be rejected".*

114   By email, the Sole Arbitrator granted leave to the extent that the Claimant sought to withdraw claims made in the current proceedings. The Arbitral Tribunal invited the Claimant to file, by email, an amended prayer for relief, highlighting such withdrawal of claims by 29 September 2020, 8pm and to explain which claims are withdrawn. The Arbitral Tribunal has not admitted any submission, including documentary evidence, which related to a *"change of the nature of the Claimant's claim for damages"* or any other new submission with regard to any of the Respondent's allegations made so far in these proceedings.

115   The Claimant had not reacted within the time limited granted. On the same day (20:57), the Claimant filed an amended prayer with an explanation, however not complying with the Tribunal's directions of the same day (this email was dealt with at the oral Hearing).

116   By emails of 29 September 2020 and 30 September 2020 respectively, the Parties sent the presentations of their opening statements.

117   By email of 30 September 2020, the Respondent sent the statement of independence of Mr. Alfredo Trujillo Betanzos.

118   From 30 September 2020 to 2 October 2020, the Hearing took place in Vienna. At the Hearing, the following witnesses and expert witnesses were examined: Miguel Luna, , José Antonio Montes, José Truchuelo, Jorge Gutiérrez, Prof. Susanne Kalss (nominated by Claimant), and Hans Maltz, Reinhard Riedl,

Alexander Hodosi, Prof. Zöchling-Jud, Margarita Beatrix Luna Ramos, Arturo del Castillo, Gerardo Vargas (nominated by the Respondent). Due to the COVID pandemic, the Hearing was conducted in part remotely (some of the witnesses and experts were interrogated per video), as agreed between the Sole Arbitrator and the Parties.

119    By email of 5 October 2020, the Sole Arbitrator sent an overview of the next steps of the arbitral proceedings to the Parties.

120    By email of 23 October 2020, the Respondent sent the transcript of the Hearing the Parties had agreed on to the Sole Arbitrator and informed that the marks "(?)" and "(…)" contained therein referred to words that neither the court reporter nor the Parties could reconstruct.

121    By emails of 10 November 2020, the Parties submitted their Post-Hearing Briefs ("**PHB Claimant**" and "**PHB Respondent**"). The Respondent's PHB was filed together with exhibit RL-48.

122    By emails of 25 November 2020, the Parties submitted their cost submissions and further comments on allocation of costs. The Claimant filed exhibit RL-15.

123    By email of 3 December 2020 (10:20), the Sole Arbitrator declared the arbitration proceedings as closed pursuant to Article 32 Vienna Rules.

124    By emails of 3 December 2020 (19:45), the Claimant submitted its updated Statement of Costs.

125    By email to the Parties of 19 February 2021, the Sole Arbitrator asked the Parties to clarify specific points related to the Parties' cost submissions by 24 February 2021.

126    By email of 19 February (Claimant) and 22 February 2021 (Respondent), the Parties sent their clarifications as requested.

## 4    THE PARTIES PRAYERS FOR RELIEF

### 4.1    Relief sought by Claimant

127    In its SoC dated 18 December 2019, Claimant requests the Arbitral Tribunal to

> "a) Declare that Respondent breached the Export Credit Facility Agreement executed between Claimant and Respondent on 10 January 2018 and dated 10 October 2017;
>
> b)  Order Respondent to pay Claimant EUR 41,585,900.00;
>
> c)  Declare that Respondent breached its duty of confidentiality to Claimant;
>
> d)  Order Respondent to bear all costs of the arbitration proceedings, including, but not limited to, the costs and expenses of the VIAC International Arbitral Centre of the Austrian Federal Economic Chamber and of the appointed arbitrator, and to compensate Claimant for all costs incurred in connection with the arbitration including attorney's fees and expenses, cost of lost executive time and executive expenses, and expert's fees and expenses if applicable;
>
> e)  Award any further relief that the Arbitral Tribunal deems necessary to effectuate the reliefs requested above."

128    In its Reply dated 14 May 2020, Claimant requests the Sole Arbitrator to

> "a) Declare that Respondent breached the Export Credit Facility Agreement executed between Claimant and Respondent on 10 January 2018 and dated 10 October 2017;
>
> b)  Order Respondent to pay Claimant EUR 41,835,685.80;
>
> c)  Declare that Respondent breached its duty of confidentiality to Claimant;
>
> d)  Order Respondent to bear all costs of the arbitration proceedings, including, but not limited to, the costs and expenses of the VIAC International Arbitral Centre of the Austrian Federal Economic Chamber and of the appointed arbitrator, and to compensate Claimant for all costs incurred in connection with the arbitration including attorney's fees and expenses, cost of lost executive time

*and executive expenses, and expert's fees and expenses if applicable;*

e)    *Award any further relief that the Arbitral Tribunal deems necessary to effectuate the reliefs requested above."*

129    In its Post-Hearing Brief of 10 November 2020, the Claimant's requests for relief states as follows:

"a)    *Declare that Respondent breached and unlawfully terminated the Export Credit Facility Agreement executed between Claimant and Respondent on 10 January 2018 and dated 10 October 2017;*

b)    *Order Respondent to pay Claimant EUR 41,835,685.80;*

c)    *Declare that Respondent breached its duty of confidentiality to Claimant;*

d)    *Order Respondent to bear all costs of the arbitration proceedings, including, but not limited to, the costs and expenses of the VIAC International Arbitral Centre of the Austrian Federal Economic Chamber and of the appointed arbitrator, and to compensate Claimant for all costs incurred in connection with the arbitration including attorney's fees and expenses, cost of lost executive time and executive expenses, and expert's fees and expenses if applicable, payable to Claimant´s counsel´s trustee account IBAN AT791200051456928903 in accordance with Section 19a RAO (österr Rechtsanwaltsordnung / Austrian Lawyer Code);*

e)    *Award any further relief that the Arbitral Tribunal deems necessary to effectuate the reliefs requested above."*

### 4.2    Relief sought by Respondent/Counterclaimant

130    In its Answer dated 31 January 2020, the Respondent requested the Sole Arbitrator to render the following

*"**AWARD:***

*(i) CLAIMANT's claims are dismissed in their entirety.*

*(ii) CLAIMANT shall be liable to fully reimburse RESPONDENT for all fees, expenses and costs related to this arbitration including internal and legal costs."*

131    In the same submission, Respondent as Counter-Claimant requests the Sole
       Arbitrator to render the following

                                    *"AWARD:*

       *(i) COUNTER-RESPONDENT shall be liable to pay the amount of*
       *EUR 3,037,823.24 plus interest as will be established in the further*
       *course of the proceedings.*

       *(ii) COUNTER-RESPONDENT shall be liable to fully reimburse*
       *COUNTER-CLAIMANT for all fees, expenses and costs related to this*
       *arbitration including internal and legal costs."*

132    In its Answer to Reply dated 30 June 2020, the Respondent maintains its
       request as stated in para. 130 above.

133    In the same submission, the Respondent as Counter-Claimant requests the
       Sole Arbitrator to render the following

                                    *"AWARD:*

       *(i) CLAIMANT / COUNTER-RESPONDENT shall be liable to pay the*
       *amount of EUR 3,075,192.72 to RESPONDENT / COUNTER-*
       *CLAIMANT within 14 days after service of this award.*

       *(ii) CLAIMANT / COUNTER-RESPONDENT shall be liable to pay to*
       *RESPONDENT / COUNTERCLAIMANT default interest of the*
       *aggregation of (1) 2.4% p.a. and (2) the one month EURIBOR as*
       *applicable if EURIBOR is not below zero, out of the amount of*
       *EUR 66,303.14 from July 01, 2020 until the date of payment of the*
       *capital, as well as default interest of the aggregation of (1) 2.94% and*
       *(2) the six months EURIBOR as applicable if EURIBOR is not below*
       *zero, out of the amount of EUR 3,008,889.59 from July 01, 2020 until*
       *the date of payment of the capital.*

       *(iii) CLAIMANT / COUNTER-RESPONDENT shall be liable to fully*
       *reimburse RESPONDENT / COUNTER-CLAIMANT for all fees,*
       *expenses and costs related to this arbitration including internal and*
       *legal costs."*

134    In its Post-Hearing Brief of 10 November 2020, the Respondent's request for
       relief states as follows:

       *"For all these reasons, RESPONDENT maintains its Requests for*
       *Relief concerning CLAIMANT's unlawful claims and RESPONDENT's*
       *counterclaim."*

## 5    BACKGROUND OF THE DISPUTE

135    The Claimant is a limited liability company established under the laws of
Mexico and is a manufacturer and distributor of film packaging. The
Respondent is one of Austria's major banks.

136    On 14 June 2016 (**PO Nr. ORC 2762**),[1] 16 June 2016 (**PO Nr. 2763**)[2] and 10
July 2017 (**PO Nr**. **2770A**)[3] the Claimant concluded three different supply
contracts ("**Purchase Agreements**")[4] for the delivery of specific types of
equipment with the Austrian manufacturer for extrusion lines ("**Equipment**")
SML Maschinengesellschaft mbH ("**SML**").

137    In order to finance the purchase of the Equipment, the Claimant opted for an
export credit facility from an Austrian bank. In this context, the Parties
concluded the **Export Credit Facility Agreement** on 10 January 2018, dated
10 October 2017 ("**the Agreement**").[5]

138    In the framework of the Agreement, the Österreichische Kontrollbank
("**OeKB**") undertook to guarantee the export credit facilities.[6]

139    Under the Agreement, the Respondent undertook to provide the necessary
financing, by granting a loan, of 85% for the supply contracts and for costs of
obtaining the required OeKB guarantee.[7] More specifically, the Respondent
made available to the Claimant a loan facility divided into two parts ("**Facility
A**" and "**Facility B**")[8] each relating to the Equipment ("**Project Assets A**"
and "**Project Assets B**") to be acquired under the Purchase Agreements. The
loans made or to be made under Facility A or Facility B of the Agreement
were defined as **Facility A Loan** and **Facility B Loan.**[9]

140    When the Agreement was signed, the following Projects and related Purchase
Agreements were specified in the Agreement:

---

[1] R-3. In this Award, factual exhibits are referred to as follows: "**C-[X]**" for Claimant's exhibits;
"**R-[X]**" for Respondent's exhibits; "**CL-[X]**" for Claimant's legal exhibits; "**RL-[X]**" for
Respondent's legal exhibits; "**CEWS-[X]**" for Claimant's expert witness statement; "**REWS-[X]**"
for Respondent's expert witness statements; "**CWS-[X]**" for Claimant's witness statements; "**RWS-
[X]**" for Respondent's witness statements.

[2] R-4.

[3] R-6.

[4] See definition in the Export Facility Agreement: C-3, p. 13.

[5] C-3.

[6] C-3, p. 4.

[7] C-3, p. 4 and Clause 2.

[8] C-3, Clauses 2.1-2.3.

[9] C-3, p. 9.

"***Project Asset A*** *means:*

*(a) one castfilm winder series 3000 plus additional part bobbin for the Borrower; and*

*(b) one coextrusion castfilm line (ecocompact) plus cooling capacity for the Material Subsidiary.*

***Project Asset B*** *means one coextrusion castfilm line (smartcast line) plus extra chiller for the Material Subsidiary.*

***Project Value*** *the aggregate amount of the Project Value A and the Project Value B, not exceeding EUR 7,384,800.*

***Project Value A*** *means the value of the Project Asset A in the total amount not exceeding EUR 3,804,800 consisting of EUR 815,000 for one castfilm winder plus part bobbin for the Borrower and EUR 2,989,800 for one coextrusion castfilm line (ecocompact) plus silos plus highlight tester for the Material Subsidiary.*

***Project Value B*** *means the value of the Project Asset B in the amount not exceeding EUR 3,580,000 for one coextrusion castfilm line (smartcast line) plus extra chiller for the Material Subsidiary.*[10]"

141    The loan amounts to be made available were described as follows:

*"2.1 **The Facility***
*Subject to the terms of this Agreement, the Lender makes available to the Borrower a facility in an aggregate principal amount of the lesser of:*

*(a) an amount not exceeding EUR 6,497,100 (euro six million four hundred ninety-seven thousand one hundred).; and*

*(b) the Financed Percentage of the Project Value plus moneys due in respect of the OeKB Guarantee Premium*

*to be divided into two facilities as follows:*

> *(i) The Facility A in an aggregate principal amount of the lesser of:*

> > *(A) an amount not exceeding EUR 3,351,600 (euro three million three hundred fifty one thousand six hundred); and*

---

[10] C-3, p. 13.

> *(B) the Financed Percentage of the Project Value A plus moneys due in respect of the OeKB Guarantee Premium Part A;*
>
> *and*
>
> *(ii) The Facility B in an aggregate principal amount of the lesser of:*
>
> *(A) an amount not exceeding EUR 3,145,500 (euro three million one hundred forty five thousand five hundred); and*
>
> *(B) the Financed Percentage of the Project Value B plus moneys due in respect of the OeKB Guarantee Premium Part B."*[11]

142   The Disbursement of a Facility under the Agreement was subject to several conditions. Those conditions were *inter alia* summarised under Clause 4.1 (Initial conditions precedent), Clause 4.2 (Conditions Precedent to Disbursement), Clause 4.4 (Further conditions precedent).

143   The Respondent had disbursed the Facility A Loan in full in October 2018.[12] The Facility B Loan was never disbursed.

144   In July 2019, the Respondent informed the Claimant that the Facility B Loan was no longer available.[13]

145   The Parties disagree as to whether in July 2019 the Respondent was obliged under the Agreement to disburse the Facility B Loan, whether the Respondent unlawfully terminated or breached the Agreement when it declared that the Facility B Loan was no longer available (or otherwise breached the Agreement) and whether the Claimant owes the Respondent any amounts related to the Facility A Loan.

146   As no amicable settlement of the dispute could be found, on 18 December 2019, the Claimant initiated this arbitration.

## 6     THE PARTIES' POSITIONS

### 6.1     Introduction

147   The following presentation is intended to merely summarize the Parties' main positions. The individual arguments of the Parties relevant to the decision will

---

[11] C-3, pp. 17-18.

[12] R-56.

[13] R-26.

be explained in more detail in the context of the assessment by the Arbitral Tribunal.

### 6.2    The Claimant's position

### 6.2.1    The Respondent has breached and unlawfully terminated the Agreement

148    The Claimant considers that the Respondent unlawfully terminated the Agreement in July 2019 by not disbursing the Facility B Loan.

149    When the Respondent terminated the Agreement in July 2019, the Respondent indicated several reasons for the termination. However, none of these reasons justified the Respondent's wrongful termination of the Agreement. In particular, the Availability Period under Facility B had not elapsed.[14] Neither had any late payments nor alleged accounting or tax issues with the Claimant's booking of the loan of Facility A occurred. Also, the status of the negotiations with SML regarding the relevant supply contract did not justify the termination.[15]

150    The Respondent also breached the terms of the Agreement. In particular, the Claimant claims that the Respondent has not disbursed the Facility B Loan within the Availability Period under the agreed amendment of the Agreement related to Facility B.[16]

151    The Respondent mishandled the "Know Your Customer" check ("**KYC**"), and, against better knowledge, had communicated and promised the Disbursement and terms of Disbursement under Facility B and had wrongfully interfered with the Claimant's contractual relations with third parties. Finally, the Claimant contends that the Respondent breached its covenants of good faith and fair dealing and breached its obligations of confidentiality.[17]

---

[14] PHB Claimant, paras. 17 et seq.

[15] SoC, para. 49 et seq.; Reply, paras. 33 et seq.

[16] SoC, paras 57 et seq.; Reply, paras. 61 et seq.

[17] SoC, paras. 67 et seq.; Reply, paras. 31 et seq.

### 6.2.2    Due to depriving the Claimant of the loan under Facility B the Respondent caused the Claimant to suffer damages

152    The Claimant is entitled to damages due to the Respondent's intentionally depriving the Claimant of the loan under Facility B and causing the Claimant to suffer damages.[18]

153    The damages, totalling EUR 41,835,685.80 consist of the following amounts:

a)    Fees paid by the Claimant which were necessary for the Disbursement of the loans under Facility A and B of EUR 276,103.57. Although the fees are non-refundable under the wording of the Agreement, the events surrounding the Agreement must be taken into account. The Respondent breached the Agreement, hence the fees are not due. The Respondent had nothing to manage regarding Facility B, hence no management fees are due. Given that the Respondent has not fulfilled a valid performance obligation, the Claimant is entitled to compensation for the expectation loss, based on §§ 920, 933a and 921 ABGB.

b)    The loan amount under Facility B which the Respondent never disbursed of EUR 3,994,000. The Claimant must be put into a position the Claimant would have been in if the performance had been duly and properly rendered by the Respondent.

The loans under the Agreement were intended to be used for acquiring equipment in order for the Claimant to fulfil its obligations under a joint venture agreement concluded with the company Zummit Plastics Inc. ("**Zummit**") on 15 September 2017 and a private purchase agreement with Empaques Poliplasticos S.A. de C.V. ("**Empaques**") on 15 January 2018. Due to Respondent's unlawful termination of the Agreement, the Claimant was not able to purchase the equipment. The Respondent caused the Claimant to breach its contracts with Zummit and with Empaques and suffer lost profits as the Claimant was not able to profit from the agreements with Zummit and Empaques. The Respondent must therefore be liable for the following additional amounts:

c)    A penalty fee due under a penalty clause contained in the joint venture agreement concluded with Zummit minus 45% that was satisfied by the loan under Tranche A of (converted from USD) EUR 2,533,300. Under the joint venture agreement, the parties joined efforts for the development of an industrial building in Phoenix which would manufacture plastic films. Under the agreement, the Claimant had to provide the necessary equipment, consisting of one winder series 3000 plus and one coextrusion

---

[18] SoC, paras. 113-129; Reply, paras. 87-112; PHB Claimant, paras. 124-188.

castfilm line plus cooling equipment, one coextrusion castfilm line (smartcast Line) plus extra chiller, and Zummit was to acquire the facility. The Claimant had a 30% profit share.

With regard to this prayer, a few days before the Hearing started, on 23 September 2020, in an unsolicited submission, the Claimant explained that the Claimant was financially strained due to the Respondent's unlawful actions and could therefore not pay the penalty fee to Zummit. Zummit had offered not to initiate legal proceedings against the Claimant but to rather take over the Claimant for its current share price which had dropped due to the Respondent's unlawful termination of the Agreement. The Claimant had entered a Memorandum of Understanding with Zummit under which Zummit would buy out the Claimant over a period of the next three years. Zummit would no longer claim the penalty fee. Instead of the penalty fee claimed so far in the entire proceedings, the Claimant now sought to claim damages arising out of the fact that the Claimant had been forced to sell its shares under value and presented a calculation in that regard. The Sole Arbitrator had granted the opportunity, before the hearing, to withdraw the claims, however not to file a revised damage claim, a claim which the Claimant again reiterated only a few hours before the Hearing (see para. 113 above). The Sole Arbitrator could not accept this change at the very late stage of the proceedings and gave the Claimant again at the hearing the opportunity to withdraw its claim under this prayer, which the Claimant has not done. In the Post-Hearing Brief, the Claimant maintained its original claim for damages.

d) The value of shares lost under a joint venture agreement with Zummit of (converted from USD) EUR 2,997,567.03. As a guarantee of compliance under the joint venture, the Claimant delivered to Zummit the share title certificate of its ownership of 1 000 000 shares representing the capital stock of USD 1,000,000.00 of Zummit. The Respondent caused the Claimant to lose its shares that it pledged.

e) A penalty fee under the private purchase agreement with Empaques of (converted from USD) EUR 27,636,300.00. Under the private purchase agreement, Empaques would buy a volume of 30 000 000 LBS of stretch film per year for the price of USD 1.00 per LBS, totalling USD 30,000,000.00 per year. In case of breach, the breaching party was liable to pay the non-breaching party a penalty in the amount of USD 30,000,000.00. The contractual penalties are governed by Mexican law and are proportionate to the damage suffered. According to the Claimant, the damage caused is a foreseeable consequence of the Respondent's breach and premature unilateral termination of the Agreement.

f)   Profit lost per year under the private purchase agreement with Empaques
     for the five-year duration of the agreement between the parties of
     EUR 4,398,415.18.

### 6.2.3    The Claimant has not breached the Facility Agreement (Defense to counterclaim)

154    The Claimant invokes § 920 ABGB pursuant to which the debtor is entitled
       to avoid the contract, even if he is in fact able to perform, but performance is
       so burdensome for him that he cannot be reasonably expected to perform. The
       Claimant considers that with the Respondent's unlawful refusal to disburse
       the loan under Facility B and the Respondent's subsequent unilateral
       termination of the Agreement, the Claimant is excused from its performance
       as it is evident that partial performance in form of only the loan under Facility
       A is of no interest to the Claimant, due to the fact that the Claimant cannot
       fulfil its contractual obligations with only the loan under Facility A. The
       understanding between the Parties was always the Disbursement of the full
       loan amount comprised of both, Facility A and B. After the termination, the
       Claimant's payment obligations have been suspended.[19]

### 6.3    The Respondent's position

### 6.3.1    The Respondent has not breached the Agreement

155    The Respondent rejects the claim and considers that in July 2019, the
       Respondent was no longer obliged under the Agreement to disburse the
       Facility B Loan which was no longer available and has not breached any
       confidentiality obligations.[20]

### 6.3.2    The Claimant's claims for damages are not justified

156    The requirements for a damage claim are not fulfilled.[21] The Claimant does
       not show damages regarding the KYC process and does not show any
       damages in regard to *culpa in contrahendo*.[22]

---

[19] Reply, paras. 113 et seq.; PHB Claimant, paras. 189-200.

[20] Answer, paras. 147 et seq., 163 et seq.

[21] Answer to Reply, paras. 64 et seq.

[22] Answer, paras. 145 et seq.; Answer to Reply, paras. 224 et seq.

157    The Claimant does not provide any reason for reimbursement of the fees paid under the Facility Agreement and does not provide a reason for being entitled to the amount under Facility B.[23]

158    The Claimant also does not establish any damages under the Zummit Agreement[24] and under the Empaques Agreement.[25] The contractual penalties in the Zummit Agreement and the Empaques Agreement are invalid under Mexican law.[26]

159    The Respondent did not cause the alleged breach of the Zummit Agreement.[27] The Claimant does not establish the Respondent's causation for the contractual penalty of the Empaques Agreement.[28]

160    The Claimant's submission on the contractual penalty of the Zummit Agreement is inconclusive.[29] The Claimant does not establish that the alleged damages under the Zummit Agreement and the Empaques Agreement are adequate.[30] The Claimant does not establish the value of the shares in Zummit[31] and does not establish lost profit under the Empaques Agreement.[32] The Claimant failed to mitigate the alleged damages.[33]

### 6.3.3    The Claimant has breached the Agreement by default in payment of the instalments due for Facility A: The Respondent's Counterclaim

161    In its counterclaim, the Respondent claims that the Claimant breached the terms of the Agreement. After the Disbursement of Facility A by the Respondent, the Claimant failed to pay the instalments due for Facility A. Based on the Claimant's default in payment, the Respondent terminated the Facility Agreement on 21 January 2020 and requested the payment of the outstanding amount, which is, in addition to interest on that amount, the subject of the counterclaim.[34] The Claimant cannot rely on § 920 ABGB.

---

[23] Answer, paras. 149 et seq., 183 et seq.; Answer to Reply, paras. 231 et seq.

[24] Answer to Reply, paras. 240-268.

[25] Answer to Reply, paras. 269-294.

[26] Answer to Reply, paras. 295-298.

[27] Answer to Reply, paras. 299-306.

[28] Answer to Reply, paras. 307-318.

[29] Answer to Reply, paras. 319-324.

[30] Answer to Reply, paras. 325-330.

[31] Answer to Reply, paras. 331-336.

[32] Answer to Reply, paras. 337-341.

[33] Answer to Reply, paras. 342-358.

[34] Answer, paras. 291-259; Answer to Reply, paras. 393-426.

# 7    CONSIDERATIONS OF THE SOLE ARBITRATOR

## 7.1    Introduction

162    The Arbitral Tribunal has carefully considered the Parties' arguments as presented in their pleadings, together with all the factual and legal evidence, the testimony of the witnesses of fact and expert witnesses and oral statements. In the following, only those arguments and evidence which the Sole Arbitrator considers relevant for its decision will be discussed.

163    In the following section 7.2, the Sole Arbitrator will discuss if the Respondent breached the terms of the Agreement. In particular, the Sole Arbitrator will discuss whether in July 2019 the Facility B Loan was still available and had to be disbursed and if the Respondent, by not disbursing Facility B, unlawfully terminated or breached the Agreement (section 7.2.1). The Sole Arbitrator will then examine whether the Respondent breached any confidentiality obligations (section 7.2.2) or otherwise breached the Agreement (section 7.2.3).

164    The counterclaim, which relates directly to the Parties' obligations under the Agreement, will be discussed in section 7.3.

## 7.2    Breach and unlawful termination of the Export Facility Agreement by the Respondent

### 7.2.1    The Respondent has not unlawfully terminated or breached the Agreement by not disbursing Facility B

#### 7.2.1.1    The Parties' Positions

165    The Claimant argues that the Agreement consists of two separate loans, Facility A and Facility B, each of which require their own Conditions Precedent to be satisfied and as such have different Closing Dates and Availability Periods.[35]

166    The Claimant has presented different alternative scenarios for the running of the Closing Period and Availability Period for Facility B, all of which show that the Availability Period had not elapsed in July 2019.

167    The Availability Period refers to a period in which the loan can be disbursed, as such it comes after the Closing Period. The Closing Period is the period

---

[35] SoC, paras. 50 et seq.

under which all Conditions Precedent must be satisfied, and this acts as a trigger for the Availability Period to commence.[36]

168    The Claimant submits that after 4 September 2018 the Respondent promised to provide the Claimant with an official document confirming the changes to the original Agreement (referring to new equipment for Facility B, with PO Nr. ORC 2823B) within the next days.[37] The Closing Period should be taken as the date when the Claimant satisfied all the Conditions Precedent necessary, which it did once OeKB had approved the changes on 4 September 2018.[38]

169    The agreed amendment under the Facility B Loan constituted a novation of the Agreement between the Parties.[39] Even if that novation did not occur as defined under § 1376 ABGB, the change in the contractual terms most certainly resulted in a change in debt within the meaning of § 1379 ABGB; the relevant conditions for granting credit and disbursing the loan amount were changed.[40] The agreed change in the terms and conditions had the consequence that the Availability Period only expired on 4 September 2019 or 4 November 2019[41] and not in July 2019.[42]

170    The Respondent failed to provide the amendment to the Facility Agreement and to disburse the loan, although all Conditions Precedent had been fulfilled.[43] The Claimant could not have been expected to make the down payment for ORC 2823B at that time.[44]

171    In any event Facility A had been successfully disbursed on 11 October 2018. One condition for the Disbursement of Facility B is the full Disbursement of Facility A, which means that the Conditions Precedent for the Disbursement of Facility B would have only been satisfied at that time. Following from that, the Closing Period could have only ended at that time as well. The Availability Period could not have started prior to this time and it would have ended on 11 October 2019, not in July 2019. Due to the Respondent's failure to give

---

[36] SoC, para. 52; PHB Claimant, para. 18.

[37] SoC, para. 38.

[38] SoC, paras. 65 et seq.

[39] SoC, para. 62, 64.

[40] Reply, para. 69.

[41] SoC, para. 65.

[42] SoC, para. 50 et seq., 63 et seq.; Reply, para. 71; PHB Claimant, paras. 21 et seq., 89 et seq.

[43] SoC, paras. 61 et seq.; PHB Claimant, paras. 21 et seq.

[44] PHB Claimant, paras. 40-45.

answers despite the Claimant's clear inquiries, the Respondent has extended the Closing Period. [45]

172    Furthermore, on 23 February 2018, the Respondent had notified the Claimant that the Closing Period for Facility A had ended. For Facility B, the Respondent did not do this. Since the Respondent never notified the Claimant of the Closing Period ending, the Availability Period could not have ended either. It had not even started.[46]

173    The Claimant argues that the fact that the above indicated scenarios for the running of the Closing and the Availability Period had to be constructed in order to understand the meaning of the Agreement, and since the Parties cannot seem to agree or interpret properly the duration of the Availability Period, such clause must be construed against the Respondent as the drafter for the Agreement. The Claimant relies on § 915 ABGB.[47]

174    The Respondent brought up the argument of the Availability Period only five months after the Availability for Facility A had elapsed.[48] The Claimant never abandoned the project.[49] The only amendment of Facility B was ORC 2823B.[50] By communication solely via email the Respondent has waived the terms under Clause 25.4 of the Agreement.[51]

175    The Respondent has breached the terms of the Agreement by failing to comply with the contractual deadlines and by unilaterally and unlawfully terminating the Agreement in July 2019.[52] All reasons indicated by the Respondent for cancelling the loan had been previously resolved between the Parties.[53]

176    The Claimant had provided all required information regarding the booking of the loan in the Claimant's accounts. There was no issue with the Claimant's accounting. The Claimant had booked the loan in its financial statements according to accounting practices and the laws of Mexico.[54]

177    The negotiations with SML had been successfully concluded and no payments were delayed when the changes under Facility B took place and the Claimant

---

[45] PHB Claimant, para. 20.

[46] SoC, para. 53; Reply, para. 48; PHB Claimant, paras. 23 et seq.

[47] PHB Claimant, para. 26.

[48] SoC, para. 76.

[49] Reply, paras. 40 et seq.

[50] PHB Claimant, paras. 28-39.

[51] Reply, para. 60.

[52] SoC paras. 49 et seq.; Reply, para. 61 et seq.; PHB Claimant, paras. 89-92.

[53] SoC, paras. 47 et seq.; Reply, paras. 33 et seq.

[54] Reply, para. 57; PHB Claimant, paras. 53-61.

had complied with every instalment and other fee due under the Agreement in that moment in time.[55] The Respondent also could not rely on any deterioration of the Claimant's financial situation.[56] Therefore, none of the reasons indicated by the Respondent at the time justified the wrongful termination of the Agreement.

178    The Respondent had communicated and promised the Disbursement and terms of Disbursement under Facility B. The Respondent cannot go back on the promise it had made. The Respondent breached its covenants of good faith and fair dealing when it failed to inform the Claimant in a timely manner that it was no longer interested in pursuing the transaction under Facility B. The Claimant is protected by the doctrine of *venire contra factum proprium* and *culpa in contrahendo*.[57] The Claimant invested in the facility, hired staff, attorneys, bought raw materials, and more.[58] The Respondent is liable for the actions of its agents, namely the promise made by the Respondent's Mr. Riedl. The Respondent is liable to the Claimant for the damage caused to it by the agent of Respondent's own choosing.[59]

179    The **Respondent** claims that after the Agreement was concluded, the Claimant only fulfilled the Conditions Precedent for Facility A within the applicable timeframe, which was then duly disbursed by the Respondent.

180    The Claimant did not provide the necessary documentation for Disbursement of Facility B. Rather the Claimant lost its interest in Project B as agreed upon, but suddenly intended to purchase a different machine from SML.[60]

181    On 30 May 2018, the Purchase Agreement B as defined in the Facility Agreement (ORC 27770A) was cancelled by the Claimant and SML and replaced by ORC 2823B. The change of the Purchase Agreement B required a signed amendment agreement of the Facility Agreement. This amendment, although negotiated, never occurred because the Respondent was informed on numerous occasions in September 2018 that ORC 2823B was not the final agreement.[61] Therefore, no new Closing Period or amended Availability

---

[55] Reply, paras. 52 et seq.; PHB Claimant, paras. 62-70.

[56] SoC, paras. 47 et seq., 77 et seq.; PHB Claimant, paras. 46 et seq.

[57] SoC, paras. 57-74, 81 et seq., 106 et seq.;Reply, paras. 80 et seq.; PHB Claimant, paras. 93 et seq., 117-123.

[58] PHB Claimant, para. 98.

[59] PHB Claimant, paras. 100-105.

[60] Answer, para. 21, 145 et seq.; PHB Respondent, paras. 32 et seq.

[61] Answer, paras. 149 et seq.; Answer to Reply, paras. 146 et seq.; PHB Respondent, paras. 44 et seq.

Period was agreed between the Parties,[62] although on 4 September 2018, Mr. Riedl had explained that an official amendment agreement for the Agreement would be provided "within the next days".

182    Given that the purchase contract ORC 2770A was cancelled, the conditions for Disbursement of Facility B could not have been (and in fact were not) fulfilled. The Conditions Precedent for Facility B had to be fulfilled within the Closing Period, i.e. by 9 March 2018. The Availability Period for Facility B elapsed on 8 March 2019. The Claimant and its expert witness distort the structure of the Facility Agreement.[63]

183    There was no termination of the Facility Agreement in July 2019. In July 2019, the Disbursement of Facility B was denied as the preconditions of the Disbursement were not met, the necessary documents could not be provided. The Disbursement was not possible as the project was abandoned by the Claimant.[64]

184    A novation, as well as every amendment of the Facility Agreement, would have been possible in writing only (Clause 19.17 (a)). Also, under Clause 25.4 (d), any consent given under the Agreement such as the consent required under Clause 19.17 (a) must not be communicated via email. Hence, the Agreement could only have been amended by a written and signed agreement. The Agreement and any deadlines could not have been tacitly amended.[65]

185    The Respondent did not commit *culpa in contrahendo*. There was no basis for any reliance on the Claimant's side that the amendment of the Agreement would be concluded in the way unilaterally requested by the Claimant.[66] In any case, the communication of September 2018 did not cause any alleged damages under *culpa in contrahendo*.[67]

186    More concretely, in July 2019, the Respondent decided not to continue with the negotiations. The Claimant frequently changed its mind with regard to the assets it intended to purchase and was not responsive to the Respondent's inquiries. The Claimant cannot rely on *culpa in contrahendo*.[68] In July 2019, the Claimant did not satisfactorily respond to the concerns of the

---

[62] Answer, paras. 15 et seq.; Reply, paras. 146 et seq.

[63] Answer to Reply, paras. 113-120.

[64] Answer, paras. 147 et seq; Answer to Reply, paras. 92-95, 133-142; PHB Respondent, paras. 95-98.

[65] Answer to Reply, paras. 143 et seq.

[66] Answer, paras. 181 et seq.; PHB Respondent, paras. 44-61, 86-88.

[67] Answer to Reply, paras. 216 et seq.; PHB Respondent, paras. 122-127.

[68] Answer to Reply, paras. 86-88, 216-222; PHB Respondent, paras. 88-94.

Respondent's risk management with regard to the accounting irregularities,[69] and the Claimant was in default when it delayed payments in March 2019; those payment delays were unexplained; and the Claimant remains in default of its payment obligations.[70]

187    Even if the Availability Period had been amended, it still would have had elapsed before July 2019. Furthermore, not all documents for Disbursement would have been submitted within the necessary time frame.[71]

188    Full Disbursement of Facility A Tranche 2 (i.e. the loan regarding the purchase price for Project Asset A), is a condition for the Disbursement of Facility B Tranche 2 (Clause 4.2 (e) (iii) of the Facility Agreement).[72]

189    The Facility Agreement was terminated in January 2020 and not before. In July 2019, the Respondent informed the Claimant that no amendment of the Facility Agreement would take place. This does not constitute a termination of the Agreement.[73]

### 7.2.1.2    Considerations by the Sole Arbitrator

190    The Claimant claims that the Respondent delayed and obstructed the Disbursement of Facility B and in July 2019 unilaterally cancelled the Disbursement of the loan under Facility B und thus unilaterally terminated the Agreement.[74] In particular, the Claimant argues that in July 2019, due to the agreed change of Project Asset B, the Closing Period and the Availability Period for Facility B had not elapsed. Therefore, the Respondent had a continued obligation to disburse Facility B. The Claimant also alleges a breach of the Agreement by the breach of confidentiality and other actions taken by the Respondent.

191    In this section, the Arbitral Tribunal will address if in July 2019 the Respondent had an obligation to disburse Facility B (as defined under the Agreement or under any agreed amendment thereto) and if the Respondent unlawfully terminated or breached the Agreement by not disbursing that Facility. In particular, the Sole Arbitrator will consider whether the Parties agreed on a change of Project B and the eventual impact of such agreed

---

[69] Answer to Reply, paras. 167-195; PHB Respondent, paras. 68-87.

[70] Answer to Reply, paras. 196-198; PHB Respondent, paras. 68-67.

[71] Answer to Reply, paras. 164-166; PHB Respondent, paras. 49-61.

[72] Answer, para. 65.

[73] Answer to Reply, paras. 199-208.

[74] PHB Claimant, para. 13.

change on the Closing Period and the Availability Period under the Agreement.

192    In that regard, the relevant questions to be addressed are the following:

i)    What are the conditions for Disbursement of Facility B under the Agreement?

ii)   What is the legal structure of the Agreement?

iii)  Was Facility B and/or any of the conditions for Disbursement of Facility B contained in the Agreement (*inter alia* the Availability Period) at any time amended by the Parties?

iv)   Were the conditions for Disbursement of Facility B satisfied by the Claimant within the time period provided under the (eventually amended) Agreement?

v)    If such conditions were not satisfied, was the Respondent nevertheless obliged in July 2019 to disburse Facility B (as eventually amended)?

193    The remaining alleged contractual and statutory breaches, including the breach of confidentiality will be addressed in sections 7.2.2 and 7.2.3.

*The Conditions for Disbursement of Facility B under the Agreement*

194    It is undisputed that under the Agreement, the Disbursement of the Facility A Loan and the Facility B Loan was subject to **several conditions**.

195    Those conditions were *inter alia* stipulated under Clause 4.1 (Initial conditions precedent, see para. 196 below), Clause 4.2 (Conditions Precedent to Disbursement, see paras. 197; 204 below) and under Clause 4.4 (Further conditions precedent, see paras. 248; 281 below).

196    With regard to the Initial conditions, precedent Clause 4.1. provides:

> "*4.1 **Initial conditions precedent***
>
> ***No Disbursement of any Loan*** *will be permitted unless the Lender has received all of the documents and other evidence listed in Part 1 of Schedule 1 (Initial Conditions Precedent) in form and substance satisfactory to the Lender **prior to the end of the Closing Period** relating to the respective Facility. The Lender shall notify the Borrower upon being so satisfied.*"[75]

---

[75] In the present Award, all highlights in quotes of the Agreement have been added by the Sole Arbitrator in order to facilitate the reading of the most relevant sections of the Agreement.

197    The **Conditions Precedent** to be fulfilled for Disbursement of **Facility B Tranche 1 Loan**, *inter alia,* required the filing of the following essential documents (Clause 4.2 (c) with reference to Schedule 1, Part III): "*A copy of the Purchase Agreement B executed by each party thereto*" (Schedule 1, Part III (a)); "*A certificate executed by a duly authorised officer of the Exporter and dated not more than ten Business Days prior to the Closing Date relating to the Facility B, confirming in a manner satisfactory to the Lender that the Purchase Agreement B in the form submitted by the Exporter to the Lender is in full force and effect*" (Schedule 1, Part III (c)), and also "*Evidence satisfactory to the Lender of the payment in full to Exporter of 15% of the Project Value B which is not part of the Financed Percentage provided for in the Purchase agreement B.*" (Schedule 1, Part III (e)); and "*An original of the OeKB Guarantee Part B, duly executed by OeKB*" (Schedule 1, Part III (f)).

198    Clause 5.1 stipulated:

> "*5.1 **Disbursements***
>
> *A Loan may only be disbursed subject to the provisions of Clause 4 (Conditions of Disbursement) and in accordance with the procedure set out in this Clause 5 (Disbursement).*"

199    Therefore, once the conditions as set forth in Clause 4 are fulfilled, Disbursement occurs.

200    In addition to the conditions in Clause 4, the procedure set out further in Clause 5 must be taken into account. In particular, Clause 5 provided that, subject to the provisions of Clause 4, the Lender shall:

> "*disburse an amount equal to the OeKB Guarantee Premium Part B, **promptly after the date on which the Borrower has satisfied all of the conditions precedent** set out in Part I of Schedule I (Initial Conditions Precedent) in accordance with Clause 4.1 (Initial conditions precedent) **and** in Part III of Schedule I (**Conditions Precedent to each Disbursement under Facility B Tranche 1**) in accordance with Clause 4.2 (Conditions Precedent to Disbursement) [...]*".[76]

201    The Agreement stipulated that the Initial Conditions Precedent and certain Conditions Precedent had to be fulfilled within a **defined period of time** (see paras. 201 et seq. below). The time frame within which the Respondent had the right to demand the **Disbursement** of the credit amounts under the Agreement was also **limited in time** (paras. 214 et seq. below).

---

[76] C-3, p. 22.

202    Clause 4.1. provides that the Initial conditions precedent had to be fulfilled within the **Closing Period** relating to the respective Facility.

203    Under the Agreement, the **Closing Period** in relation to Facility B means *"in relation to Facility B, **the period of 2 Months from and including the <u>date of this Agreement</u> <u>(or such other period as the Lender in its absolute discretion may agree)</u> <u>during which all of the conditions precedent</u>** set out in Part I of Schedule 1 (Initial Conditions Precedent) and in **<u>Part III of Schedule 1</u> <u>(Conditions Precedent to each Disbursement under Facility B Tranche 1)</u> must be satisfied** in accordance with Clause 4 (Conditions of Disbursement)."*

204    Clause 4.2 (c) states with regard to the Conditions Precedent for Facility B:

   *"No Disbursement of any **Facility B Tranche I Loan** will be permitted unless the Lender has received, on or before the **Closing Date** relating thereto (or at the discretion of the Lender after such Closing Date), in respect of such Disbursement all of the documents and other evidence listed in **Part III of Schedule 1 (Conditions Precedent to each Disbursement under Facility B Tranche 1)** in each case in form and substance satisfactory to the Lender"*

205    **Closing Date** is defined in the Agreement as follows:

   *"(a)   in relation to Facility A, the date on which all of the conditions precedent set out in Part I of Schedule 1 (Initial Conditions Precedent) and in Part II of Schedule 1 (Conditions Precedent to each Disbursement under Facility A Tranche 1) are satisfied in accordance with Clause 4 (Conditions of Disbursement) and/or waived, each as determined by the Lender in its discretion.*

   *(b)   in relation to **Facility B**, the **date on which all of the conditions precedent** set out in Part I of Schedule 1 (Initial Conditions Precedent) and in Part III of Schedule 1 (**Conditions Precedent to each Disbursement under Facility B Tranche 1) are satisfied** in accordance with Clause 4 (Conditions of Disbursement) and/or waived, each as determined by the Lender in its discretion."*

206    The Agreement therefore makes clear that the documents listed in Part 1 of Schedule 1 (Initial Conditions Precedent) must be submitted to the Respondent **prior to the end of the Closing Period** relating to the respective Facility.

207    The wording of the Agreement is clear to the extent that the Closing Period is a period of two months starting from the **date of the Agreement**. Although

dated 10 October 2017, the Parties agree that for the purpose of this clause the date of the Agreement should be the actual date of finalising the agreement, namely **10 January 2018**.

208    Regarding the documents and other evidence listed in Part III of Schedule 1 (**Conditions Precedent to each Disbursement under <u>Facility B Tranche 1</u>),** Clause 4.1 (c) provides that those documents and evidence must be submitted "*on or before the Closing Date*". The above copied definition of "Closing Date" which needs to be read together with the definition of "Closing Period" (which refers to documents listed in Part III of Schedule 1), makes it clear that the documents and evidence to be submitted as Conditions Precedent as listed in Clause 4.1 (c) must be satisfied within two months from the Agreement.

209    Therefore, when the Agreement was entered into, the Initial Conditions Precedent and the documents to comply with **Conditions Precedent to each Disbursement under Facility B Tranche 1** for Facility B had to be satisfied by **10 March 2018**, or within any other period "*as the Lender in its absolute discretion may agree*".

210    Based on the unambiguous wording of the Agreement, the Sole Arbitrator considers that there is no room for any different interpretation as to when the Closing Period started for Facility B, this being when the Agreement was signed.

211    The wording of the Agreement made also clear that the Closing Period of two months as of the date of the Agreement could be changed whereas this change was subject to the agreement by the Respondent and fell "*in its absolute discretion*."

212    Based on the Agreement, an amendment of the wording of the Agreement was not necessary to merely change the Closing Period. This change was already foreseen in the Agreement, but needed an agreement by the Respondent in writing, whereas an agreement by email would not have been sufficient (see Clause 25.4 of the Agreement).[77]

213    Had the Claimant therefore asked for the Disbursement of the Facility B Loan as described in the Agreement for Facility B (i.e. for the same maximum aggregate principal amount without changing the Purchase Agreement B) after the two months of the initial Closing Period had expired and if the Respondent had agreed (in the form of a signed letter) to this extended period, the Agreement would not have been amended. The Respondent had simply to inform the Claimant, in writing, on the expiration of the revised Closing

---

[77] See for the form requirement for any consent to be made in connection with the Agreement, also paras. 294 et seq. below).

Period. As mentioned, under the Agreement, the Respondent had "*absolute discretion*" to agree on the extension of the initial two months Closing Period.[78]

214    As part of the Conditions Precedent for Disbursement, the Agreement not only stipulates a time limit within which the Conditions Precedent to each Disbursement under Facility B Tranche 1 must be provided, but also **limits the timeframe within which the Claimant can ask for the Disbursement,** once those documents had been submitted within the Closing Period.

215    Clause 4.2 (a) stipulates as Condition Precedent that: *"No Disbursement of any Loan will be permitted unless [..](ii) the date of the Disbursement under any Tranche falls to be made on a Business Day after the Closing Date relating to the respective Facility and **within the Availability Period relating to the respective Facility.**"*

216    In other words, the Claimant can ask for the Disbursement of any Tranche only if such Disbursement is requested for a date after the Closing Date (in other words once all documents and evidence to be submitted under Conditions Precedent to each Disbursement under Facility B Tranche 1 are submitted), and only within the Availability Period. The Availability Period is defined as follows:

> *"**Availability Period** means the period from and including **the date of this Agreement** to and including:*
>
> *(a) in relation to Facility A, the day falling 12 Months after the last day of the Closing Period relating to the Facility A; and*
>
> *(b) in relation to Facility B, the day falling 12 Months after the last day of the Closing Period relating to the Facility B"*

217    The Availability Period under the Agreement therefore starts with the Agreement and ends 12 months after the last day of the Closing Period relating to Facility A or B.

218    Under the unambiguous terms of the Agreement, the Availability Period and the Closing Period therefore started for Facility A and B at the same moment, namely on 10 January 2018. The Availability Period ended 12 months after the end of the Closing Period (10 March 2018), namely on **10 March 2019**. Even if all Conditions Precedent were fulfilled within the Closing Period,

---

[78] See definition of "Closing Period".

under the terms of the Agreement, no Disbursement under Facility B was therefore to be made after 10 March 2019.

219    The Sole Arbitrator considers that the Respondent in its letter to the Claimant dated 23 February 2018[79] mistakenly identified 31 January 2019 as the end date of the Availability Period for Facility A which should have read 10 March 2019.[80] However, this mistake has no relevance for the present matter as Loan A was disbursed in full in April 2018 (for the main amount) and October 2018.[81]

220    The Arbitral Tribunal disagrees with the Claimant that under the Agreement, the end of the Closing Period acts as a "trigger" for the Availability Period.[82] The Agreement is clear insofar as the **starting date** (and hence the "trigger") for the Availability Period is the date of the Agreement, i.e. the date of its conclusion (which is also the starting date of the Closing Period), and not the end of the Closing Period. The clear wording of the Agreement does not leave any room for a different interpretation. The Claimant has not provided any convincing argument as to why the Sole Arbitrator should not rely on the unambiguous wording of the Agreement which was also perfectly in line with the entire structure of the Agreement at the time the Agreement was signed (see paras. 223 et seq. below). In that regard Prof. Kalss, expert witness nominated by the Claimant, could not explain at the Hearing with sufficient clarity understandable to the Sole Arbitrator why she concluded in her expert witness statement that the Availability Period should start to run with the "*closing day*" and not with the date of the Agreement, as stipulated in the Agreement.[83] She confirmed at the Hearing that the Closing Period started with the conclusion of the Agreement.[84] The Sole Arbitrator does not agree with Prof. Kalss that *"despite enquiries made by the borrower, the lender has not expressed that the Closing Period for Facility B had already expired"* and that therefore "*the borrower had to assume that the Closing Period had been extended and that the Closing Day had not yet been set".*[85] Prof. Kalss could not explain which "enquiry" she was referring to and confirmed at the Hearing

---

[79] C.13.

[80] SoC, para. 58. The Sole Arbitrator does not agree with the Claimant's assessment in the SoC that the end of the Availability should have been indicated in this letter on 23 February 2019.

[81] R-55; R-56.

[82] PHB Claimant, paras. 18 et seq.

[83] CEWS-1, p. 2.

[84] TR Kalss, 3165-3166.

[85] CEWS-1, p. 5.

that this was something "she assumed"[86] and that she had only seen the Agreement and had not seen any email correspondence or "anything else".[87]

221    If the Respondent was to agree to a different Closing Period for Facility A and B, as this was expressly provided for in the Agreement, (see paras. 205 et seq. above), the Availability Period would be extended accordingly, namely then ending 12 months after the end of the amended Closing Period. However, in this case, the start of the (extended) Availability Period would still be the date of the Agreement. In the same vein, if the Closing Period is not extended or amended, the Availability Period would still elapse 12 months after the last day of the initial Closing Period. In this case, if the Initial Conditions Precedent are not fulfilled and the necessary documents and evidence under the Conditions Precedent are not provided within the original (and unamended) Closing Period, the Availability Period therefore continues running. However, in this case, the Availability Period would be of no further relevance, as the Facility to be disbursed will always depend on the timely fulfilment of the (initial) Conditions Precedent within the Closing Period (as agreed or amended with the absolute discretion of the Respondent).

222    The mere fact that the Availability Period was related to the Closing Period does not imply that the Availability Period could not start running with the date of the Agreement.

223    The above described structure of the Agreement makes total sense if one is looking into the context in which the Agreement was signed.

224    The Sole Arbitrator namely considers that when the contract was concluded, the Parties had not excluded that the Disbursement for both Facilities A and B, Tranche 1 would be asked for immediately after the Agreement was concluded, even if Disbursement of Facility B Tranche 2 would only occur once Facility A was disbursed in full.

225    In that regard, the record let conclude that at the time the Agreement was signed, the Conditions Precedent to each Disbursement under Facility B Tranche 1 could have been fulfilled within the original two months Closing Period. The Purchase Agreement B had already been signed on 10 July 2017[88] and the Agreement was signed on 10 January 2018. Therefore the (initial) Conditions Precedent could have been fulfilled within the two months of the signature of the Agreement. The Claimant even asked within the first two months after signature of the Agreement when Facility B would be

---

[86] TR Kalss, 3561-2574.
[87] TR Kalss, 3038-3039.
[88] R-6.

"released".[89] The delivery period for Project A and B had only a difference of two months (eight months for Project A and ten months for Project B).[90] Had the Claimant executed Project B and made the down payment for both Projects A and B within the Closing Period, delivery of Project B and full Disbursement for Facility B could have taken place within the Availability Period of 12 months.

226    In light of the short difference in the delivery periods for Projects A and B, (eight and ten months), which had both been signed before the Agreement was entered into, it made sense that the Initial conditions precedent and the documents to be submitted under the Conditions Precedent to each Disbursement under Facility A and B Tranche 1 were to be fulfilled within the first two months after signature of the Agreement.

227    The Disbursement of Facility A in full was a condition for Disbursement of any Facility B Tranche <u>2 Loan</u>, however not Tranche 1 Loan. As mentioned above, the Disbursement for any loan under Tranche 1, which was equal to the OeKB Guarantee Premium Part B[91] was to be made "promptly" after the Initial Conditions Precedent and the Conditions Precedent to each Disbursement under Facility B Tranche 1 were satisfied. Those conditions had to be satisfied within two months of the Agreement. Therefore, based on the wording and the context of the signing of the Agreement, the Sole Arbitrator is not convinced that the Closing Period for Facility B could not start or end before the entire Loan A had been disbursed.

228    The Claimant's arguments regarding the start and end dates of the Closing Period and the Availability Period are therefore not convincing.

229    As explained above, the Arbitral Tribunal does not consider that one of the conditions for the Disbursement of Facility B Tranche 1 and 2 is the *full* Disbursement of Facility A (see para. 227 above).[92]

230    The wording of the Agreement lets conclude the contrary, as Clause 4 merely stipulates that "*No Disbursement of any Facility B Tranche **2 Loan** will be permitted*" unless Loan A has been disbursed in full. Therefore, this rule does not apply to Facility B Tranche 1 Loan.

---

[89] R-9.

[90] R-3, p. 16 (ORC 2.762: 8 months after receipt by SML of 5% down payment); R-4, p. 5 (ORC 2.763: 8 months after receipt by SML of 5% down payment); R-6 (no page number; under "Commercial Terms" (ORC 2.770A: 10 months after receipt by SML of 5% down payment).

[91] C-3, see Clause 5.2, 2.3 (a) and 10.6 (a) (ii).

[92] PHB Claimant, Scenario 1, paras. 19-20.

231    Contrary to the Claimant's statement,[93] Prof. Zöchling-Jud, the expert witness nominated by the Respondent, has not confirmed the Claimant's understanding in that regard. Prof. Zöchling-Jud explained that if all Conditions Precedent are fulfilled within the first two months, and the loan is not requested within the Availability Period, then the loan agreement cannot "*start*".[94] She neither said that one condition for the Disbursement of Facility B Tranche 1 is the full Disbursement of Facility A or that the Availability Period starts running with the end of the Closing Period. Prof. Zöchling-Jud even said that, under the Conditions Precedent, precisely the conditions listed under Clause 4.2 (e) (iii) must *not* be fulfilled within the Closing Period of two months.[95]

232    Although Mr. Riedl from the Respondent mentioned that, after the Closing Period had already expired, on 8 August 2018 the *"tranche B can only be introduced when tranche A has been fully delivered and fully disbursed"*,[96] the reference to Tranche B can only have been a reference to Facility B Tranche 2 which is the part of the Disbursement which is conditioned upon delivery of Facility A. Tranche 2 is the part that refers to the actual purchase price of Project B and is therefore the part of the loan which is of particular interest for the Claimant. The Sole Arbitrator therefore considers that the Respondent's submission that "*Full Disbursement of Facility A Tranche 2 (i.e. the loan regarding the purchase price for Project Asset A), is a condition for the Disbursement of Facility B Tranche 2*."[97] is a correct reading of the Agreement.

233    It is therefore wrong to conclude that the Closing Period for Facility B could only have ended when Tranche A was fully disbursed (which was on 11 October 2018), and that the Availability Period could not have started prior to that time and would have ended only on 11 October 2019 and, "*not in July 2019 like Respondent conveniently decided"*.[98] As explained, under the Agreement, the Closing Period for Facility A and Facility B ended two months after the Agreement had been signed. The Availability Period started when the Agreement was signed and runs 12 months after the end of the Closing Period. The Initial conditions precedent and the Conditions Precedent to each Disbursement under Facility B Tranche 1 must be fulfilled within two months after the signature of the Agreement. The Sole Arbitrator does not see which

---

[93] PHB Claimant, para. 19.

[94] TR Zöchling-Jud, 4159.

[95] TR Zöchling-Jud, 4343-4377.

[96] C-18.

[97] Answer, para. 65.

[98] PHB Claimant, Scenario 1, para. 20.

of those conditions could not be fulfilled within the Closing Period when the Agreement was signed.

234     Based on the above analysis, the Sole Arbitrator also does not agree that the Availability Period ended on 4 September 2019.[99] The Claimant argues under that scenario that the Closing Period ended (and hence the Availability Period began) on 4 September 2018, when the Respondent communicated to the Claimant that OeKB gave its approval for the amendment of Facility B, based on the amendment agreement with SML and issued a *promesse* "*signalling the fulfilment of Conditions Precedent and thus the end of the Closing Period*". Apart from the fact that the Closing Period had already elapsed two months after the Agreement had been signed, in this scenario, the Claimant seems to imply that the approval by OeKB was the only Condition Precedent to be satisfied under Clause 4 and Schedule 1 (Part III), which is not the case (see para. 197 above). As will be shown below, the Claimant also has not established that at that moment in time the Claimant had fulfilled all Conditions Precedent to each Disbursement under Facility B Tranche 1.

235     The Claimant further argues that since the Respondent had never notified the Claimant of the ending of the Closing Period for Facility B, the Availability Period could not have ended, because "*as for something to lapse something must first begin*".[100] As mentioned above, the Agreement was clear with regard to the start and end date of the Closing Period and the Availability Period. There was no provision contained in the Agreement that the Availability Period could only start running with the notification of the end of the Closing Period.

236     The Claimant claims that if the Closing Period had expired it would not make sense that the Availability Period even starts running. However, the Claimant forgets that when the Agreement was signed both periods immediately started to run. It was only because Purchase Agreement B as defined under the Agreement was, based on the Claimant's own decision, not in full force and effect within the two months following the signature of the Agreement that the Closing Period expired without the Conditions Precedent to each Disbursement under Facility B Tranche 1 being satisfied (see paras. 316 et seq. below).

237     The Agreement could well have stipulated that the Availability Period starts running when the Initial Conditions Precedent and the Conditions Precedents to each Disbursement under Facility B Tranche 1 were satisfied (Closing

---

[99] PHB Claimant, Scenario 2, paras. 21-22.

[100] PHB Claimant, Scenario 3, paras. 23-25.

Date) or if all Conditions Precedent were fulfilled (i.e. after full Disbursement of Facility A).

238    However, this is not what the Agreement provided for. The trigger event of the Availability Period was the date of the Agreement.

239    If therefore the Initial Precedents and Condition Precedents to each Disbursement under Facility B Tranche 1 were satisfied within a few days of the signing of the Agreement (Closing Day), the Facility would nevertheless be available for 12 months after the last day of the Closing Period, not only within 12 months upon the Closing Date (which would have been the case if the Availability Period was triggered by the fulfilment of Initial Precedents and Condition Precedents to each Disbursement under Facility B Tranche 1). If e.g. the Availability Period was to start with the date when *all* Conditions Precedent were fulfilled (including Clause 4.2 (e), i.e. in case of Facility B only after full Disbursement of Facility A), the Agreement would have said so. However, the Agreement precisely did not link the start of the Availability Period to the fulfilment of all Conditions Precedent, but to the date of the Agreement.

240    As will be explained in the following paragraphs, only in the event that the Agreement was amended because Project B and the related Purchase Agreement were amended and the loan amount increased, the date of the Agreement would have been amended as well, with the consequence that the starting point of the revised Closing Period would coincide with the starting date of the new Availability Period (see para. 247 below). This case must be distinguished from the mere changing of the Closing Period while maintaining the same Project A or B (see paras. 212 et seq. above).

241    The Agreement not only provided for the possibility of a change of the Closing Period, but also provided for the possibility for a **change of the Purchase Agreements**.[101]

242    The change of the equipment Purchase Agreement A or B after the initial two months Closing Period would have required a change of the Closing Period, otherwise the Conditions Precedent to each Disbursement under Facility B Tranche 1 could never have been fulfilled within the Closing Period.

243    One of the documents to be submitted within the two months Closing Period (Schedule 1, Part III (a)), is namely the Purchase Agreement B which is defined as *"**Purchase Agreement B** means the purchase agreement*

---

[101] See definition of "Purchase Agreement B" in the Agreement, which refers to the Project Asset B, "*as amended, novated, changed or supplemented with the prior written consent of the Lender and of OeKB*".

*(including, for the avoidance of doubt, any schedules and annexures thereto) in form of Order Confirmation No. ORC 2.770A dated 20 July 2017 and made between the Importer as buyer and the Exporter as seller **for the purchase of Project Asset B**, as amended, **novated,** changed or supplemented **with the prior written consent of the Lender** and of OeKB".*

244    Such change of the Project Asset B and the related Purchase Agreement required the written consent by the Respondent (and the OeKB). An Agreement by email would not have been enough.[102]

245    An amendment of the entire Agreement would become necessary (if made within the initial Closing Period or thereafter) if the **aggregate principal amount of Facility A or Facility B was increased**. The obligation of the Respondent to make available Facility B was limited to the amount of EUR 3,145,500 *"(ii) The Facility B is an aggregate principal amount of the lesser of: (A) an amount not exceeding EUR 3,145,500 (euro three million one hundred forty five thousand five hundred); and (B) the Financed Percentage of the Project Value B plus moneys due in respect of the OeKB Guarantee Premium Part B."* (Clause 2.1 of the Agreement). The Agreement has not even provided for the possibility to amend the aggregate loan amount as this was foreseen e.g. for the change of the Closing Period or the change of Project B.

246    The necessary change of the Agreement in the event of an increase of Facility B was also made clear to the Claimant before the Agreement was signed. The Respondent informed the Claimant that *"[t]he loan tranche B will only be activated after loan tranche A has been fully disbursed. Further we learnt from supplier SML that specific items/positions under the supply contract are still under discussion. Please be aware that we can consider increase/decrease in the supply contracts only until signing of the loan agreement (and increase of increases also subject to OeKB's consent)."* The Claimant must therefore have been aware that the increase of the value of supply contract required a change of the Agreement once finalised. As explained above, the reference to the full disbursement of Facility A can only have been a reference to Tranche 2 of Facility B which is the part of particular relevance for the Claimant, as Tranche 2 represents the financed part of the purchase price of Project Asset B.[103]

247    It follows from the above that if the equipment and the amount of the loan is changed, the Parties would need to agree to a new start date of the Closing Period which would allow the Claimant to fulfil the Initial Conditions

---

[102] C-3, Clause 25.1 and 25.4 (d).

[103] C-3, see Clause 3.1 (b) (ii).

Precedent and the Conditions Precedent. In this case, the Parties would actually agree on a totally revised export facility agreement (which would not be the case if the Closing Period was simply changed, without altering the loan amount and the equipment). In this case, the Availability Period must also start running as of the date of the new (amended) agreement, hence together with the new Closing Period. The Availability Period would expire 12 months after the end of the new Closing Period or within any period in time to which the amended agreement made reference.

248    As a further condition for Disbursement, the Respondent was also only obliged to make a **Disbursement if, on the proposed Disbursement Date, no Default is continuing or would result from the proposed Loan** (Clause 4.4).

249    This provision needs to be read together with the provisions of Default.

250    Default is defined in Clause 20. The Agreement contains two reasons for default: Non-payment (Clause 20.1) and Financial covenants (Clause 20.2). If an event of default occurs and continues, the Respondent may, by notice to the Claimant, cancel the Facility and declare that all or part of the loans be immediately due and payable, whereupon they shall become immediately due and payable (Clause 20.13).

251    Clause 4.4 makes clear that the Respondent had no obligation to disburse Facility A or B if the Disbursement was linked to a default situation, e.g. the risk of future non-payment *("no Default would result from the proposed Loan")*.

252    To conclude, the conditions to be satisfied within the Closing Period of two months as of the date of the agreement were clearly set out in the Agreement. The Availability Period started running at the date of the Agreement. Under the Agreement, the Closing Period for Facility A and/or B could have been amended with the absolute discretion of the Respondent, whereas a prior written agreement to that change was required. A change of the Closing Period without an amendment of the Purchase Agreement and the Facility (i.e. the loan amount) would not have altered the starting point of the Availability Period, however it would have extended it. The change of the Purchase Agreement between SML and the Claimant (after the conclusion of the Agreement), combined with an increase of the Facility would have triggered the need to agree on a revised Closing Period which would have triggered a new Availability Period.

*The Agreement must be distinguished from the Loan Agreement related to Facility B*

253    Based on the structure and logic of the Agreement, the Agreement and the individual Loan Agreements based on the Agreement must be distinguished from each other.

254    The Arbitral Tribunal insofar shares Prof. Zöchling-Jud's legal assessment, based on leading Austrian scholars, that the Agreement is to be qualified as a contract under which an agreed-upon credit amount is made available to a debtor (§ 988 of the Austrian Civil Code). The Claimant has the discretionary right to demand the Disbursement of a certain credit amount. By exercising this option, individual credit agreements are created (*theory of separation*).[104]

255    This interpretation is in absolute conformity with the definitions of "Loans" in the Agreement.

256    The Agreement defines "**Facility A Loan**" as a "*loan made or to be made under Facility A of this Agreement or the principal amount outstanding for the time being of that loan*", and "**Facility B Loan**" *"means a loan made or to be made under Facility B of this Agreement or the principal amount outstanding for the time being of that loan"*. Hence it is clear that, on the basis of the Agreement, two different loans can be made with regard to Facility A and Facility B, Facility meaning the loan amount *"made available"* at the Respondent's discretion.[105]

257    The distinction to be made between the loan agreements and the Agreement also becomes evident in the context of the repayment provisions.

258    In short, those provisions foresee that all loans which have been outstanding at the end of the Availability Period shall be repaid by the Borrower in ten installments. For Facility A the rule is as follows: *The first instalment to be repaid on the first to occur of (a) the day being six Months after the date of the Transport Document relating to Facility A; and (b) 9 June 2019, with the result that all Facility A Loans shall have been repaid in full on or before the Final Maturity Date applicable to such Loan. Final Maturity Date for Facility A Loans meant "(a) in relation to Facility A Loan, the earlier of: (i) the day*

---

[104] REWS-1, para. 18, with reference to Bollenberger in Apathy/Iro/Koziol, Österreichisches Bankvertragsrecht IV.

[105] The "Facility" is the "*term loan facility made available under this Agreement*", described for Facility B as follows in Clause 2.1 (ii) and Clause 2.3: "*Subject to the terms of this Agreement, the Lender makes available to the Borrower a facility in an aggregate principal amount* [….] *of an amount not exceeding EUR 6,497,100* [...] *to be divided into two facilities as follows: [...] [t]he Facility B in an aggregate principal amount for the lesser of [..] an amount not exceeding EUR 3,145,500* [...] *Facility B shall be divided into two tranches [...]*."

*falling 72 Months after the last day of the Closing Period relating to the Facility A; and (ii) 31 December 2023".[106]*

259    For the Facility B the rule is similar, but not identical: *The first instalments are due on the day being six months after the date of the Transport Document relating to Facility B, and any date as may be later agreed between the Lender and the Borrower [...] with the result that all Facility B Loans shall have been repaid in full on or before the Final Maturity Date applicable to such Loan. As can be seen in the definition section, Final Maturity Date for Facility B Loans meant: "(b) in relation to Facility B Loan, the earlier of: (i) the day falling 72 Months after the last day of the Closing Period relating to the Facility B; and (ii) <u>any calendar date as may be later agreed between the Lender and the Borrower</u>".[107]*

260    This shows that, regarding the repayment terms, the loans for Facility A and B were to be treated differently.

261    Also, the rules on acceleration (Clause 20.13) make it clear that the legal fate of the Agreement and the credit (loan) agreements concluded on the basis of the Agreement must be distinguished from each other.

262    Clause 20.13 states: *"On and at any time after the occurrence of an Event of Default which is continuing the Lender may by notice to the Borrower: (a) cancel the Facility whereupon it shall immediately be cancelled; (b) declare that all or part of the Loans, together with accrued interest, and all other amounts accrued or outstanding under all or any of the Finance Documents be immediately due and payable, whereupon they shall become immediately due and payable; (c) declare that all or part of the Loans be payable on demand, whereupon they shall immediately become payable on demand by the Lender; and/or (d) demand a payment under the Promissory Note of amounts that have become due under the terms of this Agreement."[108]* As mentioned in Clause 20.1, one of the events of default is non-payment.[109]

263    Default for Facility A or B therefore does not necessarily have an impact on the existence of Facility A and B. Under Clause 20.13 in case of delay in payment with one Facility, the Respondent can cancel "the Facility". Therefore, the Respondent, after full Disbursement of Facility A, could not cancel Facility B if an event of default only applies to Facility A. However, although Facility B would still be in force and does not fall apart automatically

---

[106] C-3, p. 9.
[107] C-3, p. 9.
[108] C-3, pp. 54-55
[109] C-3, p. 52

due to the non-payment for Facility A, in this case the Respondent is not obliged to make (i.e. could make) a Disbursement for Facility B, based on Clause 4.4 "*The Lender will only be obliged to make a Disbursement if on the proposed Disbursement Date (a) no Default is continuing or would result from the proposed Loan and (b) Representations are true*".

264    Although linked, Loans A and B are separate. The mere fact that Facility A and B were linked, and that Facility B Tranche 2 could not have been disbursed before Facility A was disbursed in full does not imply that the doctrine of separation does not apply. Even the Claimant speaks about two different loan agreements. In the SoC, the Claimant mentioned that *"Thus, the Agreement is in fact comprised of two separate loan agreements, with their respective definitions and separate obligations under each one of them"*.[110] If one accepts that the Agreement comprises two different loan agreements and those loan agreements, pursuant to the Agreement, can each be terminated separately, the structure only works if the Agreement itself is considered as an umbrella agreement on which the loan agreements are based, if executed.

265    The Claimant has not provided any convincing argument that the separation doctrine should not apply. This issue also has not been submitted to the Claimant's expert witness.[111]

        *Neither Facility B nor any of the Conditions Precedent or any other provision contained in the Agreement related to Facility B were amended by common consent of the Parties*

266    The loan to be made under Facility B was understood to finance Project B, which was *a coextrusion castfilm line (smartcast line), plus extra chiller*. SML, and the Claimant had concluded the Purchase Agreement B for that equipment on 20 July 2017 (**PO No. ORC 2770A).**[112]

267    It is undisputed that Project B as defined in the Agreement had never been delivered by SML. The reason for the non-delivery was caused by the fact that, after the entering into force of the Agreement, the Claimant and SML conducted negotiations about different equipment with the consequence that the purchase agreement ORC 2770A was to be replaced. It is also undisputed

---

[110] SoC, para. 24.

[111] Prof. Kalss simply mentioned in her written statement that the "loan agreement" is an independent two-page contract. Given that the Agreement contains 79 pages, it is unclear to which agreement Prof. Kalss refers; CEWS-1, p. 7.

[112] R-6.

that the Claimant never paid to SML the down payment of 5% of the purchase price, which under the purchase agreement is a condition for delivery.[113]

268    In other words, regarding Facility B, the Claimant had decided not to comply with all Conditions Precedent to each Disbursement under Facility B Tranche I within the required Closing Period of two months. Based on the fact that the original Purchase Agreement was abandoned, the Claimant could not have for instance provided evidence of the required down payment to SML of 15% of the Project Value B, or a certificate confirming that the Purchase Agreement B was in full force and effect, both requirements to be satisfied within the Closing Period as Conditions Precedent for Disbursement.

269    The record shows that already in February 2018, therefore even before the Closing Period had expired, both Parties were aware that changes under the supply contract ORC 2770A were to be made. On 19 February 2018, the Respondent already made it clear to the Claimant that the Respondent could not make *"any serious assumption"* with regard to the "*release for B"* from the OeKB because this would *"depend on the changes under the supply contract ORC277A".*[114]

270    The email communications that followed over the summer of 2018 make it clear that SML and the Claimant had agreed on the change of the Purchase Agreement B: instead of **ORC 2770A dated 20 July 2017,** the supply order was now **ORC 2823B dated 30 May 2018 (**coextrusion castfilm line Powercast XL).[115] The documents show that the loan amount had to be increased given that the amount of the revised purchase agreement for Project B was increased.[116]

271    Given that the Loan amount was to be increased, and the equipment was changed, the Agreement had to be amended (see para. 245 above).

272    In the summer of 2018, the Closing Period under the Agreement had already expired. The Availability Period for the Disbursement of that specific Loan (which started on 10 January 2018) and ended on 10 March 2019 was theoretically still running. However, as long as the Closing Period was not

---

[113] R-6 (no page number; under "Commercial Terms") ORC 2.770A: Delivery 10 months after receipt by SML of 5% down payment.

[114] R-9.

[115] R-63.

[116] C-15; R-63. The new amount indicated by the Respondent on 27 June 2018 (R-63) was EUR 3,994,000 as opposed to EUR 3,580,000 in the Agreement. On 6 June 2018, the Claimant had even indicated EUR 4,540,000 (C-15).

amended after its expiration, the Availability Period was of no further relevance.

273    On a side note, if the Closing Period had been amended while maintaining the same equipment, the Availability Period would have been extended. Had the Respondent therefore agreed to the change of the Closing Period (even after the first two months from the date the Agreement had expired), the Claimant could still have asked for the Disbursement of the Facility B Loan related to the specific equipment under the agreement (2.770A dated 20 July 2017), without any material change of the Agreement becoming necessary. In this case, the Availability Period would have been extended as well, as the end of the Availability Period (but not its beginning) is always dependent on the end of the Closing Period.

274    Without the amendment of the Closing Period, Facility B (as defined in the Agreement or as amended), could not have been disbursed under the Agreement after 10 March 2019 (end of the Closing Period).

275    The amendment would have to define *inter alia* the revised Facility and the revised Project B, and include the revised Closing Period. It would have been in the logic of the Agreement to coincide the start of the revised Closing Period with the date of the amendment of the Agreement. In this case, the Availability Period would have expired 12 months after the last day of the revised Closing Period.

276    In the eyes of the Sole Arbitrator, such amendment however never occurred.

277    The new supply contract (**2823B**, coextrusion castfilm line PowerCast XL), is dated **30 May 2018**.[117]

278    On 21 June 2018, the Respondent informed the Claimant that *"SML provided us with a copy of the final draft supply agreement ORC 2823B, which will supersede current supply contract ORC 2770A."*[118]

279    The signed contract was sent by the Claimant to the Respondent on 22 June 2018 with a note: *"Here is the contract signed and the amount we agree, so please advise what you will been to setup [sic] the tranche B and don't have the delay we had in the past".*[119]

280    This email demonstrates that the Claimant was well aware in June 2018 that the Facility B Loan depended on an agreement on the part of the Respondent.

---

[117] R-58 in its complete version, C-11 in parts.

[118] R-10.

[119] R-58.

281    On 27 June 2018, the Respondent let the Claimant know that the Respondent would prepare the official amendment request for OeKB under Tranche B, which shall *inter alia* include *"Change of supply contract (now ORC 2823B dated 30.5.2018 instead of ORC 2770A dated 20.7.2017"*, and an increase *"of amount of supply contract tranche B from currently EUR 3.580.000 to the amount EUR 4,540,000"*. The Respondent also stated that the legal department of the Respondent *"is instructed to prepare the required draft amendment agreement. Of course we have to wait for OeKB's official approval."*[120] Therefore, the Respondent made it clear that an amendment to the Agreement had to be made which was to be drafted by the legal department.

282    On 29 June 2018, the Respondent made it clear to the Claimant that the 5% down payment to be made by the Claimant to SML to start preparation works under the new ORC 2823B was not dependent on the approval of the financing by OeKB. The Respondent explained that there was *"no direct connection between official amendment of OeKB cover and your remittance of the first part of the down-payment under ORC 2823B"*.[121]

283    On 30 August 2018, the OeKB issued the *promesse* for the changed Tranche B.[122] The validity of the *promesse* with an aggregate guarantee amount of EUR 4.5 mio. was initially limited in time until 31 December 2018.[123]

284    On 4 September 2018, the Respondent stated, upon the Claimant's request:

> *"Dear Miguel,*
> *Yes, we like to inform you that we received OeKB's approval to the increase of tranche B (new supply contract ORC 2823B for EUR 4,540,000 shall supersede supply contract ORC 2770A for EUR 3,580,000).*
> *Within the next days we shall provide you with the draft of the necessary amendment agreement under the loan agreement.*
> *Best regards from Vienna, Reinhard"*

285    Therefore, on 4 September 2018, the Respondent announced that the draft of the necessary amendment of the Agreement would be provided. This revised draft would have included the new Project B, namely ORC 2823B, the revised

---

[120] R-63; C-17.

[121] C-18.

[122] R-64.

[123] R.64.

Facility B, and a new Closing Period. As explained above, the total revision would also have triggered a new Availability Period.

286    It is undisputed that the Respondent never provided the text of the revised Agreement. As a consequence, no change of the Agreement was ever formalised in the form of a signed written agreement.

287    The Claimant claims that the Facility Agreement was **novated** when it was agreed that the equipment supplied had changed. In its Post-Hearing Brief, the Claimant stated *"The only amendment that had actually occurred was the one on 4 September 2018 for which OeKB gave its approval and issued a promesse. This has been explicitly confirmed by Respondent's own witness Mr. Riedl"*.

288    The Claimant states that the main change related to the main object of the contract, namely the actual equipment of the supply contract and therefore the Agreement, was novated.[124] Based on the novation, or at least change of liability under § 1379 ABGB ("Schuldänderung"), the Closing Period should be taken as the date when the Claimant satisfied all the necessary Conditions Precedent, which it did once OeKB had approved the changes on 4 September 2018. This in turn triggers the Availability Period to commence and as such the Availability Period would lapse on 4 November 2019 and not in July 2019 when the Respondent claimed that to be the case.[125]

289    The Claimant therefore considers that the Parties agreed on an amendment of the Agreement, referring to a new Project B, and a different Closing Period as stated in the Agreement. The new Closing Period triggered the new Availability Period.

290    The Sole Arbitrator considers that such novation pursuant to § 1375, § 1376 et seq. ABGB or change to liability has not occurred. In particular, the Sole Arbitrator is not convinced that the communications sent by Mr. Riedl on 28 June and 4 September 2018 can be considered as valid consent by the Respondent to amend the Agreement (see paras. 291 et seq. below). Even if this was the case, the Claimant withdrew its consent when it communicated to the Respondent that ORC 2823B would be replaced (see paras. 348 et seq. below). Even if one were to assume that the Parties agreed on the amendment, the Claimant would not have satisfied the Conditions Precedent within the revised Closing Period (see paras. 316 et seq. below).[126]

---

[124] SoC, paras. 62 et seq.

[125] SoC, para. 65.

[126] See PHB Claimant, paras. 100 et seq.

291    The above quoted email of 27 June 2018 makes it clear that the amendment required a revised amended Agreement to be made by the Respondent's legal department and would depend on the *promesse* by OeKB. Therefore, no changes were agreed upon by the Respondent at that moment in time.

292    Nor can the email of 4 September 2018 be considered as novation to which both Parties agreed.

293    First, the email as such merely announces and makes it clear that the "draft" of the amendment Agreement would be sent. This in itself means that the email could not be understood to be the agreed amendment. It must have been clear to the Claimant from the communication in June that the amendment was to be sent by the Respondent's legal department. Neither the Claimant nor Mr. Riedl could know which provisions the legal department would include in the amendment.

294    Further, Clause 19.17 (a) of the Agreement states that *"The Borrower shall not (and shall ensure that none Material Subsidiary shall) amend, vary, **novate**, supplement, supersede, waive, suspend the operation of, repudiate or terminate any term of any of the **Transaction Documents** without **the prior written consent** of the Lender and OeKB."*

295    Under the Agreement, Transaction Documents means the *"**Finance Documents,** the **Purchase Agreement** and any other agreement designated as such by the Lender and the Borrower."* The Finance Document is, *inter alia,* the Agreement.[127]

296    Under the Agreement, email communication in connection with the Finance Documents may not be used for *"**any consent**, notification, correspondence, or other information or document in respect of which the Lender, acting reasonably, requires a hard copy signature"* (Clause 25.4 (d)). The Sole Arbitrator considers that if this rule applies to any kind of communication, it must even more apply to any consent with regard to changes of the Agreement.

297    The Sole Arbitrator therefore concludes that the Agreement contains a strict form requirement with regard to the novation or other amendments of the Agreement. It certainly required a written consent by the Respondent. The Respondent could only have agreed to an amendment to the Agreement by a written and physically signed document.

---

[127] C-3, pp. 9, 15.

298    The Claimant claims that the Agreement does not define what the word
       "*written*" in Clause 19.17 of the Agreement means and considers that email is
       sufficient.[128]

299    Although the Agreement does not define "*written consent*", the rule contained
       in Clause 25.4. (d) let certainly conclude that email should not be sufficient to
       the extent a consent is required by the Respondent. Furthermore, as the
       Respondent correctly points out, under the applicable Austrian law, the form
       requirement "in writing", as provided for in Clause 19.17 (a), means that a
       document must be signed by the respective parties, as explicitly provided in
       § 886 ABGB. Under Austrian doctrine, a simple email without electronic
       signature is not sufficient.[129] The Claimant has not established that this rule
       shall not apply.

300    Given that the email of 4 September 2018 does not fulfil the strict form
       requirements as agreed by the Parties, this email cannot be validly considered
       as an amendment to the Agreement. The Sole Arbitrator agrees with the
       Respondent that it is certainly reasonable and common to require a hard copy
       signature for an (amended) credit facility agreement.[130]

301    The Sole Arbitrator does not see any element on record that let conclude that
       the Respondent waived the in writing requirement or that the Parties tacitly
       agreed on the amendment. The Respondent precisely mentioned in the emails
       of 27 June and 4 September 2018 that the amendment would have to be
       included in a written document to be elaborated by the legal department. The
       witness Mr. Riedl explained at the Hearing that the amendment would have
       been sent to the Claimant in draft form for signature, then sent back to the
       Respondent for signature since two signatures were required.[131]

302    Based on the fact that the Parties never agreed on an amendment of the
       Agreement, no agreement on the revised Facility B occurred. The Respondent
       also has not agreed to an amended Closing Period for the revised Facility B.
       Therefore, the Availability Period for Facility B under the Agreement was at
       that time still expiring on 10 March 2019. Given that no amended Closing
       Period had been agreed for a revised Facility B, no new Availability Period
       could start running regarding the new equipment. Therefore, Facility B, as
       defined in the Agreement, was no longer available in July 2019.

---

[128] Reply, para. 67.

[129] RL-35, § 886 ABGB.

[130] Answer to Reply, para. 148.

[131] TR Riedl, 6201-6202; 6906-6908.

303    Even if one would consider that the Closing Period was amended on 4 September 2018, Facility B was no longer available in July 2019 (see paras. 316 et seq. below).

304    In order to demonstrate that the amendment was binding on the Respondent, the Claimant, in its Post-Hearing Brief, *inter alia,* relies on § 880a Austrian Civil Code. It is the Claimant's submission that the Claimant could validly rely on Mr. Riedl's authority to "*promise*" the amendment, whereas it is irrelevant if he was authorised to do so. Mr. Riedl presented himself as having authority and the Claimant had no real or constructive knowledge of the opposite. The Respondent is responsible for making sure that the performance of its agent is to the full satisfaction of the client and the promise made to that client. In the event of the contrary, the Respondent is liable to the Claimant for the damage caused to it by the agent of the Respondent's own choosing.[132]

305    Apart from the fact that the Claimant has relied on § 880a ABGB at a very late stage of the proceedings, which did not allow the Respondent to prepare a full defence, the Sole Arbitrator does not share the Claimant's assessment.

306    Under § 880a ABGB it would be the person who promised the performance who would be liable if the performance is not executed. If e.g. a bank guarantees the payment of equipment to the exporter in favour of an importer, under § 880a ABGB, the bank as guarantor will have to pay the purchase price to the exporter if the importer fails to pay. Under the present scenario, the person who allegedly promised the amendment was Mr. Riedl, and not the Respondent. Therefore, the guarantor under § 880a ABGB would be Mr. Riedl and not the Respondent.

307    In this context, the Claimant seems rather to rely on the concept of "apparent authority" pursuant to § 1029 ABGB, arguing that the amendment must be binding based on that concept. However, as will be explained immediately below, the Claimant could not rely on Mr. Riedl's authority to conclude the amendment, which is a requirement to rely on § 1029 ABGB. Therefore, the Claimant cannot base any claims on this concept either:

308    First, given that the formal requirement for an amendment, which was known to the Claimant, was not fulfilled, it is irrelevant whether Mr. Riedl had the authority to agree on the amendment or not. The amendment was simply not concluded.

309    Further, Mr. Riedl informed the Claimant in 2018 that the legal department would prepare a draft amendment. Therefore, the Claimant could not have

---

[132] PHB, Claimant, paras. 100 et seq.

justifiably relied on Mr. Riedl's power to provide the final agreement on the amendment.

310    Having gone through the process for the signature of the Agreement, the Claimant was, at any rate, aware of the above-mentioned strict form requirements to conclude the amendment, in addition to the fact that Mr. Riedl could not agree on the amendment alone.

311    This is confirmed by the Claimant's own submission.

312    The Claimant considers that the Agreement was concluded only when the Respondent (represented by one additional person in addition to Mr. Riedl) finally signed the Agreement on 10 January 2018, not when the Claimant had received the draft Agreement in October 2017. The same must therefore apply for the conclusion of the amendment, i.e. the amendment can only be considered final and binding once it has been put into an amended agreement and signed by two representatives of the Respondent.

313    The Claimant also states that the Claimant did not make the down payment for the new equipment ORC 2823B because the Claimant was not sure which purchase agreement would be accepted.[133] The Claimant thus did not even rely on the fact that the email sent by Mr. Riedl on 4 September 2018 was the final agreement to the amendment. Had that been the case, no doubt would have been left as to which agreement would be accepted by the Respondent.

314    Finally, as rightly pointed out by the Respondent, Mr. Luna testified at the Hearing that Mr. Riedl's competence was to "check the loans", but he did not know who was in charge of agreeing to any amendments, and therefore could not have relied on the fact that Mr. Riedl had the authority to make such amendments.[134]

315    The amendment therefore never occurred. It will be discussed in paras. 342 et seq. below, if the Respondent can be made liable for the fact that the Respondent has not provided and concluded the amendment *"within the next days"*, as announced in September 2018, including an amendment of the Closing Period, and whether the Respondent breached the Agreement by not disbursing Facility B, as amended, even though no formal amendment of the Agreement was concluded.

---

[133] PHB Claimant, paras. 43 et seq.

[134] TR Lima, 1375-1380; PHB Respondent, para. 111.

*The Conditions Precedent required for Disbursement of Facility B were not and would not have been fulfilled by the Claimant within the time period provided under the (eventually amended) Agreement*

316    The Sole Arbitrator considers that the Agreement was not amended on 4 September 2018 (see paras. 266 et seq. above). Therefore, the conditions for Disbursement of Facility B as listed in the Agreement were never altered. As a consequence, the Claimant had to satisfy the Initial conditions precedent and the Conditions Precedent to each Disbursement under Facility B Tranche 1 within the initial Closing Period, i.e. by 10 March 2018 at the latest. The Availability Period expired on 10 March 2019.

317    As it is undisputed that Project B as mentioned in the Agreement (2.770A) was never in full force and effect and that no down payment was made, it is established that the Conditions Precedent to each Disbursement under Facility B Tranche 1 were not fulfilled within the Closing Period and certainly not until July 2019. Therefore, Facility B, as defined in the Agreement, was no longer available as of 10 March 2019, unless the Parties had agreed on a change of the Closing Period and/or amendment of the Agreement.

318    The Sole Arbitrator therefore concludes that in July 2019, Facility B was no longer available for Disbursement. The Respondent had no legal obligation to amend the Closing Period, the change of which fell under the Respondent's "absolute discretion".

319    Given that the Availability Period had expired and the Claimant had not fulfilled the relevant Conditions Precedent within the Closing Period or any amended time period for the equipment under the Agreement (for which the Respondent had full discretion), the Respondent could simply inform the Claimant, as of 10 March 2019, that the Availability Period had elapsed. The Agreement did not have to be terminated. The Respondent also did not have to terminate the loan agreement related to Facility B, which had not yet been concluded since the possibility to ask for Disbursement of Facility B simply fell apart after the (non-amended) initial Closing Period and certainly since the Availability Period had elapsed.

320    The Respondent, by its communications of 2 July and 18 July 2019, therefore correctly reflected the legal situation at the time, namely that the Availability Period had elapsed, and that Loan B was no longer available.[135] In its communication of 18 July 2019, the Respondent therefore simply let the Claimant know that it would terminate the *negotiations* for a revised agreement, including for a revised Closing Period. The Sole Arbitrator will

---

[135] R-61; R-26.

discuss below the question whether the Respondent, by terminating the negotiations, became liable to the Claimant (see paras. 342 et seq.).

321    Even though the Respondent was not required to inform the Claimant of anything else than the fact that the Availability Period had expired, the Respondent informed the Claimant about the motivations as to why the Respondent was not willing to continue the negotiations to amend the Agreement.

322    Even if not relevant for the present decision, the Sole Arbitrator considers that the reasons mentioned in the Respondent's letter were valid arguments not to continue the negotiations.

323    At the Hearing Mr. Hodosi explained that the accounting issue and the issue of late payments for Facility A were the real reasons why the Respondent refused to continue the negotiations for the amendment of the Agreement. This was also reflected in the communications of July 2019.[136]

324    It is undisputed that before July 2019, the Claimant was late with the first instalment repayments related to Facility A and the Respondent agreed to partial payments. Therefore, the Respondent could validly have some concerns regarding the payments of Loan B, once disbursed. In the eyes of the Sole Arbitrator, it is irrelevant for which reason the Claimant could not make the payments on time. The mere fact that the Claimant was late justified that the Respondent was reluctant to renegotiate the amendment.

325    It is equally understandable that the unclear situation with regard to the booking of the loan under Facility A, which the Respondent had disbursed on 14 March, 24 April and 11 October 2018 but which was not reflected in the Claimant's financial statements of 2018, was an important element for the Respondent not to continue the negotiations to amend the Agreement. The Claimant's explanations in that regard were in the eyes of the Sole Arbitrator not convincing at the time, and are not convincing today. The "Auditors explanations" provided by the Claimant (C-35) and the explanatory email sent by the Claimant on 10 May 2019 explaining that the Claimant, based on Mexican accounting standard NIF C-9, had "*decided until the machines started to operate fully and to generate revenue, would record fixed assets and liabilities to the equipment; also for that the taxes receivables and payables were equitable. As well, that it would begin to pay in the year 2019*", do not provide a reasonable explanation why under Mexican accounting rules a loan disbursed in 2018 was not reflected in the financial statements of the same year. In that regard, at the hearing Mr. Montes, witness nominated by the

---

[136] TR Hodosi, 7942-7978.

Claimant, relied on Mexican accounting standards NIF C-6, C-9, however did not explain the content of such standards and did not explain why, according to those standards, a liability should only be recognized until it generates income or until its financing begins to be paid.[137] On the other hand, Mr Vargas provided a thorough explanation about the content of NIF C-9. He explained that pursuant to NIF C-9 a liability is recognised as soon as the loan was disbursed to purchase the financed item and that therefore, the Claimant should have reflected the loan liability in its accounts, regardless of when it would begin the loan payments.[138]

326    Given that the Respondent has not cancelled the loan for an event of default, but simply has not disbursed the loan because the Conditions Precedent were not fulfilled and the Availability Period had expired, it is irrelevant if the "accounting issue" was an event of default or not.

327    Although this could be considered as a tough business decision, the Respondent's decision to stop the discussions was in line with the terms of the Agreement. This decision was also in line with the rules on acceleration. Considering that the failure to submit financial statements timely was a reason of default that would have allowed the Respondent to accelerate the Loan B, had it already been concluded (see Clause 20.2 which refers to Clause 18 on Financial Convenants. The Financial testing as provided for in Clause 18.3 could not be done without the financial statements to be delivered at the latest within 180 days after the end of each financial year), justified doubts with regard to the correctness of financial statements must all the more be a justified reason for not concluding a new facility agreement. Finally, even if the equipment had been maintained, the late payment in Facility A would have been a reason for non-Disbursement of Facility B under Clause 4.4 of the Agreement.

328    The Agreement also did not provide for any obligation that the Facility B Loan was to be disbursed if the Facility A Loan was disbursed. Both loan agreements were separate (see paras. 253 et seq. above).

329    Even if one were to admit that the Parties had agreed on a new Closing Period which started on 4 September 2018, the Respondent had not breached the Agreement in July 2019, given that the Claimant would in any event not have fulfilled the Initial conditions precedent and the Conditions Precedent to each Disbursement under Facility B Tranche 1 within the amended Closing Period. This can be concluded from the following:

---

[137] TR Montes, 4801-4808; see PHB Respondent, para. 77.

[138] REWS-2, paras. 68 et seq. TR Vargas, 8275-8320, 8511-8515.

330    The Agreement referred to a Closing Period of two months as of the
       Agreement. It is therefore reasonable to assume that in the amended
       Agreement, the Respondent would have suggested a new Closing Period of
       two months as of signature of the amendment. If, for the sake of argument,
       one assumes that the amendment was agreed on 4 September 2018, the Initial
       conditions precedent and the Conditions Precedent to each Disbursement
       under Facility B Tranche 1 (as amended) had to be submitted within two
       months, i.e. until 4 November 2018. Had the Closing Period already
       terminated on 4 September 2018, as alleged by the Claimant, the Initial
       conditions precedent and the Conditions Precedent to each Disbursement
       under Facility B Tranche 1 would have had to have been complied with by
       4 September 2018 already.

331    The Conditions Precedent to each Disbursement under Facility B Tranche 1
       are listed under Schedule 1 Part III. They contain, *inter alia,* a certificate that
       the Purchase Agreement B is in full force and effect, an original of the OeKB
       Guarantee Part B and evidence of the 15% down payment from the Claimant
       to SML (see paras. 197 et seq. above).

332    The record lets conclude that these documents could not have been submitted
       by 4 November 2018, for the simple reason that the Claimant abandoned the
       amended Project B as of September 2018 already. The Sole Arbitrator is
       convinced that it is established that as of September 2018, the Respondent had
       been informed that ORC 2823B would be amended. This follows from the
       written and oral evidence.

333    The Sole Arbitrator has no reason to doubt the testimony of Mr. Riedl that
       after the email of 4 September 2018 he was informed that ORC 2823B was
       not the final agreement between SML and the Claimant.[139] He also testified
       that on 1 October 2018, the Claimant's employee Mr. Luna called the
       Respondent and informed it that he was in ongoing discussions with SML
       regarding changes of the payment terms under ORC 2823B.[140] In addition, the
       record of the communications between SML, the Claimant and the
       Respondent which followed until the end of December 2018 clearly show that
       between Mr. Riedl's email of 4 September and 31 December 2018, the
       Claimant univocally made the Respondent understand that it had no further
       interest in ORC 2823B (see paras. 349 et seq. below).

334    Therefore, in the fall of 2018, ORC 2823B was not final.

---

[139] See TR Riedl, 6242-6247, 6838-6849 (information from exporter "must have been during the
course of September 2018"), 6887-6890, 6503-6507.

[140] RWS-8, para. 60.

335    Consequently, the Claimant could not have confirmed by 4 November 2018 that ORC 2823B was in full force and effect, which is one condition to be fulfilled within the two months Closing Period.

336    Also, the Claimant should have made the down payment of 15% of Project B before that date. However, it is not disputed that this down payment or even the 5% down payment that secured the delivery under the purchase agreement was never made.

337    The Claimant argues that the down payment could not be made before the Claimant had certainty about the amended Agreement.[141]

338    The Sole Arbitrator fails to see the link between the down payment (which is not covered by the loan) and the amendment of the Agreement. Had the Claimant truly wanted to secure the delivery of ORC 2823B (agreed upon in May 2018) which is dependent on the 5% down payment to the exporter, and indeed relied on the amendment of the Agreement, as the Claimant alleges it did, the Claimant would have made such payment even before the amendment was signed. The record shows that the down payment for Project A ORC 2762 (Eco Compact line) was received by SML on 10 January 2017.[142] This therefore was made months before the Agreement was signed by the Respondent, and even before the Claimant received the draft Agreement from the Respondent.[143]

339    The record strongly suggests that the down payment was in fact not made because the Claimant again changed its mind and actually wanted to replace the equipment related to the PO Nr. ORC2823B (see paras. 332 et seq. above and paras. 349 et seq. below). This is also confirmed by the fact that there is no evidence on record which would demonstrate or suggest that the Claimant ever complained about the fact that, after 4 September 2018, the amendment containing the equipment Power Cast line (ORC 2823B) was not finalised. The Arbitrator is therefore not convinced that the down payment was not made because the Claimant was not sure whether the amended Agreement would be finalised.

---

[141] PHB Claimant, para. 43.

[142] C-14.

[143] R-5.

340     The Claimant rather considered making a down payment for the yet changed equipment for 2 SmartCast Lines[144] and not ORC 2823B, on which the Claimant now relies.

341     The above let conclude that even if one assumes that on 4 September 2018 the Parties agreed on an amendment of the Agreement, the Conditions Precedent as listed in Part III of Schedule 1 (Conditions Precedent to each Disbursement under Facility B Tranche 1) would not have been fulfilled within the amended Closing Period. Therefore, the Availability Period, even if started on 4 September 2018 and terminated on 4 September 2019, would not have been of any further relevance without the written agreement by the Respondent to amend the Closing Period. However, for this change, the Respondent had its full discretion. Therefore, the Respondent was not obliged under the Agreement or any amendment, if such amendment was agreed upon, to disburse Facility B (as amended) in July 2019.

*The Claimant could not justifiably rely on the conclusion of the amendment*

342     Under the terms of the Agreement, in July 2019, Facility B was no longer available.

343     The Sole Arbitrator will now turn to the question as to whether the Respondent has breached the Agreement by not having agreed to an amendment, and, consequently, by not having agreed on a revised Closing Period and an extended Availability Period for Facility B, as eventually amended.

344     The Claimant contends that with its email of 4 September 2018, the Respondent gave the Claimant *"every possible reason to rely on the conclusion of such amendment."*[145] By relying on the Respondent's *"promises to deliver an official amendment"* and the Disbursement of the loan under Facility B, Claimant suffered damages. Claimant invested in the facility, hired staff, attorneys, bought raw material, and more. The Claimant bases its claim for damages suffered *inter alia* on the concept of *culpa in contrahendo*.

345     The Sole Arbitrator considers that the Claimant cannot base any claims on *culpa in contrahendo* in the present matter.

346     In the current context, as correctly pointed out by the Respondent, one important scope of application for liability under the concept of *culpa in*

---

[144] C-21, p. 1: It can be concluded from an email of 14 November 2018 from the Respondent to the Claimant that ORC 2823 (PowerCast XL) was to be replaced by *"ORC2858 (SmartCast L [..]) and ORC ... (MiniCast [...])"*.
[145] PHB Claimant, para. 94.

*contrahendo* under Austrian law is fault during contract negotiations. However, only under special circumstances, namely if an intensive state of trust was created in an imputable manner with regard to the conclusion of the contract can liability for damages be considered if negotiations are broken off.[146]

347    In other words, in the case of a party which could rely on the conclusion of a certain contract which is not concluded due to the final refusal of the other party although it had given the impression it would conclude the agreement, the party can claim damages.

348    The Sole Arbitrator considers that in the present case, the threshold for *culpa in contrahendo* as described above is not fulfilled. In particular, it was the Claimant who had broken off the negotiations and therefore did not and could not rely on the conclusion of the amendment. No intensive state of trust that would protect the Claimant was created.

349    As explained above, already in September 2018, the Respondent was made aware that the Claimant and SML had discussions to amend ORC 2823B.

350    The Claimant has not challenged the witness declarations that in September 2018 and on 1 October 2018, the Respondent was informed about the fact that ORC 2823B would be replaced. The events that followed in November and December 2018 actually confirm that the Claimant abandoned ORC 2823B:

351    On 14 November 2018, the Respondent wrote to the Claimant: *"We learnt from SML that the supply contract(s) for financing tranche B are still under discussion. The supply contract ORC2823 (PowerCast XL) shall be cancelled and will be replaced by ORC2858 (SmartlCast L for US-entity) and ORC ... (MiniCast for Queretaro-entity) [...]"*.[147]

352    On 28 December 2018, the Claimant stated to the Respondent: *"The idea is to buy 2 SmartCast L we just signed the first one and we'll send the down payment next week. Keep you posted on the 2nd one"*.[148]

353    In reply to this information, the Respondent made clear on 31 December 2018 that the amendment of the loan agreement for Tranche B would be conditioned upon the receipt of the details and copies of the new purchase contracts

---

[146] See RL-24; R-25; Answer to Reply, para. 86; PHB Respondent, paras. 112 et seq.
[147] C-21, p. 1.
[148] C-21, p. 1.

enabling the Respondent *"to prepare the required loan agreement amendment for tranche B in time"*.[149]

354    The uncertainty regarding the equipment under Facility B went on in early 2019.

355    On 1 February 2019, the Respondent asked if there were any developments on the new supply contract for Tranche B.[150] On 13 March 2019, the Respondent informed the Claimant that it was in close contact with SML regarding the new supply contract to be included in Tranche B.[151]

356    The record also clearly shows that until 2 July 2019[152] and 18 July 2019[153] it was not clear between SML and the Claimant which equipment should be sent under Project B.

357    On 12 July 2019, the Claimant was still vague as it mentioned that it was *"looking to buy this equipment"* and that they were *"sending our down payment by first week of August"*. ORC 2823B was not mentioned in this context.[154]

358    SML however confirmed at the same time to the Respondent that there was no agreement finalised.[155] The Sole Arbitrator has no reason to believe that this statement did not reflect the *status quo* of the discussion between SLM and the Claimant.

359    There is no document on record that would make the Sole Arbitrator believe that after September 2018, the Claimant still relied on ORC 2823B or that the Claimant complained that the Respondent had not provided the draft amendment related to ORC 2823B.

360    The exchange of emails of November/December 2018 also show that the Respondent has not only relied on information provided by SML, as claimed by the Claimant. Even if that had been the case, this would have been sufficient to not continue with the discussions on the amendment of the Agreement. During the entire duration of the contractual relationship the Respondent had contact with SML. The Claimant was well aware of this and had never informed the Respondent that it should not rely on information that

---

[149] C-21, p. 1.

[150] R-59.

[151] C-22.

[152] R-24.

[153] R-26.

[154] R-61.

[155] R-61.

came from SML (for the alleged breach of confidentiality by the Respondent, see paras. 376 et seq. below).

361   Therefore, the Claimant had not, between September 2018 and July 2019, clarified the situation about the Project B. At the same time, the Respondent had reasonable doubts about the Claimant's creditworthiness. It is understandable that under such circumstances, the Respondent did not want to continue the negotiations on the amendment, including the revised Closing Period.

362   It was not the Respondent who *"had managed to find various ways to delay and obstruct the disbursement of Facility B, either by asking for various new documents or by avoiding the question of Facility B entirely"*.[156] The reality is that the non-Disbursement was due to the Claimant's own behaviour.

363   As a consequence, as of September 2018, the Claimant could no longer trust that the Respondent would issue an amendment which referred to Project B as amended in September 2018 (ORC 2823B) which was of no further relevance.[157]

364   In July 2019, the Facility Agreement was still in force. After the original Closing Period and the Availability Period had expired, the Parties could still have agreed to an amendment in order to agree on a new Closing Period related to new equipment and a revised aggregate amount for the loan. Until July 2019, the Respondent clearly was open to agree to an amendment of the Facility Agreement.

365   However, the amendment of the Agreement, including the start of the new Closing Period, would have made sense only once the Claimant and SML had agreed on the equipment which should replace 2.770A.

366   The Claimant claims that *"[t]here is a reason why no other purchase agreements from SML, other than the ORC 2823B which formed the basis of amending Facility B, were ever provided to Respondent – because Claimant did not wish to amend it again. The only signed and effected purchase agreement that Claimant ever wanted to have under Facility B and under which it wanted to amend Facility B is ORC 2823B. Everything else, if ever mentioned, was simply an idea and not a binding agreement nor a cancellation of the old one"*.[158]

---

[156] PHB Claimant, para. 13.

[157] PHB Claimant, para. 116.

[158] PHB Claimant, paras. 31-32.

367   Based on the above record, the Sole Arbitrator is convinced that this submission is wrong. Contrary to its allegations, the Claimant abandoned Project B as amended and wished to yet again amend the purchase agreement and therefore also wished to change the Facility Agreement in order to take into account the reamended purchase agreement.

368   The Claimant claims that any discussions with SML were *"concluded once ORC 2823B was signed"* and that *"[e]verything that may have come after was mere talk and proposals which never came into effect, as conceded by Respondent's own Expert Witness."*[159]

369   When one has a close look at the quoted passages of the Hearing transcript, Prof. Zöchling-Jud answered the question of the Claimant's counsel whether discussions on a revised purchase agreement would "torpedo" the Agreement. The question was not related to ORC 2823 specifically but related to a theoretical example provided by the Claimant's counsel. Prof. Zöchling-Jud replied *"This I would not say. As long as everything is done within the closing period. And if there is no changement of the original purchase agreement, the purchase 2 as you said as an example, then they can buy five machines as long as machine 1 that has been agreed among all the parties, the bilateral parties, then, of course there is no doubt that the obligations of the Credit Facility Agreement are still there"*.[160]

370   Prof. Zöchling-Jud therefore merely confirmed that the Project under the Agreement could change, however the relevant Conditions Precedent for the agreed equipment must be fulfilled within the Closing Period. She also confirmed that as long as no change of an agreed equipment was agreed upon, the original equipment was subject matter of the Facility Agreement. In the present case, the contemplated change was made far outside the Closing Period and implied an increase of the aggregate amount, and therefore required a change of the Agreement, which, in the eyes of the Sole Arbitrator, never occurred. The Respondent had not excluded the possibility to agree to formalise the change, as required by the terms of the Agreement, however the Claimant, by its own behaviour, rendered this change obsolete.

371   The Claimant therefore also cannot rely on the *"doctrine of contradictory behaviour"*.[161] Until no amendment was signed, the Respondent was free to decide not to conclude the amendment. The only remedy left would be *culpa in contrahendo* which does not apply in the present case.

---

[159] PHB Claimant, para. 66.

[160] TR Zöchling-Jud, 4444 et seq.

[161] SoC, paras. 67 et seq.

372    Finally, the Claimant alleges that the Respondent breached its covenants of
       good faith and fair dealing when it failed to inform Claimant in a timely
       manner that it was no longer interested in pursuing the transaction under
       Facility B.[162] Given the Claimant's behaviour about the change of equipment,
       the delay in payments with regard to Facility A and uncertainty with regard to
       the accounting of the Loan A, the Respondent's refusal to amend the Facility
       Agreement was a perfectly understandable business decision. It was certainly
       not any act against good faith and fair dealing. The Respondent has also not
       given any grounds to the Claimant to let it believe that it would agree to the
       amendment. The Respondent cannot mislead the Claimant on something
       which the Claimant itself had to decide.

373    The fact that the Respondent failed to provide the Claimant with the promised
       amendment, any term sheet requested by the Claimant, or the adequate letter
       of notice, as it had done for Facility A, was therefore also not a breach of the
       Agreement. The Claimant could not rely on the conclusion of the amendment.
       The Respondent could not deliver any term sheet without knowing the
       detailed figures of Facility B. And the obligation to inform is contained only
       with regard to the fulfilment of the Initial conditions precedent (Clause 4.1),
       not for the case when those conditions or the Conditions Precedent are not
       fulfilled.

374    To conclude, the Respondent is not liable for the fact that the Disbursement
       for Facility B did not occur in July 2019 and, by not making loan B available,
       has not unlawfully terminated or breached the Agreement.

375    In July 2019, the Respondent had full discretion to amend the Agreement, to
       extend the Closing Period which, under the specific circumstances, would
       have triggered a new Availability Period. However, based on the Claimant's
       behaviour and the surrounding circumstances, the Respondent simply took the
       business decision to terminate the discussions for making any amendments, a
       decision which was in line with the terms of the Agreement.

### 7.2.2    The Respondent has not breached any confidentiality obligations

#### 7.2.2.1    The Parties' positions

376    The **Claimant** claims that the Respondent breached the duty of confidentiality
       under Clause 29.1 of the Agreement and section 38 Austrian Banking Act by
       sharing information with SML regarding repayment of instalments under the
       Agreement. The Respondent had no right to share any information regarding

---

[162] SoC, paras. 106 et seq.; PHB Claimant, paras. 117 et seq.

the repayment of instalments with SML.[163] The Claimant considers that this information does not fall within the definition of Transaction Document or Ancillary Documents under the Agreement and as such does not fall under the exemption contained within Clause 29.1 (b) of the Agreement.[164] This violation of confidentiality has caused SML's technicians to refuse to provide technical assistance and they have threatened to halt all future services to the Claimant, citing the payment wiring issues. This development caused the Claimant to suffer losses due to the lack of technical assistance afforded to it.[165]

377    The **Respondent** states that the disclosure of information concerning the default of the Claimant in payments of the credit rates was not a breach of any obligations by the Respondent. Clause 29.1 (b) of the Agreement contains an explicit and written waiver of banking secrecy. Under the Exporter Undertaking, which is listed as Transaction Document in the Agreement, the Respondent was obliged to inform SML of defaults in payment regarding the Agreement. The Disbursement of Facility B was dependent on the timely payments by the Claimant.[166]

378    The Claimant has not shown any damage related to the alleged breach of confidentiality and has no legal interest in the claimed declaratory relief.[167]

### 7.2.2.2    Considerations by the Sole Arbitrator

379    In email communications between SML and the Claimant of April 2019, SML referred to information received by the Respondent with regard to late payments of the first instalment under Facility A.[168] The Claimant considers that when providing this information to SML, the Respondent violated its duty of confidentiality.

380    Before dealing with the alleged breach of confidentiality, the Sole Arbitrator would like to point out that the Claimant had informed SML on 21 March 2019 already about the Claimant's general payment issues. The Claimant asked SML for leave to pay only a 2.5% down payment *"for the new cast line 3mts"* because they had to pay *"first payments to Unicredit"* and the down payment was therefore a real *"challenge"* for them.[169] SML immediately, on

---

[163] SoC, para. 93.

[164] SoC, paras. 44, 91 et seq.; Reply, para. 73 et seq.; PHB Claimant, paras. 106-116.

[165] SoC, paras. 44, 91-97.

[166] Answer, paras. 45 et seq., 163-180; Answer to Reply, paras. 84, 371-377.

[167] Answer to Reply, paras. 84 et seq., 378-383; PHB Respondent, paras. 285-291.

[168] C-31; C32.

[169] R-60.

26 March 2019, replied that it would be important that SML pays the first instalment to the Respondent, which was due on 27 March, *"otherwise this would jeopardise the financing of the new line".*[170] Therefore, SML was well aware of payment concerns on the Claimant's end before the Respondent communicated the delay with payments to SML in April 2019.

381    In any event, no breach of confidentiality occurred:

382    Clause 29.1 (a) of the Agreement provides that *"[a]ll information relating to any of the Transaction Documents and/or Ancillary Documents, whether in written or oral form, shall be confidential[…]".*

383    Pursuant to Clause 29.1 (b), *"**The Lender** may disclose any information **relating to any of the Transaction Documents and/or Ancillary Documents** to OeKB and/or the **Exporter**, the Importer and their respective directors, employees, agents and advisers and shall use reasonable efforts to procure that such persons treat the information disclosed as confidential to the extents set out in Clause 29.1 (a)."*

384    Therefore, under the Agreement, the Respondent could share with the Exporter (SML) **any information relating to** any Transaction Documents **and/or Ancillary Documents**. Under the Agreement, *Transaction Documents* are *Finance Documents* (the Agreement, any Promissory Note). *Ancillary Documents* are the **Exporter Documents** or any OeKB Documents. Exporter Documents means the **Exporter Undertaking**. The Exporter Undertaking means *"a written undertaking to be given on or about the date of this Agreement by the Exporter to the Lender."* The "Exporter", namely SML, was hence expressly mentioned in the provisions on confidentiality and was therefore considered as a "third party" which should be treated differently than any other "third party."

385    The Respondent bases its defence on the fact that the Agreement (which is a *"Transaction Document"* included in the exception rule of Clause 29.1 (b), and *"clearly includes any information on the repayment of the loans provided under the Facility Agreement."*[171] In particular, the Agreement refers to the Exporter Undertaking which contains the Respondent's obligation to inform the Claimant on default in payments.*"*[172] The Respondent relies on the Respondent's expert testimony in this regard which was not challenged by the Claimant.

---

[170] R-60.

[171] Answer to Reply, para. 374.

[172] Answer to Reply, paras. 372 et seq.

386   The Sole Arbitrator believes that the rule contained in Clause 29.1 (b) which not only refers to "Transaction Document" but also to "Ancillary Documents" allowed the Respondent to share with SML any information on the repayment of the loans provided under the Facility Agreement:

387   Under the Agreement, the Respondent was allowed to share with SML any **information relating to the Exporter Undertaking which is an Ancillary Document** under the Agreement. As pointed out by the Respondent, under section 5.5 of the Exporter Undertaking, the Respondent was obliged to inform SML of all *significant developments* in connection with the Agreement. The Exporter Undertaking expressly lists *"delay of payment"* by the Claimant as one of such *"significant developments"* of which the Respondent must inform SML without delay. As a consequence, in the view of the Sole Arbitrator, any delay of payment by the Claimant with regard to Facility A or B which cumulated in instalment payments is relevant for the execution of the Exporter Undertaking (as providing such information is an obligation under such Undertaking) and as such must be qualified as "related to the Exporter Undertaking".

388   Given that the rule contained in Clause 29.1 (b) is an exemption to the confidentiality undertaking and information of delay of payment is covered by this exemption, the Respondent has not breached the duty of confidentiality under Clause 29.1 of the Agreement (or section 38 Austrian Banking Act) by sharing information with SML regarding (late) repayment of instalments under the Agreement. The Claimant has not established or explained why this information does not fall within the definition of Transaction Document or Ancillary Documents under the Agreement. The Claimant also has not established why the banking secrecy should prevail over the broad contractual terms which included an exception to the Respondent's confidentiality obligation.

389   This conclusion is also not contradicted by the report submitted by the Claimant's expert witness. The expert witness nominated by the Claimant, Prof. Kalss, in her report, dealt with the confidentiality issue, however had not mentioned Clause 29.[173] She explained that she had understood that *"the exporter did not want to be confronted or faced with any facts related to funding"* and that based on this situation, the confidentiality clause was not applied and this was the reason why she had not mentioned Clause 29 in her

---

[173] CEWS-1, pp. 8 et seq.

expert report.[174] She confirmed that she had not seen the exporter undertaking.[175]

390    Given that no violation of any confidentiality obligations occurred, the question whether this violation of confidentiality caused the Claimant to suffer losses due to the lack of technical assistance afforded to it does not have to be further examined. The information clearly was given to SML in order to comply with the contractual obligation in the Exporter Undertaking and not to "harm" the Claimant. § 1295(2) of the Austrian Civil Code is therefore not of relevance under the circumstances.

### 7.2.3    The Respondent is not otherwise liable for damages

### 7.2.3.1    The Parties' positions

391    The **Claimant** claims that the delay in signing the Agreement was due to the Respondent's mishandling of the KYC process which caused damages.[176] The Claimant ensured that the Respondent would receive all the KYC relevant requested documentation and the Claimant paid in a timely fashion all the necessary fees prerequisite to the Disbursement of the loans under the Agreement, mainly the administrative fee, management fee, handling fee and OeKB premium fee.[177] Nevertheless the Respondent delayed matters and caused a delay in disbursing the loan for Facility A which had an impact on the production of designs by SML both for Project A and B. SML was therefore running late under the original delivery schedule of the supply contracts which in turn left the Claimant with no production and unsatisfied obligations to third parties.[178]

392    The Respondent has wrongfully interfered with the Claimant's contractual relations with third parties. The Respondent informed SML about the Claimant's partial payments under the first repayment instalment. Upon such notification, SML's technical team refused to cooperate with the Claimant any further and refused to perform their duties, causing the Claimant to suffer losses, due to the Respondent's involvement and their lack of assistance. The Claimant refers to § 1295(2) of the Austrian Civil Code.[179]

---

[174] TR Kalss, 3728-3733.

[175] TR Kalss, 3746.

[176] SoC, paras. 28 et seq.;Reply, para. 32, PHB Claimant, paras. 76-84.

[177] SoC, paras. 30 et seq.

[178] SoC, paras. 35 et seq.

[179] SoC, paras. 98 et seq.

393    The **Respondent** argues that it did not delay the KYC process which was a requirement to conclude the Agreement. It was the Claimant who delayed the process when not providing the relevant documents.[180] The Respondent could communicate payment issues to SML.

394    The Respondent claims that there is no legal basis for the reimbursement of fees and premiums. The Disbursement conditions for Facility B were not met and no damages related to the contractual penalties are due.[181]

### 7.2.3.2    Considerations by the Sole Arbitrator

395    The Claimant claims that the delay in signing the Agreement between October 2017 and January 2018 by the Respondent was due to the Respondent's mishandling of the KYC process.[182] Due to the delay in disbursing the loan for Facility A, which was *inter alia* caused by the mismanagement of the KYC check, SML did not start with the production of design both for Project A and Project B, and thus SML was now running late under the original delivery schedule of the supply contracts which in turn left the Claimant with no production and unsatisfied obligations to third parties.[183]

396    The Sole Arbitrator considers that the duration of the KYC check was one of the reasons why the Agreement was signed by the Respondent only in January 2018. This was explained by Mr. Riedl, whose witness statement remained unchallenged in that regard.[184] The Sole Arbitrator is not able to appreciate if under the circumstances, the KYC could have been executed quicker. However, as Mr. Hodosi testified, the conduct of the KYC check is a requirement to be fulfilled due to regulations by the Austrian regulatory FMA ("*Finanzmarktaufsicht*") and according to the Austrian money laundering regulations which are rooted in mandatory EU law.[185] The KYC conduct of the KYC check was therefore not a breach of the Agreement. More importantly, the late signature of the Agreement cannot have caused a delay in delivery of Project A. The Purchase Agreements for Project A (ORC 2763 and ORC 2762) were signed on 14 and 16 June 2016 and had a delivery period of eight months. The record shows that the down payment was made on 10 January 2017.[186] The delay in the delivery was caused by technical reasons and because SML had not started certain works without having approved

---

[180] Answer to Reply, paras. 209-215.

[181] Answer, paras. 183-201.

[182] SoC, para. 28.

[183] SoC, paras 35 et seq.; PHB Respondent, paras. 76 et seq.

[184] RWS-8 (Riedl), paras 35 et seq.

[185] RWS-9 (Hodosi), paras. 13 et seq.

[186] C-14.

financing. However, already in March 2017, SML confirmed that *"Now as the financing is approved, we have started with the electrical UL design work and corresponding inquiries where it came up that we have to expect delays."*[187] Therefore, SML had not conditioned the design work on the signed Agreement. As a consequence, the delay in the signature of the Respondent between October 2017 and January 2018 of three months and the alleged mishandling of the KYC process, cannot have been the source of delay of the start of the production of Project A as suggested by the Claimant.[188]

397    The Respondent also cannot be made liable for having informed SML about payment issues by the Claimant, who acted in conformity with the terms of the Agreement which was therefore certainly not in violation of any good faith principles (see paras. 382 et seq. above). The Sole Arbitrator is also not convinced of the existence of a causal link between the Respondent's actions and SML's alleged refusal to perform in the relationship between the Claimant and SML.

### 7.3    Breach of the terms of the Export Facility Agreement by the Claimant: The Respondent's counterclaim

#### 7.3.1    Introduction

398    In its counterclaim, the Counter-Claimant requests that the Counter-Respondent repays the outstanding loan made under Facility A including interest.

399    In this section, the Sole Arbitrator will consider whether any payments are due by the Counter-Respondent under the Agreement for Facility A.

#### 7.3.2    The Parties positions

400    The **Counter-Claimant** claims that both Tranches of Facility A were disbursed in full.[189] The first instalment was paid by the Counter-Respondent belatedly after two months, after several reminders. The second instalment which became due on 27 September 2019 (with interest due on 30 September) was not paid by the Counter-Respondent. Further interest became due on 30 September 2019 but was not paid.[190]

---

[187] C-14.

[188] SoC, paras. 28, 35.

[189] Answer, para. 237; Answer to Reply, paras. 113, 397.

[190] Answer, para. 242; Answer to Reply, paras. 397 et seq.

401  A payment notification referring to an event of default (due payments) was sent to the Counter-Respondent's counsel on 19 December 2020.[191] Based on the Counter-Respondent's default in payment, the Counter-Claimant unilaterally terminated the Agreement on 21 January 2020, based on Clause 20.13, and requested the payment of the outstanding amounts due for Facility A.[192] By letter of 21 January 2020, the Counter-Claimant declared all Loans outstanding and cancelled Facility A with immediate effect, based on Clause 20.13 (a) of the Facility Agreement.[193]

402  The Counter-Claimant is claiming the outstanding loans and interest as summarised under paras. 130 et seq.; 161 above.

403  The Counter-Claimant bases its claim on Clauses 6.1, 8.1, 8.3 and 20 of the Agreement. The requirements for demanding repayment of Facility A, including interest, are fulfilled.[194] The Event of Default was permanent.[195]

404  The Counter-Respondent's obligations under Facility A were not suspended and the doctrine of impossibility after the fact ("*nachträgliche Unmöglichkeit*") does not apply. § 920 ABGB is of no relevance. The loan under Facility A is a contract separate from the Agreement. Even if the doctrine of impossibility were to apply, this would have no impact on the loan under Facility A.[196] Hence, the Counter-Claimant was well within its rights to accelerate Facility A and demand all outstanding amounts, which it did on 21 February 2020.[197]

405  The **Counter-Respondent** invokes § 920 ABGB pursuant to which the debtor is entitled to avoid the contract, even if he is in fact able to perform, but performance is so burdensome for him that he cannot be reasonably expected to perform.[198] The Counter-Respondent considers that with the Counter-Claimant's unlawful refusal to disburse the loan under Facility B and the Counter-Claimant's subsequent unilateral termination of the Agreement, the Counter-Respondent is excused from its performance as it is evident that partial performance in form of only the loan under Facility A is of no interest to the Counter-Respondent, due to the fact that the Counter-Respondent cannot fulfil its contractual obligations with only the loan under Facility A and

---

[191] Answer, para. 252 (where the Respondent mistakenly referred to 19 December 2020).

[192] Answer, paras. 238, 253.

[193] Answer, para. 252; Answer to Reply, para. 399.

[194] Answer to Reply, paras. 394-410.

[195] Answer, para. 256.

[196] Answer to Reply, paras. 394-426; PHB Respondent, paras. 292-301.

[197] PHB Respondent, para. 300.

[198] Reply, paras. 113 et seq.

the understanding between the Parties was always the Disbursement of the full loan amount comprised of both Facility A and B.

406    After the termination, the Counter-Respondent's payment obligations have been suspended.[199] The Counter-Respondent cannot be expected to accept a unilateral decision by the Counter-Claimant to terminate the loan under Facility B, as this has formed the basis of the Parties' understanding from the beginning of the Parties' relationship. The Counter-Respondent rejects the Counter-Claimant's defence based on the theory of separation. The Counter-Claimant made the Counter-Respondent believe that the loan under Facility B would be disbursed. The Counter-Respondent had to pay commitment fees and other fees. It would be contrary to the principle of good faith if a customer is supposed to pay fees for a loan that the Counter-Claimant can simply decide not to disburse arbitrarily. Even more after the *promesse* had been issued. The Counter-Claimant did not provide a separate contract when all Conditions Precedent were fulfilled. The Counter-Respondent was well aware for which purpose the machines were ordered.[200]

### 7.3.3    Considerations by the Sole Arbitrator

407    The Sole Arbitrator considers that, the Agreement and the individual loan agreements regarding Facility A and B must be distinguished (see paras. 253 et seq. above).

408    The Agreement had not been unlawfully breached or terminated in July 2019 by the Counter-Claimant (see Section 7.2 above). Therefore, as of July 2019, the Agreement and the Loan A continued to exist, although the individual credit agreement regarding Facility B was no longer available and never came into existence.

409    Under these circumstances, it cannot be argued that once Facility B was no longer available (which was due to the Counter-Respondent's own behaviour), the Counter-Respondent's obligations were suspended regarding Facility A. This would lead to an absurd result: The Counter-Respondent could obtain a loan for Facility A and, by simply not fulfilling the Conditions Precedent for Facility B, would be freed of all its obligations of repayment under Facility A.

410    Therefore, the Counter-Respondent's arguments based on § 920 ABGB are not convincing and must be rejected. Given that the loan agreement regarding Facility A was fulfilled by the Counter-Claimant and the Counter-Respondent

---

[199] Reply, para. 116.

[200] Reply, paras. 113 et seq.; PHB Claimant, paras. 189-200.

has to repay Loan A independently of Facility B, the Counter-Respondent's obligation to pay back Loan A is not suspended. Furthermore, the Counter-Respondent could make use of the equipment financed under Loan A. The Sole Arbitrator is convinced that it was the Counter-Respondent itself and not the Counter-Claimant who caused the non-Disbursement of Facility B due to the delay in finding a final agreement with SML. The Counter-Claimant has therefore not *"simply decided not to disburse arbitrarily"* but took the business decision not to continue negotiations for the amendment of the Agreement which were triggered by the Counter-Respondent's choice to abandon Project B. This business decision was in line with the Agreement.

411    The payments claimed by the Counter-Claimant under the counterclaim are due.

412    In is not contested that the Disbursement for Loan A was made for Tranche 1 for an amount of EUR 100,630.65 in March 2018[201] and for Tranche 2 for an amount of EUR 3,107,974.00 in April 2018[202] and, for an amount of EUR 134,606.00 in October 2018.[203]

413    Regarding the repayment of loans which had been disbursed and non-payment of instalments, the Agreement provides as follows:

414    Pursuant to Clause 20.13 (a) and (b), on and at any time after the occurrence of an Event of Default which is continuing, the Lender may by notice to the Borrower cancel the Facility and declare that all or part of the loans, together with accrued interest, and all other amounts accrued or outstanding under all or any of the Finance Documents be immediately due and payable, whereupon they shall become immediately due and payable.

415    Pursuant to Clause 20.1, non-payment by the Borrower on the due date of any amount payable pursuant to a Finance Document is an Event of Default.

416    Pursuant to Clause 6.1, Loan A had to be repaid in ten semi-annual and equal instalments, whereas the first instalment was due within six months as of the date of the Transport Document relating to Facility A. It was not contested that those documents were sent to the Counter-Claimant on 27 September 2018 and that therefore the first instalment of EUR 334,321.07 became due on 27 March 2019.[204] It is also not contested that this first instalment was eventually paid, however with some delay.

---

[201] R-54.

[202] R-55.

[203] R-56.

[204] R-14.

417    As the instalments had to be paid every six months, the second instalment became due on 27 September 2019. The Counter-Respondent was informed about the instalment due of EUR 334,321.07 and the related due date on 27 August 2019.[205]

418    This second instalment was not paid by the Counter-Respondent. A payment notification referring to an Event of Default (due payments) was sent to the Counter-Respondent's counsel on 19 December 2019.[206]

419    As the outstanding second instalment had not been paid on the due date of 27 September 2019, an Event of Default occurred pursuant to Clause 20.1. Therefore, the Counter-Claimant had the right to accelerate the Loan on 21 January 2020 based on Clause 20.13 (a) and (b) of the Agreement, with the effect that the entire loan amount became immediately due and payable. The outstanding amounts and interest as of 21 January 2020 were summarised in the Counter-Claimant's Letter of Notice.[207]

420    At the date of termination of the Agreement (21 January 2020), the amount of **EUR 3,035,348.44** (outstanding principal amount of **EUR 3,008,889.5** for the second to tenth instalment plus interest) was due.[208] Those amounts still remain unpaid.

421    Although the Counter-Respondent contested that those amounts were due, the Counter-Respondent has not contested that the method of calculation of the amounts claimed, including interest, was not correct. The Sole Arbitrator finds the calculation of default interest as summarised in the notice letter of 21 January 2020[209] conclusive and in line with the terms of the Agreement.

422    The default interest rate was calculated according to Clause 8.3 which provides as follows:

423    With regard to interest, Clause 8.3 provides as follows:

> "**8.3 Default interest**
>
> (a)  *If the Borrower fails to pay any amount payable by it under a Finance Document on its due date, interest shall accrue on the overdue amount from the due date up to the date of actual payment (both before and after judgment) at a rate which is:*

---

[205] R-27.

[206] R-30.

[207] R-31.

[208] R-31.

[209] R-31.

> (i)   in the case where the overdue amount is a Loan, the
>        aggregate of two per cent and the rate of interest which
>        would be otherwise payable under the Finance Document in
>        respect of such Loan; or
>
> (ii)  in the case where the overdue amount is not a Loan, the
>        aggregate of (A) two per cent (B) the Margin (C) the rate of
>        interest per annum charged by the Lender for funding such
>        amount from whatever source it may reasonably select, as
>        determined by the Lender at the time and (D) the Mandatory
>        Cost (if any),
>
> for successive Interest Periods, each of a duration selected by the
> Lender (acting reasonably) provided however that if the
> component of such rate of interest referred to in paragraph
> (b)(C) above is below zero per centum per annum, such
> component shall be considered to be zero per centum per annum.
>
> (b)   Any interest accruing under this Clause 8.3 shall be immediately
>        payable by the Borrower on demand by the Lender."

424   Under Clauses 8.1, 8.3 (a) (i) and 9.3, default interest for **unpaid loan amounts** is the following:

425   The aggregate of **two percent and the rate of interest which would be otherwise payable under the Finance Document (Clause 8.3(a)(i))**.

426   Pursuant to Clause 8.1, the rate of interest *"which would be otherwise payable under the Finance Document"* is the percentage rate per annum which is the aggregate of the applicable (a) EURIBOR; (b) OeKB Margin; (c) Margin; and (d) Mandatory Cost, if any. As explained by the Counter-Claimant, and not contested by the Counter-Respondent, the EURIBOR for the entire duration of the Agreement was negative and continues to be negative. The Margin, pursuant to the definition in the Agreement, was 0.4% p.a. The record shows that the OeKB Margin for Facility A was 0.54%.[210] No mandatory costs were claimed by the Counter-Claimant. Therefore, the interest rate for loan payments was and continues to be (as long as EURBOR is negative) 0.94%.

427   Pursuant to Clause 8.3 (a)(i), the default rate is calculated by adding 2% to this and hence was and currently is 2.94% p.a. This was reflected as such in the letter of 21 January 2020. The same methodology was applied by the Counter-Claimant in the counterclaim and in the Answer to Reply.

---

[210] C-13, point 7.

428    For overdue **amounts which are not loans**, 2% must be added to the Margin
       of 0.4%. This is stipulated in Clause 8.3 (a) (ii) of the Agreement. Hence the
       default interest rate for overdue amounts that are not loans is currently 2.4%.

429    Based on this method of calculation applied by the Counter-Claimant, from
       21 January 2020 until the date of submission of the counterclaim of
       31 January 2020, default interest of **EUR 2,474.80** had accrued pursuant to
       Clause 8.3 of the Agreement. Between the date of the counterclaim and the
       date of the Answer to Reply on 30 June 2020 additional interest of
       **EUR 37,369.48** had, pursuant to the Counter-Claimant's calculation,
       incurred. Therefore, as of 30 June 2020, the total outstanding amount claimed
       was **EUR 3,075,192.72**. Out of this amount **EUR 3,008,889.59 relate to the
       total principal amount due, the difference, EUR 66,303.14, refer to
       interest.** Those calculations of unpaid amounts due remained unchallenged
       and, in the view of the Sole Arbitrator, have been made in conformity with the
       above outlined provisions on interest contained in the Agreement.

430    Applying the above interest calculation as of 1 July 2020 to the amounts due
       under the Agreement, the following must apply:

431    The total outstanding amount as per 30 June 2020, including interest due
       pursuant to Clause 8.3, was **EUR 3,075,192.72**.

432    On the outstanding loan amount of **EUR 3,008,889.59,** interest of 2.94% p.a.
       (2% plus 0,54% plus 0,4%, as long as EURIBOR is negative) is due as of 1
       July 2020 until the date of payment of the capital.

433    For the claimed amounts that are not loans, i.e. EUR 66,303.14, the default
       interest rate of 2.4% (2% plus Margin of 0.4%) p.a. as of 1 July 2020 applies.

434    The Agreement grants the Counter-Claimant under Clause 8.3(a) last
       paragraph the right to select the Interest Period for default interest for
       *"successive Interest Periods, each of a duration selected by the Lender",* if
       *"the rate of interest per annum charged by the Lender for funding such
       amount from whatever source it may reasonably select"* is above zero and as
       long as the Counter-Claimant is acting reasonably. As Mr. Maltz explained,
       the monthly EURIBOR reflects the best way of the Counter-Claimant to
       refinance itself for outstanding non loan amounts.[211] Given that the definition
       of Interest Period under Clause 1.1 refers to Clause 8.3 in general (*"Default
       interest"*) and *"the rate of interest which would be otherwise payable"* in
       respect of loan amounts also depends on EURIBOR (Clause 8.1 (a), the Sole
       Arbitrator considers that the last paragraph of Clause 8.3 (a) applies to

---

[211] RWS-10, para. 55.

outstanding loan amounts and outstanding amounts that are not loan amounts. The Counter-Respondent has not pleaded the contrary. Therefore, as long as EURIBOR is positive, the Counter-Claimant can choose the successive Interest Periods for Default interest which needs to be reflected in the present decision.

435   In the Answer, the Counter-Claimant selected the Interest Period to be six months for overdue loans (given that the ordinary Interest Period under the Agreement was six months (see Clause 9.1 (a) (i)), and the Interest Period of one month for overdue amounts that are not loans. The Counter-Respondent has not claimed that this was not a reasonable choice. The Sole Arbitrator finds the (unchallenged) explanations given by the witness Mr. Maltz conclusive.[212]

436   If the EURIBOR therefore becomes positive in the future before payment of the claimed amounts, the EURIBOR (as defined by reference to the Screen Rate for the applicable Interest Period) applicable for overdue loans is therefore six months EURIBOR. The EURIBOR applicable for overdue amounts that are not loans is one-month EURIBOR.

437   The Sole Arbitrator notes that in its Post-Hearing Brief,[213] the Counter-Claimant, for the counterclaim, fully maintained the prayers for relief as contained in its Answer to Reply of 30 June 2020.[214] Therefore, no additional or different amounts were claimed than those reflected in the prayer of 30 June 2020. Based on the above conclusions, that prayer was to be granted accordingly.

438   To conclude, the Counter-Respondent has breached the terms of the Agreement by failure of re-payment of the amounts received under Loan A and is liable to pay the Counter-Claimant all outstanding amounts due under Facility A plus interest, as calculated in the present section.

## 8   CONCLUSION

439   To conclude, the Respondent has not unlawfully terminated or otherwise breached the Agreement. The Respondent's decision in July 2019 not to further disburse Facility B Loan was taken in compliance with the terms of the Agreement and Austrian law. There is therefore also no legal basis to claim the reimbursement of fees paid under the Facility Agreement, any payment of amounts under Facility B, penalties or loss profit. The fees paid were due and

---

[212] RWS-10, paras. 52-57.

[213] PHB Respondent, para. 302.

[214] Answer to Reply, para. 426.

non-refundable (Clause 10) under the Facility Agreement, independently of the disbursement of Facility B. For the loan amount for Facility B, the Conditions Precedent were not fulfilled. The Respondent has not violated any confidentiality obligations. Therefore, the Claimant's claims for damages and all other claims are not justified and must be rejected.

440    The Respondent has disbursed the Facility A Loan. The Claimant has never repaid the loan amount in its entirety and therefore breached the Agreement. The Sole Arbitrator therefore condemns the Claimant and Counter-Respondent to pay the Respondent and Counter-Claimant the outstanding loan amounts due under the Agreement including default interest.

## 9     COSTS

### 9.1     The Claimant's cost submission and comments on allocation on costs

441    On 24 November 2020 and 3 December 2020, the Claimant submitted its costs for a total of EUR 408,050.00, including advance on costs paid to VIAC and registration fees. In its email of 19 February 2021, the Claimant confirmed that the total amount of costs also referred to expenses incurred.

442    In its Post-Hearing Brief, the Claimant submitted that the Claimant should in no event be liable for costs and expenses associated with Respondent's filing of the Request for Security for Costs, as this request was rejected by the Arbitral Tribunal.

443    The Claimant asserts the same position with regards to the Respondent's Document Production Request, particularly with regards to those requests that were rejected by the Arbitral Tribunal.

444    The Claimant also objects to costs related to unscheduled submissions, mainly the Respondent's Additional Submission to Claimant's Witness Statement as this submission had no bearings on the proceedings and deals with a request that has already been decided upon by the Arbitral Tribunal.

445    The Claimant further objects to costs for face shields as these were not necessary, proven to be ineffective and not used.

### 9.2     The Respondent's costs submission

446    In its submission dated 14 November 2020, the Respondent submitted an overview of the costs incurred by the Respondent in connection with this arbitration.

447   The invoices paid to the Respondent's counsel on record amounted to EUR 524,353.60; expenses (which included costs for written expert reports and fees of legal counsel in Mexico) amounted, at the date of the cost submission, to EUR 264,078.24. In its letter of 22 February 2021, the Respondent clarified the details of all expenses claimed and mentioned that expenses of EUR 4,025.07 which related to the Claimant's share in the costs of conducting the examination of witnesses in Mexico City has to be deducted from the amount claimed for expenses which now is EUR 260,053.17

448   The lump sum for internal costs amounts to EUR 65,493.50. This lumpsum is calculated based on the estimated minimum time spent by the Respondent's employees in connection with this arbitration proceedings and the average hourly rates that represent the actual costs for these working hours (excluding any profits margin) as it is also used for services rendered to other entities of the Respondent's group.

449   In its Post-Hearing Brief, with regard to allocation of costs, the Respondent relied on § 609 ABGB and Article 38 Vienna Rules and requests that the Sole Arbitrator, when allocating costs, notes that the outcome of the proceedings shall be taken into consideration, but also the conduct of the Parties and their representatives.

450   All costs related with these proceedings shall be borne by the Claimant.

451   Even if the Arbitral Tribunal was to grant one or more of the Claimant's requests on the merits with the result that the Respondent's request for relief would not be upheld in their entirety, then the Claimant should still bear the costs for parts of the proceedings as this is warranted by the Claimant's conduct.

452   In particular, the Claimant shall bear the costs incurred for the Request for Security for Costs. Also, during Document Production, the Claimant unnecessarily delayed the proceedings and augmented expenses.

453   The Respondent requests that, in case the Arbitral Tribunal grants all of the Respondent's requests for relief and upholds the Respondent's counterclaim, then all costs of this arbitration shall be borne by the Claimant. Even in case the Claimant was (partially) successful on the merits of this dispute, it shall still bear the costs for specific parts of the proceedings.

### 9.3   The Parties' positions on the cost submissions

454   On 24 November 2020, **the Claimant** objected to the Respondent's Comments on the Allocation of Costs.

455   It is the prevailing view that Article 38(2) Vienna Rules supersedes § 609(1)
      ZPO in its entirety, meaning that the outcome of the proceedings is not a
      mandatory criterion. This leaves sufficient flexibility to the Arbitral Tribunal
      to take into account different international principles of reimbursement of
      costs.

456   Although the recovery of costs by the successful party is the starting point,
      additional factors that need to be considered are, for instance, bad faith of a
      party or unsubstantiated fraud allegations. The Respondent has made many of
      those. Apart from its unsubstantiated and untrue allegations of collusion, the
      Respondent also claimed that a member of the Claimant's counsel's team was
      making false assertions in its witness statement. The Respondent also
      purposeful delayed these proceedings.

457   The Claimant wishes to remind the Respondent that its Request for Security
      for Costs was rejected. Such a decision is a clear indication to the Respondent
      that its request was not warranted at all. As such, the Claimant should in no
      event be liable for the costs and expenses associated with the Respondent's
      meritless filings.

458   During the Respondent's Document Production Request, the Claimant has
      supplied the Respondent with every single one of the documents that the
      Claimant had in its possession at the time. The Claimant should not bear the
      costs of the Respondent's rejected document production requests.

459   In response to the Claimant's submission on costs allocation, **the Respondent**
      denies all of the Claimant's submissions on cost allocation and maintains that
      the Claimant should bear all costs related to this arbitration.

### 9.4    The Sole Arbitrator's considerations on costs

460   Pursuant to Article 38(1) Vienna Rules, when the proceedings are terminated,
      upon request of a party, the arbitral tribunal shall set forth, in the final award,
      the costs of the arbitration as determined by the Secretary General of VIAC
      pursuant to Article 44(1.1) Vienna Rules and determine the amount of the
      appropriate costs of the parties pursuant to Article 44(1.2) Vienna Rules, as
      well as other additional expenses pursuant to Article 44(1.3) Vienna Rules.
      Pursuant to Article 38(2) Vienna Rules, the arbitral tribunal shall also
      establish who will bear the costs of the proceedings.

461   The Claimant and Counter-Respondent has paid an advance on costs for the
      principal claim and the counterclaim to VIAC of EUR 144,000 (EUR 106,000
      as advance for the claim and EUR 38,000 for the counterclaim). The
      Respondent and Counter-Claimant has paid an advance on costs for the

counterclaim of EUR 144,000 (EUR 106,000 as advance for the claim and EUR 38,000 for the counterclaim). Each Party has paid a registration fee of EUR 1,500 for the claim and counterclaim respectively. This amount will be dealt with as expenses pursuant to Article 44(1.3) Vienna Rules, as both Parties requested the reimbursement of all costs and expenses.

462  Pursuant to Article 44(1.1) Vienna Rules, VIAC has fixed the administrative fees and the arbitrator's fees, together with the arbitrator's expenses as follows:



463  According to the Vienna Rules, the arbitral tribunal may decide on the costs in the manner it deems appropriate. Pursuant to Article 38(2) Vienna Rules, the conduct of the parties and their representatives and their contribution to the conduct of efficient and cost-effective proceedings may be taken into consideration by the arbitral tribunal in its decision on costs.

464  It can be left open whether Article 38(2) Vienna Rules supersedes the provision of § 609(1) ZPO in its entirety. In any event, the Sole Arbitrator considers that when deciding on costs pursuant to Article 38(2) Vienna Rules, the outcome of the proceedings, even if not a mandatory criterion, should be primarily taken into account.

465     In the present case, the Sole Arbitrator grants all of the Respondent's requests for relief, including the totality of the counterclaim and reject's all of the Claimant's claims. Therefore, all costs of this arbitration shall be borne by the Claimant, to the extent those costs are reasonable.

466     The Claimant must therefore bear the entirety of the arbitrator's fees and expenses, and the VIAC administrative costs and must reimburse the Respondent an amount of **EUR 128,518.36**.

467     Regarding the reasonableness of the Respondent's remaining costs and fees claimed, the following needs to be taken into account:

468     The fees of the Respondent's counsel are reasonable, as those are proportionate to the present proceedings. It is difficult to directly compare the Claimant's legal fees with the Respondent's fees because the Claimant's cost claim includes fees and expenses. However, the Respondent's fees are certainly higher that the Claimant's fees, however still justified. The size of the Respondent's team was not unreasonable and was proportionate to the complexity of the present matter. However, the size of the team has to be taken into account when deciding on the reasonableness of the Respondent's management costs.

469     With regard to the expenses claimed, the Sole Arbitrator considers that those are reasonable. Given the issues at stake, the expert reports submitted were necessary and reasonable, as was the engagement of Mexican counsel. The Sole Arbitrator however considers that in the present matter, internal costs of **EUR 65,493.50** are not reasonable. The Respondent explained that the Respondent's employees spent at minimum 550 hours on this matter and applied an average hourly rate between EUR 94.77 and EUR 126.48, based on "actual costs". Apart from the fact that the hourly rates seem to be on the high end for internal costs, the Sole Arbitrator does not think that granting the internal costs claimed would be justified under the current circumstances. The entire dispute relates to a contract drafted by the Respondent and to a rather straightforward contractual relationship, the very nature of which is part of the Respondent's core business. The Sole Arbitrator therefore does not think that the investment of 550 hours spent by the Respondent's employees was necessary or required to prepare the Respondent's case, considering also that the Respondent was represented in this arbitration by a team of two lead counsel with the assistance of other team members who charged their client EUR 524,353.60 for the services provided. The Sole Arbitrator therefore does not think that it would be reasonable to condemn the Claimant to pay the internal costs claimed.

470    The Sole Arbitrator does not agree with the Claimant that the Respondent acted in "bad faith" or made "many unsubstantiated fraud allegations" which shall have an impact on the cost allocation. Both Parties conducted the proceedings in a professional manner and none of the Parties is to be blamed for any misconduct. In particular, the Sole Arbitrator does not consider that the Respondent conducted the proceedings in a way that lead to unnecessary accumulation of costs.

471    The Request for Security for Costs was rejected at the time. Therefore, the costs related to this request should not be borne by the Claimant, any developments after the decision on security for costs should not be taken into account. The Respondent has identified **EUR 10,594.50 (fees)** (35% of EUR 30,270.00) and **EUR 13,669.55 (expenses)** (60% of EUR 22,782.58) for this step in the proceedings. It is therefore appropriate to deduct this amount from the overall costs to be paid by the Claimant for the Respondent's costs.

472    With regard to the Respondent's Document Production Request, the Sole Arbitrator considers that the cost allocation with regard to this procedural step, on which the Parties had agreed and on which the Respondent at least in part succeeded, should follow the overall cost allocation based on the final outcome of the proceedings.

473    The Respondent's additional submission to Claimant's Witness Statement was justified to the extent that the Respondent was finally granted an additional opportunity to comment on facts contained in the witness statements, as was outlined in PO6 (Annex 1).

474    The Sole Arbitrator does not see any other reason not to follow the "costs follow the event" principle in this arbitration.

475    Finally, the costs for face shields had been agreed upon by the Parties and were necessary for conducting the oral Hearing given the health situation and are therefore part of the reasonable expenses incurred by the Respondent in the present arbitration.

476    In addition, the Claimant must reimburse the Respondent the registration fee paid to VIAC of **EUR 1,500** (Article 44 (1.3) Vienna Rules).

477    Based on the above, the Sole Arbitrator decides on the costs to be borne by the Claimant as follows:

a)    The Claimant must bear the totality of the costs of the arbitration for the claim and the counterclaim as determined by the Secretary General of VIAC pursuant to Article 44(1.1) Vienna Rules (the administrative fees and the arbitrator's fees, together with the arbitrator's expenses), namely

**EUR 257,036.72**. Given that the Respondent has so far borne EUR 144,000.00 of these costs which have been paid to VIAC, considering further that the amount of EUR 15,481.64 will be reimbursed by VIAC to the Respondent, the Claimant must pay **EUR 128,518.36** to the Respondent.

b) In addition, the Claimant must pay to the Respondent the following total amount of fees, costs and expenses incurred by the Respondent: **EUR 761,642.72**.

## 10  AWARD

Based on the above, the Sole Arbitrator renders the following award:

1.  The Claimant's claims are dismissed in their entirety.

2.  The Claimant/Counter-Respondent is liable to pay the amount of **EUR 3,075,192.72** to the Respondent/Counter-Claimant within 14 days after service of this award.

3.  The Claimant/Counter-Respondent is liable to pay to the Respondent/Counter-Claimant default interest of the aggregation of (1) 2.4% p.a. and (2) the one month EURIBOR as applicable if EURIBOR is not below zero, out of the amount of EUR 66,303.14 from 1 July 2020 until the date of payment of the capital, as well as default interest of the aggregation of (1) 2.94% and (2) the six months EURIBOR as applicable if EURIBOR is not below zero, out of the amount of EUR 3,008,889.59 from 1 July 2020 until the date of payment of the capital.

4.  The Claimant/Counter-Respondent is liable to pay the Respondent/Counter-Claimant an amount of **EUR 890,161.08** for fees, expenses and costs related to this arbitration.

5.  All other claims and requests are rejected.


Place of arbitration: Vienna, Austria


Date:



The Sole Arbitrator




_____

Dr Werner Jahnel